EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| IRIS MELÉNDEZ VEGA<br><br>APELADA<br><br>v.<br><br>EL VOCERO DE PUERTO RICO, INC.;<br>CARIBE INTERNATIONAL NEWS<br>CORP.; GASPAR ROCA; JOSÉ A.<br>PURCELL Y OTROS<br><br>APELANTES<br>——————————<br>IRIS MELÉNDEZ VEGA<br><br>APELADA<br><br>v.<br><br>EL VOCERO DE PUERTO RICO, INC.<br>Y OTROS<br><br>MARTHA MARRERO DE RAMOS<br><br>APELANTE<br>——————————<br>IRIS MELÉNDEZ VEGA<br><br>PETICIONARIA<br><br>v.<br><br>EL VOCERO DE PUERTO RICO, INC.<br>Y OTROS<br><br>RECURRIDOS | Apelación<br>Certiorari<br><br>2013 TSPR 81<br><br>189 DPR ____ |

Número del Caso:      AC-2007-66
                     AC-2007-67
                     CC-2007-827


Fecha: 3 de julio de 2013


Tribunal de Apelaciones:

        Región Judicial de San Juan


AC-2007-66

Abogado de la parte Apelante:

        Lcdo. Francisco Ortiz Santini

Abogados de la parte Apelada:

        Lcda. Maricarmen Ramos De Szendrey
        Lcdo. José Álvarez González

**AC-2007-67**

Abogado de la parte Apelante:

      Lcdo. José J. Nazario de la Rosa

Abogada de la parte Apelada:

      Lcda. Maricarmen Ramos De Szendrey

**CC-2007-827**

Abogado de la Parte Peticionaria:

      Lcda. Maricarmen Ramos de Szendrey
      Lcdo. José Julián Álvarez González

Abogado de la Parte Recurrida:

      Lcdo. Miguel Negrón Matta

Materia: Daños y Perjuicios estándar de revisión en casos de difamación; Procedimiento Civil – Regla 64: sustitución de juez durante juicio.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| IRIS MELÉNDEZ VEGA<br><br>APELADA<br><br>v.<br><br>**EL VOCERO DE PUERTO RICO, INC.; CARIBE INTERNATIONAL NEWS CORP.; GASPAR ROCA; JOSÉ A. PURCELL Y OTROS**<br><br>APELANTES | Núm.: **AC-2007-0066**<br><br>Consolidado con | Apelación<br><br><br><br><br>Apelación |
| IRIS MELÉNDEZ VEGA<br><br>APELADA<br><br>v.<br><br>EL VOCERO DE PUERTO RICO, INC. Y OTROS<br><br>**MARTHA MARRERO DE RAMOS**<br><br>APELANTE | Núm.: **AC-2007-0067**<br><br>Consolidado con | |
| IRIS MELÉNDEZ VEGA<br><br>PETICIONARIA<br><br>v.<br><br>EL VOCERO DE PUERTO RICO, INC. Y OTROS<br><br>RECURRIDOS | Núm.: **CC-2007-0827** | *Certiorari* |

Opinión del Tribunal emitida por el Juez Asociado señor FELIBERTI CINTRÓN

En San Juan, Puerto Rico, a 3 de julio de 2013.

Hoy resolvemos por primera vez, desde la incorporación de New York Times Co. v. Sullivan, 376 U.S. 254 (1964), a nuestra doctrina de difamación, que un funcionario público probó adecuadamente que la prensa escrita obró con malicia real al publicar aseveraciones

difamatorias en su contra. Es decir, con un grave menosprecio de si lo divulgado era cierto o no.

De otra parte, a través del proceso judicial se generaron una serie de controversias novedosas de índole procesal y sustantiva que igualmente nos vimos precisados a atender en estos recursos. Así pues, aplicamos a la situación del presente caso los criterios establecidos en la Regla 64 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 64 (2001) (Regla 64 de Procedimiento Civil),[1] para la sustitución de un juez una vez comenzado un juicio. También fijamos el estándar de revisión apropiado en casos de difamación de un funcionario público. Por último, y no menos importante, delimitamos el alcance del privilegio de una comunicación difamatoria hecha en un procedimiento autorizado en ley cuando las comunicaciones también son vertidas a los medios públicos.

## I

El 3 de septiembre de 1990 la Lcda. Iris Meléndez Vega (licenciada Meléndez o la fiscal Meléndez) fue designada Directora del Centro Metropolitano de Investigaciones y Denuncias (C.M.I.D.) del Departamento de Justicia. Para entonces, y desde noviembre de 1987, la Sra. Martha Marrero Rivera (señora Marrero) se desempeñaba como Secretaria Legal I del Director y Subdirector del C.M.I.D. Basado en la capacidad demostrada por la señora

---

[1] En vista de que los hechos del presente caso ocurrieron previo al 1 de julio de 2010, aplicaremos las Reglas de Procedimiento Civil de 1979.

Marrero para ejercer sus funciones, a ésta se le había delegado ciertas labores administrativas que no le correspondían a su puesto. Inclusive, se había tramitado una recomendación para cambiar su puesto a Secretaria Legal II. No obstante, debido a que el cambio no se pudo realizar en aquel entonces a causa de las finanzas del Departamento de Justicia, quedó pendiente su reclasificación.

Cuando la licenciada Meléndez fue nombrada Directora del C.M.I.D., decidió retener a la señora Marrero como su secretaria. Transcurrido un tiempo, la licenciada Meléndez se percató de que existía cierta tensión entre la señora Marrero y otros funcionarios del C.M.I.D., por lo que decidió limitar las responsabilidades de la señora Marrero a aquellas que le correspondían a su puesto de Secretaria Legal I. Estos cambios internos representaron para la señora Marrero un tipo de descenso, por lo que no estuvo conforme con los mismos.

Según se desprende de los autos del caso, la relación laboral Directora-Secretaria se fue deteriorando marcadamente, hasta que la señora Marrero eventualmente se trasladó fuera del C.M.I.D. en el mes de junio de 1991. Las versiones de ambas funcionarias difieren en cuanto a los motivos de dicho traslado: por un lado, la señora Marrero sostiene que se trasladó fuera del C.M.I.D. por ser víctima de hostigamiento sexual de parte de la licenciada Meléndez, mientras que ésta niega que dicho

hostigamiento haya ocurrido, a la vez que aduce que la señora Marrero era una empleada difícil de complacer.

Luego de presentar una querella por alegado hostigamiento sexual en contra de la licenciada Meléndez ante el fiscal Pedro Goyco Amador (fiscal Goyco), Director de la Oficina de Investigación y Procesamiento Criminal del Departamento de Justicia, la señora Marrero ofreció su versión sobre este asunto a un periodista de El Vocero, el Sr. José A. Purcell (señor Purcell). Con la información brindada, el 5 de noviembre de 1991 El Vocero publicó en primera plana una noticia donde se reportaba que la licenciada Meléndez había hostigado sexualmente a su ex-secretaria y que altos funcionarios del Departamento de Justicia habían tratado de "amapuchar" la querella. Ese escrito fue el primero de una serie de cuarenta y tres (43) artículos publicados durante veintitrés (23) meses por dicho rotativo que giraron en torno a este tema.

La subsiguiente investigación de la querella de hostigamiento sexual por el Departamento de Justicia desde noviembre de 1991 hasta junio de 1992, la cual contó con más de veintidós (22) declaraciones juradas, exoneró a la licenciada Meléndez y concluyó que los incidentes de hostigamiento sexual imputados por la señora Marrero nunca ocurrieron.

A base de las múltiples publicaciones de El Vocero, el 19 de junio de 1992 la licenciada Meléndez instó en el Tribunal de Primera Instancia, Sala de San Juan, una

Demanda en daños y perjuicios por difamación en contra de la señora Marrero, el señor Purcell, Caribbean International News Corp., El Vocero de Puerto Rico, Inc. (El Vocero) y el Sr. Gaspar Roca (señor Roca), entonces Presidente y Director del diario.**2** Posteriormente, se enmendó la Demanda para incluir al Lcdo. Héctor Santiago Rivera (licenciado Santiago Rivera), representante legal de la señora Marrero, por éste enviar varias comunicaciones alegadamente difamatorias al entonces Secretario de Justicia, Hon. Jorge Pérez Díaz (Secretario de Justicia), que luego fueron objeto de varios artículos por parte de El Vocero. En síntesis, la licenciada Meléndez alegó en su Demanda que lo diseminado era falso y que todos los demandados lo publicaron a sabiendas de su falsedad o con grave menosprecio de si era falso o no, causándole daños a su reputación y graves angustias mentales.

La señora Marrero, la prensa y el licenciado Santiago Rivera aducen que lo publicado por ellos era cierto. La prensa argumenta, en la alternativa, que aunque no fuera cierto no obró con malicia real porque su fuente principal era la señora Marrero, quien merecía entera credibilidad. El licenciado Santiago Rivera alega, por su parte, que lo expresado por él era privilegiado por ser expresiones hechas durante un procedimiento autorizado por ley.

---

**2**     Nos referiremos al señor Purcell, Caribbean International News Corp., El Vocero y el señor Roca conjuntamente como "la prensa".

El juicio en su fondo, el cual duró un total de noventa y un (91) días, estuvo plagado de varios retrasos y paralizaciones. Véase <u>Meléndez v. Caribbean Int'l. News</u>, 151 D.P.R. 649 (2000); *In re* <u>Marchand Quintero</u>, 151 D.P.R. 973 (2000). Después de presidir el juicio durante cincuenta y cuatro (54) días, el Juez Superior Víctor Rivera González (Juez Rivera González) se retiró de la judicatura en diciembre de 2000. Tras revisar las transcripciones de toda la prueba presentada hasta el momento, para comienzos del año 2002 el Juez Luis Roque Colón (Juez Roque Colón) continuó a cargo del juicio. Pasados casi doce (12) años desde el inicio del caso, el 1 de marzo de 2004 el Tribunal de Primera Instancia dictó Sentencia[3] mediante la cual declaró *Con Lugar* la Demanda contra todos los demandados por estos haber obrado con malicia real al difundir las falsas alegaciones de hostigamiento sexual. Ordenó el pago de daños ascendentes a un millón ochocientos quince mil dólares ($1,815,000.00) por angustias mentales y daños a la reputación de la licenciada Meléndez, más cien mil dólares ($100,000.00) en concepto de honorarios de abogado por temeridad, con intereses legales sobre ambas cuantías al cinco por ciento (5%) desde la fecha de la presentación de la Demanda, hasta la fecha en que se dictó la Sentencia.

---

[3] El 15 de marzo de 2004 el Juez Luis Roque Colón emitió una Resolución Enmendando Sentencia. Por medio de ésta enmendó el último párrafo de la Sentencia dictada condenando además a los demandados al pago de intereses legales sobre la cuantía de la Sentencia, desde la radicación de la Demanda hasta la fecha en que se dictó la Sentencia.

Inconformes, todos los demandados acudieron ante el Tribunal de Apelaciones solicitando la revocación del dictamen del Tribunal de Primera Instancia. El tribunal apelativo intermedio mediante Sentencia de 28 de febrero de 2007 confirmó al foro de instancia en aquella parte de la Sentencia apelada en que se le impuso a la señora Marrero y a la prensa la obligación de indemnizar a la licenciada Meléndez, así como en el monto de daños asignados por el tribunal juzgador. Sin embargo, revocó la determinación de responsabilidad civil en cuanto al licenciado Santiago Rivera por dos (2) razones: (1) sus comunicaciones no cumplían con el requisito de referencia específica a la licenciada Meléndez y (2) el letrado estaba cobijado por el privilegio de comunicaciones hechas en el curso de un procedimiento autorizado en ley.

Ante este Tribunal comparecen todas las partes, excepto el licenciado Santiago Rivera. Consolidamos los recursos de la señora Marrero, la prensa y la licenciada Meléndez, todos acogidos como recursos de *certiorari*.[4] Como cuestión de umbral, la señora Marrero adujo que erró el Tribunal de Primera Instancia al continuar el juicio ante el Juez Roque Colón y violentó su derecho a un debido proceso de ley al dictar Sentencia valiéndose de una transcripción de varios testimonios, los cuales no presenció. Argumentó, además, que erró el Tribunal de

---

[4]    Ver nuestras Resoluciones con fecha de 9 de noviembre de 2007 en los recursos AC-2007-0066 y AC-2007-0067, y de 13 de diciembre de 2007 en el recurso CC-2007-0827.

Apelaciones en su análisis de la Regla 64 de Procedimiento

Civil, la cual rige la sustitución de un juez.**5**

---

**5**     Los siete (7) errores alegados por la señora Marrero leen como sigue:

Erraron el Tribunal Superior de San Juan y el Tribunal de Apelaciones al dictar sentencia contra la apelante Marrero Rivera, valiéndose de una transcripción de aproximadamente cinco mil páginas, sin el beneficio de examinar y escuchar directamente testimonios cruciales en un caso de difamación y libelo por la publicación en la prensa de una querella de hostigamiento sexual; todo ello en violación a la cláusula de debido proceso de ley, al derecho al careo y confrontación de las partes y en menoscabo de la función judicial de adjudicar la credibilidad de los testigos cuya supremacía se concretiza en el derecho a tener un día en corte. En particular, el análisis de la Regla 64 de Procedimiento Civil –que permite discrecionalmente y por excepción utilizar un récord o transcripción por [un] Juez que sustituya a otro– expuesto por el Tribunal de Apelaciones, es contrario a las normas constitucionales aplicables a un caso de libelo y calumnia; particularmente cuando la credibilidad de los testigos está en controversia.

Erró el Tribunal de Apelaciones al brindar total deferencia al tribunal de instancia en la evaluación de la prueba y concluir que "no nos corresponde sustituir las determinaciones de hechos que formuló el T.P.I. por unas, que cuanto más, reflejarían una posibilidad alterna en cuanto a la interpretación de la prueba", en contravención al mandato constitucional de realizar una evaluación independiente de la totalidad del récord en los casos de libelo; y al evaluar "los restantes señalamientos de error a base del cuadro fáctico plasmado en la sentencia del foro apelado."

Erraron el Tribunal Superior de San Juan y el Tribunal de Apelaciones al declarar con lugar la demanda contra la apelante Marrero Rivera, en contravención a la inmunidad que le cobijaba por haber presentado una querella por hostigamiento sexual ante el Departamento de Justicia y la Unidad Anti-discrimen, a tenor con la Ley Núm. 17 del 22 de abril de 1988 (prohibiendo el hostigamiento sexual), 29 L.P.R.A. §155 et seq[.] y sin examinar la prueba presentada para sostener sus alegaciones en violación a la cláusula de debido proceso de ley.

Erraron el Tribunal Superior de San Juan y el Tribunal de Apelaciones al declarar con lugar la demanda contra la apelante Marrero Rivera e imponerle responsabilidad en daños por las publicaciones e información diseminada por el periódico El Vocero en la que ésta no tuvo ningún control, participación o poder decisional, así como por daños causados por terceros mediando actos independientes.

Erraron el Tribunal Superior de San Juan y el Tribunal de Apelaciones en la apreciación de la prueba al declarar con lugar la demanda contra la apelante Marrero Rivera fundado en que "se demostró la existencia de una causa de acción por libelo", cuando a la luz de la totalidad de la prueba no se establecieron los hechos constitutivos de falsedad, ni se demostró la existencia de malicia real.

Erraron el Tribunal Superior de San Juan y el Tribunal de Apelaciones al conceder daños y cuantías exageradas – de naturaleza punitiva– no sostenidas por la prueba testifical y en ausencia total de prueba pericial; con el agravante de que la apelada Iris Meléndez Vega optó por sustraer del juicio la prueba médica en su poder sobre su condición, tratamiento médico e impacto que tuvieron en su persona las publicaciones de prensa objeto de controversia, y al concluir que hubo daños a la reputación en contravención a la prueba desfilada.

Erraron el Tribunal Superior de San Juan y el Tribunal de Apelaciones al imponer honorarios de abogado por temeridad a la apelante Martha Marrero Rivera; cuando ésta ejerció las defensas que el ordenamiento constitucional le confiere ante una reclamación de libelo frívola que se instó como represalia por haber presentado una querella por hostigamiento sexual contra la Fiscal Iris Meléndez Vega.

(Énfasis en original).

Como próximo señalamiento de error, la señora Marrero y la prensa[6] plantearon que erró el Tribunal de Apelaciones al no efectuar una evaluación independiente de la prueba en un pleito de difamación, donde la licenciada Meléndez tenía que probar malicia real con prueba clara y convincente.

Del mismo modo, y en cuanto a los méritos de la Sentencia recurrida, la señora Marrero refutó que procediera la acción en su contra, basándose en los siguientes tres (3) argumentos: (1) que estaba cobijada por el privilegio de comunicaciones hechas en un procedimiento autorizado por ley, dado que había presentado una querella por hostigamiento sexual en el Departamento de Justicia; (2) que no se le podía imponer responsabilidad por las publicaciones de El Vocero, por no haber tenido participación o control en las mismas; y (3) que la totalidad de la prueba no establecía falsedad, ni la existencia de malicia real.

La prensa por su parte alegó, en términos generales, que el Tribunal de Apelaciones no aplicó las normativas

---

[6] Los cuatro (4) errores alegados por la prensa son los siguientes:

Erró el Tribunal de Apelaciones al ignorar su deber de efectuar una evaluación independiente de la prueba, en un pleito en que la apelada tiene que probar malicia real con prueba clara y convincente.

Erró el Tribunal de Apelaciones al no aplicar las normativas constitucionales y jurisprudenciales que, en protección de los derechos fundamentales de libertad de prensa y expresión, han desarrollado tanto este Tribunal como el Tribunal Supremo de los Estados Unidos, al amparo del Artículo II, [S]ección 4, de la Constitución del Estado Libre Asociado de Puerto Rico y la Primera Enmienda a la Constitución de los Estados Unidos de América.

Erró el Tribunal de Apelaciones al reconocerle a la apelada la existencia de daños compensables y al valorar los mismos de manera exagerada y punitiva.

Erró el Tribunal de Apelaciones al imponerle al apelante el pago de honorarios de abogado en concepto de temeridad.

constitucionales relativas a la protección de los derechos fundamentales a la libertad de prensa y de expresión. Específicamente, argumentó que faltaba evidencia demostrativa de malicia real; que gozaba del privilegio del informe justo y verdadero; y que el Tribunal de Apelaciones no revisó adecuadamente cada artículo impugnado por la licenciada Meléndez para aseverar que eran de índole difamatoria.

Ambas partes sostuvieron que los daños concedidos a la licenciada Meléndez eran exagerados y de naturaleza punitiva, y que la imposición de honorarios de abogado por concepto de temeridad fue errónea.

Por otro lado, la licenciada Meléndez señaló dos (2) errores relacionados a la exoneración de responsabilidad del licenciado Santiago Rivera por el Tribunal de Apelaciones:

> Erró el [Tribunal de Apelaciones] al resolver que [le] asiste a Santiago Rivera el privilegio de comunicación por un abogado en un procedimiento autorizado por ley.

> Erró el [Tribunal de Apelaciones] al resolver que la prueba contra Santiago Rivera no satisface el requisito de referencia a la demandante.

Evaluados los recursos, acordamos expedir. Tras analizar todos los escritos ante nuestra consideración, así como el derecho aplicable, procedemos a resolver las controversias presentadas. Atenderemos las mismas en el siguiente orden. Descartaremos, primero, la controversia inicial planteada por la señora Marrero referente a la sustitución del juez de instancia. Próximo, discutiremos

las controversias relacionadas al estándar de revisión apelativa exigido en un caso de difamación. Tercero y cuarto, evaluaremos la responsabilidad del licenciado Santiago Rivera a la luz del privilegio estatutario extendido a comunicaciones difamatorias hechas en el transcurso de un procedimiento autorizado por ley y el requisito de referencia específica. Continuamos al analizar si la señora Marrero y la prensa incurrieron en difamación de la licenciada Meléndez, atendiendo a las defensas planteadas por cada una. Finalmente, revisaremos la cuantía de los daños y la imposición de honorarios adjudicada por el tribunal sentenciador.

## II
## SUSTITUCIÓN DE UN JUEZ DURANTE UN JUICIO YA INICIADO

La señora Marrero refuta el análisis expuesto por el Tribunal de Primera Instancia y el Tribunal de Apelaciones sobre lo apropiado que pueda resultar sustituir a un juez en medio de un juicio en su fondo, conforme a la Regla 64 de Procedimiento Civil. Argumenta que se le violentó el debido proceso de ley, ya que el Juez Roque Colón sólo consideró una transcripción de los testimonios de varios testigos que desfilaron ante el Juez Rivera González en la primera fase del juicio para llegar a su determinación de credibilidad, factor definitivo en este caso de difamación donde la veracidad de las expresiones está en juego. La

señora Marrero solicita, por tanto, que ordenemos la celebración de un nuevo juicio.

Por primera vez tenemos la oportunidad de expresarnos sobre el procedimiento de sustitución de un juez tal como lo disponen las Reglas de Procedimiento Civil. La Regla 64 de dicho cuerpo legal, tal como estuvo en vigor para la fecha del juicio en el caso de autos, exponía:

> Si por razón de muerte, enfermedad, o por cualquier otra razón, un juez no pudiere continuar entendiendo en un asunto, otro juez podrá actuar en su lugar; *pero si éste se convenciere de que no puede desempeñar dichos deberes*, sin la celebración de un nuevo juicio sobre todos o parte de los hechos *o sin oír nuevamente a algún testigo*, podrá tomar las medidas que fueren necesarias para resolver el pleito.

32 L.P.R.A. Ap. III, R. 64 (2001) (énfasis nuestro).[7]

El tratadista de derecho procesal civil J.A. Cuevas Segarra manifiesta que de dicha disposición legal se desprende que "[e]s discrecional del nuevo magistrado determinar si debe celebrar un nuevo juicio sobre todos o parte de los hechos", pero advierte que "[n]o es una invitación a la relitigación de los asuntos que ya han sido determinados por otro juez". J.A. Cuevas Segarra, Tratado de Derecho Procesal Civil, San Juan, Publicaciones J.T.S., 2000, T. II, pág. 1137.

---

[7]     La nueva Regla 64 de Procedimiento Civil de 2009 es casi idéntica a la anterior. Esta provee lo siguiente:

> Si por razón de muerte, enfermedad, *retiro* o por cualquier otra razón, un juez *o jueza* no *puede* continuar entendiendo en un asunto, otro juez *o jueza* podrá actuar en su lugar, pero *si de haber comenzado o concluido el juicio*, se *convence* de que no puede desempeñar dichos deberes, sin la celebración de un nuevo juicio sobre todos o parte de los hechos o sin oír nuevamente a algún testigo, podrá tomar las medidas que *sean* necesarias para resolver el pleito.

32 L.P.R.A. Ap. V, R. 64 (2010) (énfasis nuestro).

Cuando se adoptó la Regla 64 de Procedimiento Civil en el año 1979,[8] su contenido tenía una similitud sustancial a la Regla 63 de Procedimiento Civil federal (Regla 63), la cual, para ese entonces, disponía:

> If by reason of death, sickness, or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules *after a verdict is returned or findings of fact and conclusions of law are filed*, then any other judge regularly sitting in or assigned to the court in which the action was tried may perform those duties; but if such other judge is satisfied that he cannot perform those other duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial.

Fed. R. Civ. P. 63, 28 U.S.C. App. (1937) (énfasis nuestro).

Es menester señalar que, en aquel momento, la regla federal era más restrictiva que la nuestra al limitar la posibilidad de sustituir un juez en la etapa final del litigio de un caso, es decir, sólo después de que el juez original hubiese expuesto sus determinaciones de hechos y derecho. La antes mencionada condición para la sustitución de un juez no se reflejó en nuestra regla correspondiente, sino que ésta le delega al juez sustituto la discreción de determinar si puede desempeñar los deberes envueltos en la continuación de un caso comenzado bajo otro juez, independientemente de cuáles sean esos deberes y el momento en que ocurre la sustitución.

En el año 1991, la regla federal se enmendó sustancialmente por primera vez desde el año 1937,

---

[8]    Regla 64 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 64 n. (2001).

incorporando nuevas medidas y obligaciones para los jueces

sustitutos:

> If a trial or hearing has been commenced and the judge is unable to proceed, any other judge may proceed with it upon certifying familiarity with the record and determining that the proceedings in the case may be completed without prejudice to the parties. In a hearing or trial without a jury, the successor judge shall at the request of a party recall any witness whose testimony is material and disputed and who is available to testify again without undue burden. The successor judge may also recall any other witness.

Fed. R. Civ. P. 63, 28 U.S.C. App. (2006).[9] La nueva regla

federal ahora facilita la sustitución de un juez en

cualquier fase de un juicio si el nuevo juez certifica, no

sólo que está familiarizado con el récord, sino también

que el continuar el caso bajo su intervención no le

resultará perjudicial a parte alguna. En un caso sin

jurado, el juez sustituto siempre estará obligado, si una

parte así lo desea, a llamar a declarar nuevamente a

aquellos testigos que estén disponibles y cuyos

testimonios sean materiales y estén en disputa.

Las notas del Advisory Committee on Rules de la regla

federal enmendada explican, de este modo, el propósito del

cambio:

> ....

> The former rule made no provision for the withdrawal of the judge during the trial, but was

---

[9] La Regla 63 federal también sostuvo cambios estilísticos en el año 2007:

> If a judge conducting a hearing or trial is unable to proceed, any other judge may proceed upon certifying familiarity with the record and determining that the case may be completed without prejudice to the parties. In a hearing or a nonjury trial, the successor judge must, at a party's request, recall any witness whose testimony is material and disputed and who is available to testify again without undue burden. The successor judge may also recall any other witness.

Fed. R. Civ. P. 63, 28 U.S.C.A. (2008).

> limited to disqualification after trial. Several courts concluded that the text of the former rule prohibited substitution of a new judge prior to the points described in the rule, thus requiring a new trial, *whether or not a fair disposition was within reach of a substitute judge…*.
>
> The increasing length of federal trials has made it likely that the number of trials interrupted by the disability of the judge will increase. An efficient mechanism for completing these cases without unfairness is needed *to prevent unnecessary expense and delay*. To avoid the injustice that may result if the substitute judge proceeds despite unfamiliarity with the action, the new Rule provides, in language similar to Federal Rule of Criminal Procedure 25(a), that the successor judge must certify familiarity with the record and determine that the case may be completed before that judge without prejudice to the parties. This will necessarily require that there be available a transcript or a videotape of the proceedings prior to substitution….

Fed. R. Civ. P. 63, 28 U.S.C. App. (1991) (énfasis nuestro; citas internas omitidas).

De esta manera, el cambio flexibilizó la sustitución de un juez antes de que se terminase un juicio si éste, por alguna razón, se encuentra imposibilitado de continuar a cargo de los procedimientos – siempre y cuando se sigan los criterios implantados para asegurar que el proceso sea justo para las partes. Por tanto, la regla federal refleja la preferencia de evitar el comienzo de un nuevo juicio, a menos que sea necesario. Esta consideración tiene especial significado cuando, tomando en cuenta las circunstancias particulares del caso, el juez sustituto está preparado para disponer del asunto, mientras que un nuevo juicio crearía una demora onerosa.

Nuestra Regla 64 de Procedimiento Civil, sin embargo, no presentaba estas barreras procesales y desde su inicio

lograba el mismo fin que su contraparte federal al facilitar la sustitución de un juez después de comenzado un juicio. Dicha visión más liberal constituye un mecanismo eficiente para continuar con el desarrollo y progreso de un juicio largo que se ha visto interrumpido por razón de que un juez no ha podido cumplir con sus deberes hasta la resolución final del caso. La regla se diseñó con las salvaguardas necesarias para proteger contra la injusticia que pueda resultar si un juez no familiarizado con el caso procede a emitir una sentencia. Para ello provee mecanismos para que el nuevo juez tome el curso de acción que, en su discreción, estime necesario para disponer adecuadamente del pleito, incluyendo ordenar la celebración de un nuevo juicio sobre parte o todos los hechos, u oír nuevamente a algún testigo declarar.

Ahora bien, aunque un juez sucesor tiene plena autoridad de resolver un caso heredado, lo cierto es que no tiene la preparación adecuada para evaluar la credibilidad de testigos que no presenció declarar, aunque tenga una transcripción completa del testimonio. En nuestro ordenamiento judicial le asignamos mayor deferencia al tribunal de instancia en cuanto a su apreciación de la prueba precisamente porque estuvo en mejor posición para aquilatar la prueba testifical, ya que tuvo la oportunidad de oír y ver el comportamiento del testigo de manera directa. Pueblo v. Irizarry, 156 D.P.R.

780, 815 (2002); <u>Hernández v. San Lorenzo Const.</u>, 153 D.P.R. 405, 425 (2001). Teniendo en cuenta que la adjudicación de hechos no es tarea fácil o sencilla, y que es una labor llena de elementos subjetivos,[10] si un juez sustituto no tuvo el beneficio de escuchar a un testigo declarar y reaccionar bajo juramento, sino que simplemente leyó una transcripción de dicho testimonio, su determinación de credibilidad no es merecedora de esa deferencia.

José Cuevas Segarra afirma que un juez sustituto "no está en condiciones de pasar credibilidad sobre testigos que no ha escuchado". Cuevas Segarra, <u>op. cit.</u>, pág. 1137. Más bien, lo importante "es determinar si la falta de contacto del nuevo juez con la prueba desfilada lo coloca en una condición incapaz de desentrañar la verdad del cúmulo de ésta". <u>Íd.</u> págs. 1137-1138. Véase <u>Trib. Exam. Méd. v. Cañas Rivas</u>, 154 D.P.R. 29, 45 (2001) ("Determinamos que en procedimientos disciplinarios en los cuales existan importantes cuestiones de credibilidad, no debe el juzgador de los hechos aceptar que el caso sea sometido a base de una transcripción de la prueba de los testimonios pertinentes. De ordinario, el juzgador de los hechos debe recibir directamente los testimonios referidos para poder aquilatar su valor de manera óptima." (Nota al calce omitida)).

---

[10]    R.E. Bernier y J.A. Cuevas Segarra, <u>Aprobación e Interpretación de las Leyes en Puerto Rico</u>, San Juan, Publicaciones J.T.S., 1987, pág. 218.

De igual manera, el Advisory Committee on Rules de la Regla 63 federal enmendada distingue entre la capacidad de un juez sustituto de llegar a una determinación de hechos basada en prueba que nunca escuchó *versus* poder sopesar la credibilidad de un testigo que no tuvo presente ante sí.

> *The revised [rule] authorizes the substitute judge to make a finding of fact at a bench trial based on evidence heard by a different judge.* This may be appropriate *in limited circumstances.* First, if a witness has become unavailable, the testimony recorded at trial can be considered by the successor judge pursuant to F.R.Ev. 804, being equivalent to a recorded deposition available for use at trial pursuant to Rule 32. For this purpose, a witness who is no longer subject to a subpoena to compel testimony at trial is unavailable. Secondly, the successor judge may determine that particular testimony is not material or is not disputed, and so need not be reheard. The propriety of proceeding in this manner may be marginally affected by the availability of a videotape record; a judge who has reviewed a trial on videotape may be entitled to greater confidence in his or her ability to proceed.
>
> *The court would, however, risk error to determine the credibility of a witness not seen or heard who is available to be recalled….*

Fed. R. Civ. P. 63, 28 U.S.C. App. (1991) (énfasis nuestro; citas internas omitidas). Véase <u>Patelco Credit Union v. Sahni</u>, 262 F.3d 897, 906 (9th Cir. 2001) ("[T]he successor judge may examine the trial transcript as if it were 'supporting affidavits' for summary judgment purposes and enter summary judgment if no credibility determinations are required.") (citando 12 *Moore's Federal Practice* sec. 63.05[3] (3d ed. 1999)); <u>Mergentime Corp. v. WMATA</u>, 166 F.3d 1257 (D.C. Cir. 1999); <u>Henry A. Knott Co. v. Chesapeake & Potomac Tel. Co.</u>, 772 F.2d 78, 85 (4th Cir. 1985) ("A hearing *de novo* before a new successor

master or before the district court must be conducted if the case requires the trier of fact to make credibility determinations concerning the testimony of witnesses; otherwise the parties['] right to a full due process hearing would be severely undercut.").

En el caso de autos, el juicio tardó ocho (8) años en iniciarse ante el Juez Rivera González.[11] Se desfiló extensa prueba testifical durante cincuenta y cuatro (54) días,[12] hasta que el Juez Rivera González se retiró de la judicatura en diciembre del 2000. El 26 de marzo de 2001 el caso le fue asignado al Juez Roque Colón, quien rápidamente celebró una vista para acordar un plan de trabajo para la resolución del caso.[13] Posteriormente, y con el beneficio de haber analizado en su totalidad la transcripción de la prueba presentada ante el juez anterior, el Juez Roque Colón quedó convencido de que podía continuar con los procedimientos sin necesidad de iniciar un nuevo juicio.[14] No obstante, aclaró que "[s]i para la adjudicación final del caso, nos convenciéramos de que fuera necesario oír nuevamente parte del testimonio de alguno de los testigos ya presentados así lo

---

[11]  La Demanda se presentó el 19 de junio de 1992, y el juicio comenzó el 19 de junio de 2000.

[12]  Los declarantes ante el Juez Rivera González incluyeron a los siguientes testigos: el Lcdo. Luis Rivera Martínez, la Lcda. Zenaida Acosta Ronda, el Secretario de Justicia, la señora Marrero, la Sra. Sonia Palacios de Miranda, el fiscal Goyco, y la fiscal Norma Lora Longoria (fiscal Lora).

[13]  Orden del Tribunal de Primera Instancia (J. Roque Colón) de 30 de marzo de 2001; Resolución del Tribunal de Primera Instancia (J. Roque Colón) de 10 de enero de 2002.

[14]  Resolución del Tribunal de Primera Instancia (J. Roque Colón) de 10 de enero de 2002.

determinaremos oportunamente".[15]    Al reafirmar dicha decisión en reconsideración, el Juez Roque Colón se cercioró que cumplía con el objetivo de garantizar una solución rápida y económica del caso, apoyándose en los recursos provistos por las Reglas de Procedimiento Civil, y que al así proceder no se le violaba el debido proceso de ley a ninguna de las partes envueltas.[16]

El juicio continuó durante treinta y siete (37) días adicionales, durante los cuales se terminó de presentar la prueba de la licenciada Meléndez, incluyendo su testimonio, así como la mayoría de la prueba de los demandados.  Destacamos que el Juez Roque Colón tuvo la oportunidad de ver y escuchar a la señora Marrero testificar en vivo durante dos (2) días, tiempo que consideramos suficiente para poder apreciar su credibilidad por sí mismo.

Así las cosas, el Tribunal de Apelaciones correctamente concluyó que el Juez Roque Colón cumplió con las exigencias de la Regla 64 de Procedimiento Civil sin que se violase el debido proceso de ley de ninguna de las partes.  Ciertamente, la regla no exige la celebración de un nuevo juicio en todas las ocasiones en que se sustituye un juez.  Por el contrario, le delega al juez sustituto la autoridad para determinar el curso adecuado a seguir para

---

[15]    Íd.

[16]    Resolución del Tribunal de Primera Instancia (J. Roque Colón) de 8 de febrero de 2002, pág. 4.

la más efectiva y justa disposición de un caso. El Juez Roque Colón actuó razonablemente al continuar los procedimientos tomando el lugar de su antecesor y reservándose el derecho de llamar nuevamente a cualquier testigo, de estimarlo necesario.[17] Con su determinación, el juez sustituto logró un balance apropiado entre permitir la continuación de un juicio ya bastante aplazado, y velar porque no se llegara a una conclusión equivocada o parcial.

Además, el Juez Roque Colón no transgredió la Regla 64 de Procedimiento Civil, según argumenta la señora Marrero, al valerse únicamente de una transcripción para sopesar la credibilidad de ésta frente a la de la licenciada Meléndez, quien el juzgador escuchó y vio testificar de principio a fin. La señora Marrero falla al no reconocer que el Juez Roque Colón tuvo la oportunidad de verla y escucharla directamente y comprobar su veracidad. Durante el tiempo que la señora Marrero estuvo sentada como testigo ante el Juez Roque Colón, éste la vio y oyó declarar sobre varios incidentes ocurridos entre ella y la licenciada Meléndez, incluyendo los eventos del 21 de diciembre de 1991 que consistieron en la entrega por su parte de un regalo conteniendo ropa interior y maquillaje a la licenciada Meléndez - su supuesta hostigadora - y el alegado agarre de su glúteo por dicha

---

[17] Resultó ser innecesario llamar nuevamente a aquellos testigos que el Juez Roque Colón no escuchó, ya que la credibilidad de éstos no fue determinante para llegar a una adjudicación final.

fiscal. Cabe señalar, además, que los fiscales Goyco y Lora, quienes se presentaron como testigos en la primera fase del juicio, fueron llamados a testificar por segunda vez ante el juez sustituto a petición de los demandados. Claramente, el Juez Roque Colón no estuvo limitado a una lectura fría de la transcripción para llegar a la conclusión determinante de que la señora Marrero no le merecía credibilidad.

Por lo tanto, concluimos que el juez sustituto sí estaba capacitado para desempeñar los deberes inherentes de presidir la continuación del juicio y adjudicar la credibilidad de la señora Marrero sin violarle el debido proceso de ley. No fue erróneo continuar con el juicio de la manera en que se hizo.

### III

### ESTÁNDAR DE REVISIÓN EN CASOS DE DIFAMACIÓN

### A. BREVE RESUMEN DE LOS ELEMENTOS DE DIFAMACIÓN DE UN OFICIAL PÚBLICO

La protección contra ataques abusivos a la honra y reputación emana del Artículo II, Sección 8 de la Constitución de Puerto Rico, además de lo provisto por el Artículo 1802 de nuestro Código Civil, según modificado por la doctrina constitucional federal. Colón, Ramírez v. Televicentro de P.R., 175 D.P.R. 690, 705-706, 726

(2009).**18**   De esta protección surge la causa de acción de difamación, la cual envuelve la difícil tarea de balancear el alcance de la libertad de expresión y el derecho a la intimidad, ambos valores reconocidos como de alta jerarquía e interés público en nuestro ordenamiento jurídico. Giménez Álvarez v. Silén Maldonado, 131 D.P.R. 91, 97-98 (1992).   Como es sabido, la doctrina de difamación se divide en dos (2) vertientes, cada una con sus respectivas exigencias constitucionales, de acuerdo a si el demandante es clasificado como funcionario o figura pública, o como persona privada.

De entrada, observamos que en el caso de autos no existe controversia sobre la clasificación de la licenciada Meléndez como funcionaria pública.   Nos consta que dicha designación es una adecuada tomando en cuenta la posición de alta jerarquía de la licenciada Meléndez dentro del Departamento de Justicia.   Véanse, por ejemplo, Soc. de Gananciales v. López, 116 D.P.R. 112, 115-116 (1985); Rosenblatt v. Baer, 383 U.S. 75, 85 (1966) ("[T]he 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial

---

**18**   Nuestra jurisprudencia recoge varias fuentes de protección contra la difamación en Puerto Rico: el Artículo II, Sección 8 de la Constitución de Puerto Rico, L.P.R.A., Tomo I (2008); la Ley de Libelo y Calumnia, 32 L.P.R.A. sec. 3141 et seq. (2004) (Ley de Libelo y Calumnia); y el Artículo 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141 (1990). Giménez Álvarez v. Silén Maldonado, 131 D.P.R. 91, 97-98 (1992); Villanueva v. Hernández Class, 128 D.P.R. 618, 640 (1991) (añadiendo el Artículo II, Sección 4 de la Constitución de Puerto Rico como un precepto constitucional contra expresiones difamatorias).

responsibility for or control over the conduct of governmental affairs." (Nota al calce omitida)).

En New York Times Co. v. Sullivan, *supra*, el Tribunal Supremo Federal detalló el equilibrio constitucionalmente exigido en casos de difamación de un funcionario público, a fin de salvaguardar los derechos conflictivos que protegen a cada parte.[19] En síntesis, para un funcionario público prosperar en un caso de difamación tiene que probar, mediante prueba directa o circunstancial,[20] que la expresión difamatoria es falsa, se publicó a sabiendas de que era falsa o con grave menosprecio de si era falsa o no, es decir, con malicia real, y que dicha publicación le causó daños reales. Garib Bazain v. Clavell, 135 D.P.R. 475 (1994); Villanueva v. Hernández Class, 128 D.P.R. 618, 642 (1991); García Cruz v. El Mundo, Inc., 108 D.P.R. 174, 178 (1978); New York Times Co. v. Sullivan, *supra*, págs. 279-280. Otro requisito de rango constitucional es que la expresión se refiera a la persona del demandante de modo particular, criterio conocido en el Derecho Común como "*of and concerning the plaintiff*". Colón, Ramírez v. Televicentro de P.R., *supra*, págs. 720, 726; Soc. de Gananciales v. El Vocero de P.R., 135 D.P.R. 122, 128-133

---

[19]  Dado que "en Puerto Rico son obligatorias las interpretaciones del Tribunal Supremo Federal sobre la relación entre la libertad de expresión y el derecho al honor o la reputación, en cuanto están basadas en la Constitución federal…", el estándar definido en New York Times Co. v. Sullivan, 376 D.P.R. 254 (1964), rige en nuestro ordenamiento legal. Colón, Ramírez v. Televicentro de P.R., 175 D.P.R. 690, 705-706 (2009) (citando a Torres Silva v. El Mundo, Inc., 106 D.P.R. 415 (1977)); y Villanueva v. Hernández Class, *supra*, pág. 641.

[20]  Harte-Hanks Communications v. Connaughton, 491 U.S. 657, 667-668 (1988).

(1994); <u>New York Times Co. v. Sullivan</u>, *supra*, págs. 288-292.

Para establecer malicia real en el caso de difamación de un funcionario público se requiere, además, un *quantum* de prueba más oneroso. La figura pública tiene que probar malicia real de manera clara, robusta y convincente. <u>Colón, Ramírez v. Televicentro de P.R.</u>, *supra*, pág. 708; <u>Villanueva v. Hernández Class</u>, *supra*, pág. 643; <u>New York Times Co. v. Sullivan</u>, *supra*, págs. 285-286. De esta manera, no basta con una afirmación generalizada de que el demandado obró con malicia real, sino que tiene que establecerse con hechos específicos. <u>García Cruz v. El Mundo, Inc.</u>, *supra*, pág. 180. Vale recalcar, también, que la suficiencia de prueba para establecer malicia real es una cuestión estrictamente de derecho.[21] <u>Colón, Ramírez v. Televicentro de P.R.</u>, *supra*, pág. 725; <u>Villanueva v. Hernández Class</u>, *supra*, págs. 644-645; <u>Harte-Hanks Communications v. Connaughton</u>, 491 U.S. 657, 685 (1988).

En <u>Giménez Álvarez v. Silén Maldonado</u>, *supra*, pág. 98, expresamos que la elevada exigencia de prueba protege en mayor grado la libertad de expresión y tiene el "resultado práctico de… establecer un tipo de privilegio

---

[21] Actualmente existe debate sobre si el *quantum* de prueba necesario para probar el elemento de falsedad lo es la preponderancia de la prueba o mediante prueba clara y convincente. En <u>Harte-Hanks Communications v. Connaughton</u>, *supra*, pág. 661 n. 2, el Tribunal Supremo Federal negó pronunciarse en cuanto a dicha discusión. Véanse D. A. Elder, <u>Defamation: A Lawyer's Guide</u>, Deerfield, Illinois, Clark Boardman Callaghan, 1993, págs. 7-81 y 7-82 ("Curiously and anomalously, the [Supreme] Court [of the United States] has also intimated that it has taken no position on the debate as to what evidentiary standard a public plaintiff must meet in proving falsity."); R.A. Smolla, <u>Smolla and Nimmer on Freedom of Speech</u>, Minnesota, West, 2011, Vol. 3, pág. 23-124 ("There is an ongoing debate over whether a plaintiff's burden of proving falsity includes a requirement that falsity be proven with 'clear and convincing evidence' or merely a 'preponderance of the evidence['].").  En esta ocasión tampoco encontramos necesario expresarnos en cuanto a ese punto.

limitado a favor de quien hace la expresión". Véase, además, <u>Villanueva v. Hernández Class</u>, *supra*, págs. 641-642 n. 13 (donde se expresó que desde <u>New York Times Co. v. Sullivan</u>, *supra*, se ha desarrollado "una protección constitucional más amplia… al amparo de los derechos de libertad de expresión y de prensa y a expensas del derecho a la intimidad…". (Citas omitidas)). Con esto en mente, no es sorprendente que desde nuestra adopción de <u>New York Times Co. v. Sullivan</u>, *supra*, no hayamos emitido opinión mayoritaria alguna donde reconozcamos que un funcionario público logró probar malicia real adecuadamente.

**B. EVALUACIÓN INDEPENDIENTE DEL RÉCORD**

Pasamos ahora a contestar la controversia planteada ante nos sobre el adecuado estándar de revisión apelativa en un caso de difamación de un funcionario público.

En <u>New York Times Co. v. Sullivan</u>, *supra*, luego de pautar la nueva doctrina que rige en casos de difamación de un funcionario o figura pública, el Tribunal Supremo Federal se expresó sobre su función revisora por ser un Foro apelativo y declaró:

> [T]he rule is that *we examine for ourselves the statements in issue and the circumstances under which they were made* to see whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect…. *We must make an independent examination of the whole record* … so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.

<u>Íd.</u> pág. 285 (énfasis nuestro; citas, comillas y nota al calce omitidas).

Luego, en Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 501 (1984), el Tribunal Supremo Federal se reafirmó, elevando la norma de evaluación independiente en el contexto de difamación de un funcionario público a grado constitucional: "[T]he rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge". Enfatizó la importancia de dicha función revisora como sigue:

> The requirement of independent appellate review reiterated in New York Times Co. v. Sullivan is a rule of federal constitutional law…. It reflects a deeply held conviction that judges—and particularly Members of this Court—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. *Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."*

Íd. págs. 510-511 (énfasis nuestro). Aclaró, también, que una evaluación independiente no equivale a un examen *de novo* de toda la prueba, sino que requiere el repaso únicamente de aquellas porciones del récord que estén relacionadas al elemento de malicia real. Íd. n. 31.

Dicha evaluación independiente puede producir la invalidación de una determinación de malicia real hecha tanto por un jurado, véase New York Times Co. v. Sullivan, *supra*, pág. 286, como por un juez de instancia, véase Bose

Corp. v. Consumers Union of U.S., Inc., *supra*, págs. 511-512, si la misma no está sustentada suficientemente en los hechos contenidos en el récord.

Este estándar de revisión, aunque ciertamente más riguroso que la regla que impera en nuestra jurisdicción de la no intervención con la apreciación de la prueba por los tribunales de instancia a menos que sea claramente errónea,[22] no es incompatible con la norma de deferencia hacia el foro primario en cuanto a determinaciones de credibilidad de los testigos, tal como mencionáramos anteriormente. El Tribunal Supremo Federal armonizó estas dos (2) pautas, en el contexto de las Reglas de Procedimiento Civil Federal, de la siguiente manera:

> [Federal Rule of Civil Procedure] 52(a) commands that "due regard" shall be given to the trial judge's opportunity to observe the demeanor of the witnesses; the constitutionally based rule of independent review permits this opportunity to be given its due.

Bose Corp. v. Consumers Union of U.S., Inc., *supra*, págs. 499-500. El Tribunal Supremo Federal señaló con aprobación que el foro apelativo intermedio en Bose Corp. v. Consumers Union of U.S., Inc., *supra*, rehusó cuestionar las determinaciones de credibilidad del juez de instancia, dejando para el juzgador de hechos evaluar el peso que ameritaba el *demeanor* de los testigos. Íd. pág. 500.

---

[22]    Véase Regla 43.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 43.2 (2001); Rolón v. Charlie Car Rental, Inc., 148 D.P.R. 420, 433 (1999) ("un foro apelativo no puede descartar y sustituir por sus propias apreciaciones, basadas en un examen del expediente del caso, las determinaciones tajantes y ponderadas del foro de instancia…." (Citando a López Vicil v. I.T.T. Intermedia, Inc., 142 D.P.R. 857 (1997)).

El Tribunal Supremo Federal volvió a atender este asunto en Harte-Hanks Communications v. Connaughton, *supra*, confrontando directamente la pregunta de cómo debe evaluarse independientemente un récord que contiene testimonios orales conflictivos, además de una determinación de credibilidad – situación similar al caso de autos. Citando Bose Corp. v. Consumers Union of U.S., Inc., *supra*, y New York Times Co. v. Sullivan, *supra*, el Tribunal reiteró:

> In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full. Although *credibility determinations are reviewed under the clearly-erroneous standard* because the trier of fact has had the opportunity to observe the demeanor of the witnesses… the reviewing court must examine for itself the statements in issue and the circumstances under which they were made to see whether they are of a character which the principles of the First Amendment protect….

Harte-Hanks Communications v. Connaughton, *supra*, pág. 688 (énfasis nuestro; citas, comillas, corchetes, elipsis y nota al calce omitidas). Como parte de su análisis, señaló que el mero hecho de que el jurado encontrara que una versión de los hechos merecía credibilidad, mientras que la otra versión – la que se publicó por el periódico demandado – era falsa, no constituía de por sí prueba clara y convincente de que el periódico actuó con malicia real. Íd. pág. 681. Sin embargo, después de revisar mesuradamente la totalidad del récord, y a base de los hechos que el jurado *tuvo* que haber aceptado como ciertos para llegar a su veredicto, junto con la prueba no

controvertida, el Tribunal Supremo Federal encontró que, efectivamente, se había probado malicia real. Íd. págs. 689-691.[23]

El tratadista Rodney A. Smolla describe el procedimiento establecido por el Tribunal Supremo Federal de la siguiente manera:

> In engaging in its own independent review of the record, the Court held, it would confine itself to only those issues that the jury *must* have found in order for it to return a verdict. When those findings are considered along with the undisputed evidence, the Court held, the conclusion that actual malice existed was supported by clear and convincing evidence.

R.A. Smolla, Law of Defamation, 2da ed., Minnesota, West, 2011, Vol. 2, pág. 12-77 (énfasis en original).[24]

En fin, del marco delineado por la jurisprudencia del más alto Foro Federal se desprende que los tribunales apelativos vienen obligados a sopesar por sí mismos, a través de una evaluación independiente de la prueba, si se estableció malicia real de manera clara y convincente en casos de difamación de un funcionario público. La única

---

[23] Véase, además, Sujyot S. Patel, Harte-Hanks Communications, Inc. v. Connaughton: The Application of the New York Times Standard, 16 Ohio N.U. L. Rev. 725, 733-735 (1989) ("In addressing the correct standard of review to be applied, the [Supreme] Court held that in libel cases concerning public figures, a dual standard of review should be applied. First, the credibility determinations of the jury should be reviewed using the clearly erroneous standard. Second, the Court should make an independent assessment of the statements in issue to determine whether they are protected by the first amendment." (Nota al calce omitida)).

[24] Para una crítica de este estándar de revisión establecido por el Tribunal Supremo Federal, véase Elder, op. cit., págs. 4-5 ("The well-ensconced concept of independent appellate review remains somewhat unclear as to the *scope* of appellate review. The Supreme Court dealt with the issue in *Harte-Hanks Communications, Inc. v. Connaughton* in an extremely ambiguous if not ambivalent way, leaving the issue open for likely scrutiny in the future." (Énfasis en original)); Paul D. Driscoll, The Scope of Independent Appellate Court Review in Public Person Libel Cases, 14 Loy. L.A. Ent. L.J. 257, págs. 274-275 (1993-1994) ("What is unclear is what level of discretion appellate courts have in weighing the evidence once the jury has made factual findings based on credibility."); R.A. Smolla, Law of Defamation, 2da ed., Minnesota, West, 2011, Vol. 2, pág. 12-76.29 (The Supreme Court's opinion in Harte-Hanks has "thrown the current status of the Bose doctrine into an even greater state of confusion" and done "little to clarify the scope of the Bose standard".); S. S. Patel, *supra*.

deferencia reservada para el juzgador de los hechos en dicha tarea está atada a las determinaciones de credibilidad de los testigos, como fuera determinado en Bose Corp. v. Consumers Union of U.S., Inc., *supra*, y Harte-Hanks Communications v. Connaughton, *supra*. Paul D. Driscoll, The Scope of Independent Appellate Court Review in Public Person Libel Cases, 14 Loy. L.A. Ent. L.J. 257, 274 (1993-1994) ("[T]he *Harte-Hanks* decision makes clear that lower court findings of fact anchored in credibility determinations must be accepted unless clearly erroneous…." (Énfasis en original)). Sin embargo, esas determinaciones de credibilidad no obligan al resultado final del tribunal revisor, sino que se consideran en unión con el resto de la prueba.

Si bien es cierto que en nuestras opiniones hemos aludido indirectamente al estándar de revisión plasmado por el Tribunal Supremo Federal,[25] en ninguna hasta ahora hemos definido o delineado de manera directa el mandato constitucional de evaluación independiente de toda la prueba.[26] Hoy llenamos ese vacío.

---

[25] Véase, por ejemplo, Ocasio v. Alcalde Mun. de Maunabo, 121 D.P.R. 37, 41 n. 2 (1988) (donde establecimos que mientras el análisis de la prueba testifical y documental en un caso de libelo sigue la norma de deferencia hacia los foros de instancia en cuanto a las determinaciones de hechos, lo mismo no es cierto para determinaciones mixtas de hechos y de derecho, tales como si las publicaciones fueron negligentes, falsas o maliciosas).

[26] La única excepción a tomar en consideración es la opinión disidente del Juez Asociado señor Rivera Pérez en Krans Bell v. Santarrosa, 172 D.P.R. 731, 750 (2007), donde éste reconoció que "bajo el palio de nuestra Constitución y de la Constitución federal, estamos obligados a realizar un *examen independiente* de *toda* la evidencia para determinar si el dictamen apelado constituye o no una intervención indebida en el ámbito de la libertad de expresión". (Énfasis en original y nota al calce omitida). Notablemente, sin embargo, el Juez Rivera Pérez no citó caso alguno resuelto por este Foro para sustentar este estándar de revisión, esto por la obvia razón de que no se había adoptado de manera expresa en nuestra jurisprudencia.

En el caso de autos, la señora Marrero y la prensa alegan que el Tribunal de Apelaciones ignoró su deber de realizar una evaluación independiente de la totalidad del récord para comprobar que se probó malicia real con prueba clara y convincente. Además, argumentan que dicho foro erróneamente optó por brindarle deferencia a las determinaciones de hechos del Tribunal de Primera Instancia, contraviniendo de esta manera un mandato constitucional. La prensa específicamente aduce que el Tribunal de Apelaciones no cumplió con su deber, toda vez que ignoró la prueba eximente de malicia real que le trajeron a su atención.[27] Por otro lado, la señora Marrero basó su argumento en que el Tribunal de Apelaciones describió su función revisora conforme la regla general de concederle al Tribunal de Primera Instancia gran deferencia en cuanto a las determinaciones de hechos.

Debido a que los apelantes no probaron que medió prejuicio, parcialidad o error manifiesto, el Tribunal de Apelaciones explicó que no le "correspon[día] sustituir las determinaciones de hechos que formuló el [Tribunal de Primera Instancia] por unas que, cuando más, reflejarían una posibilidad alterna en cuanto a la interpretación de la prueba del caso", y concluyó que, por lo tanto, evaluaría los señalamientos de error "a base del cuadro fáctico plasmado en la sentencia del foro apelado". Sin

---

[27] La prensa también argumentó que el Tribunal de Apelaciones erróneamente limitó su ámbito de revisión al sostener que el Tribunal de Primera Instancia estaba en una mejor posición que el foro apelativo intermedio para evaluar la prueba testimonial. Atenderemos este señalamiento más adelante.

embargo, contrario a lo que alega la señora Marrero, en su contexto este pasaje revela que el Tribunal de Apelaciones se estaba refiriendo únicamente a su revisión de la determinación del Tribunal de Primera Instancia a los efectos de que la señora Marrero mintió, hecho que tenía como base testimonios encontrados. En el párrafo justo antes del pasaje objetado por la señora Marrero, el Tribunal de Apelaciones resumió que "ante el [Tribunal de Primera Instancia] – y, en específico, ante el Juez Roque Colón – [se] desfiló aquella prueba testifical necesaria para que el foro sentenciador dictaminara sobre cuál de las versiones conflictivas de las partes le merecía credibilidad". El Tribunal de Apelaciones no erró al conceder tal deferencia. Por cierto, más adelante el foro apelativo intermedio afirmó su "obligación de cerciorar[se] de que la malicia real del demandado surja claramente de los autos", indicando el estándar de revisión adecuado.

Sin embargo, irrespectivamente del resultado de la evaluación independiente del Tribunal de Apelaciones, en calidad de foro revisor tenemos nuestro propio deber de determinar si a base del voluminoso expediente de autos sobresale prueba clara y convincente de malicia real. Con el beneficio de la guía expuesta en Harte-Hanks Communications v. Connaughton, *supra*, brindaremos la debida deferencia a las determinaciones de credibilidad del Tribunal de Primera Instancia por éstas no ser

claramente erróneas. Conjuntamente con los hechos no controvertidos, examinaremos si las circunstancias que rodearon las alegadas expresiones difamatorias realmente carecen de la protección constitucional que normalmente poseerían.

Aclaradas las controversias procesales presentadas en los recursos, atenderemos la aplicabilidad del privilegio estatutario del cual gozan las comunicaciones hechas en el curso de un procedimiento autorizado en ley antes de evaluar los méritos de la acción por difamación en lo referente a las tres (3) partes demandadas.

## IV

## PRIVILEGIO DE COMUNICACIONES VERTIDAS COMO PARTE DE UN PROCEDIMIENTO AUTORIZADO POR LEY

En Giménez Álvarez v. Silén Maldonado, *supra*, págs. 98-100, notamos que la doctrina que rige en materia de difamación, en el interés de llegar a un balance justo entre los derechos constitucionales que se encuentran en juego, establece ciertas exigencias que tienden a crear mayores protecciones hacia la libertad de expresión en contraposición al derecho a la intimidad. Íd. pág. 98. Destacamos, dentro de dicha tendencia, el privilegio limitado reconocido por algunos tribunales a favor de quien hace la expresión en el contexto de un procedimiento judicial.

> Una de las situaciones en las que generalmente se reconoce inmunidad es durante los procedimientos judiciales. La inmunidad no se limita a las

> expresiones que pueda efectuar un juez, sino que incluye las expresiones de los testigos y de los abogados. Debido al interés público en la administración de la justicia y en permitir un amplio y libre acceso a los tribunales, la inmunidad se extiende también a lo expresado con relación a la controversia, ya sea a través de las alegaciones, en declaraciones juradas o en corte abierta….

Íd. págs. 98-99 (citas omitidas).

En Puerto Rico, este privilegio está recogido estatutariamente en la Sección 4 de la Ley de Libelo y Calumnia, 32 L.P.R.A. sec. 3144 (2004) (Ley de Libelo y Calumnia), la cual establece que "[n]o se tendrá por maliciosa, ni como tal se considerará la publicación que se hace en un procedimiento legislativo, judicial, u otro procedimiento cualquiera autorizado por la ley".[28] De este pasaje surge la protección que brindamos a toda expresión vertida en el curso de un procedimiento de carácter legal, aunque sea falsa o difamatoria. Notablemente, el estatuto no distingue entre diferentes categorías de oradores, sino que ofrece una protección global para todo lo allí expresado.

Este privilegio aplica a toda comunicación necesaria, habitual o útil en la preparación o desarrollo de un caso pendiente. D.A. Elder, Defamation: A Lawyer's Guide, Deerfield, Illinois, Clark Boardman Callaghan, 1993, pág. 2-73. Por cierto, una demanda y las manifestaciones allí incluidas constituyen una publicación en el contexto de un procedimiento judicial, por lo que no se tendrán por

---

[28] Para propósitos de esta Opinión, adoptamos la frase "procedimiento legal" en lugar de privilegio judicial para referirnos al conjunto de procedimientos señalados bajo la Sección 4 de la Ley de Libelo y Calumnia, 32 L.P.R.A. sec. 3144 (2004).

maliciosas, siempre y cuando guarden algún tipo de relación con el asunto en controversia. <u>Giménez Álvarez v. Silén Maldonado</u>, *supra*, págs. 99-100. Sin este privilegio, los abogados estarían expuestos a causas de acción por difamación por cualquier expresión hecha en el curso de la representación de sus clientes que resultara ser falsa.[29] Ello tendría el efecto probable de obligar una litigación amplia y vigorosa por temor a luego ser perseguido con un pleito de libelo. Igualmente, representaría un conflicto con su deber ético de hacer todo lo posible para lograr que se imparta justicia. Smolla, <u>Law of Defamation</u>, <u>op. cit.</u>, págs. 8-9. A la larga, la cautela ejercida en el proceso de escoger cuáles casos aceptar también afectaría el libre acceso del público a los tribunales.

Esta norma está recogida por la regla mayoritaria en el Derecho Común estadounidense, resumida de la siguiente manera:

> Under the undoubted consensus view of the authorities an attorney is absolutely privileged[30] as to defamatory statements during civil, criminal and administrative quasi-judicial proceedings in the conduct of the litigation and for any defamation contained in pleadings or petitions, motions, briefs, communiques and other documents filed therein which have some relation to the proceedings…. This protection for attorney advocates reflects the public policy that it is essential that attorneys be free to

---

[29] El Tribunal de Apelaciones tenía esto presente al advertir que sin el privilegio, un abogado que descarga su responsabilidad de representar la posición de su cliente, que no necesariamente refleja la suya, estaría a la "merced de ser penalizado[] por ejercer su deber de defender celosamente la posición de un representado que no resultó favorecido en algún proceso".

[30] Cabe señalar que en Puerto Rico este privilegio es uno condicional y no absoluto. <u>Caraballo v. P.R. Ilustrado, Inc.,</u> 70 D.P.R. 283 (1949). Véase también <u>Cortés Portalatín v. Hau Colón</u>, 103 D.P.R. 734, 739 (1975) (un "privilegio restringido").

> act on their own best judgment in prosecuting or defending without fear of later having to defend a civil action for defamation….

Elder, op. cit., págs. 2-70 a 2-72 (comillas, elipsis y notas al calce omitidas; nota al calce nuestra); Smolla, Law of Defamation, op. cit., págs. 8.1-8.2.

En el caso de autos, el licenciado Santiago Rivera cursó cinco (5) cartas[31] al entonces Secretario de Justicia durante el curso de la investigación instada por el Departamento de Justicia sobre el alegado hostigamiento sexual del que fue víctima la señora Marrero. Estas cartas falsamente imputaron conducta ilícita por parte de varios empleados de dicha entidad, alegando que estos se organizaron con el propósito de encubrir información para que la licenciada Meléndez saliera favorecida en la investigación instada en su contra.[32] Posteriormente, el licenciado Santiago Rivera le relató el contenido de las cartas al señor Purcell para que se publicaran en varios reportajes de El Vocero. De esta manera, el licenciado Santiago Rivera se convirtió en una fuente de la prensa, supliendo material para generar la publicación de más artículos relacionados al alegado encubrimiento de la querella por hostigamiento sexual presentada por su clienta.

Contrario al Tribunal de Primera Instancia, el Tribunal de Apelaciones resolvió que bajo la Sección 4 de

---

[31] Éstas se enviaron los días 15 de noviembre, 5 de diciembre (dos (2) cartas ese día) y 30 de diciembre de 1991, y el 16 de marzo de 1992.

[32] Varios testimonios luego desmintieron esas aseveraciones.

la Ley de Libelo y Calumnia "[t]oda vez que las cartas en cuestión fueron remitidas como parte del proceso que llevaba a cabo el Secretario de Justicia en el descargo de su deber legal de investigar la querella de la señora Marrero, el [licenciado] Santiago Rivera no puede ser demandado por las expresiones vertidas en ellas". Diferimos de dicha determinación en vista de la totalidad de los hechos.

Indudablemente, la investigación interna ejecutada por el Departamento de Justicia sobre los alegados actos de hostigamiento sexual representa un "procedimiento autorizado por la ley". Véase 29 L.P.R.A. sec. 155 (2009); Smolla, Law of Defamation, op. cit., sec. 8:15; Elder, op. cit., págs. 2-33 – 2-36. También es evidente que las cartas se enviaron al Secretario de Justicia con la intención de que formaran parte del expediente del procedimiento en curso, y que la información comunicada a través de las mismas guardaba una relación directa con el asunto en controversia. Por lo tanto, dado que se reunieron todos los elementos que fundamentan el mencionado privilegio judicial, las expresiones del licenciado Santiago Rivera contenidas en las cartas dirigidas al Secretario de Justicia, efectivamente, gozaban de la inmunidad estatutaria contra un pleito de difamación.[33]

---

[33] Cabe señalar que la licenciada Meléndez, igualmente, destacó en su alegato que no demandó al licenciado Santiago Rivera por haber cursado las cartas difamatorias al Secretario de Justicia, sino por haberlas enviado *a la prensa*.

Sin embargo, el licenciado Santiago Rivera no se limitó a expresar sus aseveraciones dentro de la esfera de la investigación interna del Departamento de Justicia, sino que deliberadamente tomó acciones para que el contenido de las cartas fuera difundido al público a través del periódico. De aquí surge la interrogante ante nos: bajo estas circunstancias, ¿las expresiones siguen gozando de la inmunidad que adquirieron por formar parte de un procedimiento autorizado por ley? La determinación del Tribunal de Apelaciones y los argumentos expuestos por el licenciado Santiago Rivera contestan en la afirmativa, mientras que la licenciada Meléndez argumenta en la negativa.

Aunque esto representa una controversia novedosa ante este Foro, no lo es en otras jurisdicciones. Según el tratadista David Elder, existe una distinción importante entre el hecho de que un abogado se comunique directamente con la prensa en relación a un procedimiento pendiente, y el que la prensa, por su propia cuenta, decida publicar información ya presentada en el curso de un procedimiento legal.

> The cases have almost universally found that oral and written publications to the media preliminary to, during the course of, or following a judicial proceeding or a filing therein are not within the sphere of activities which judicial immunity was designed to protect but are made to a mere concerned observer having no sufficient connection to the proceedings and whose receipt thereof does not enhance the judicial function. As to attorneys, these extrajudicial reiterations do not constitute actions of an attorney while performing his functions as such and are inconsistent with

> ethical duties imposed on him or her as a member of the bar….
>
> [However, t]he … privilege is not forfeited by the mere fact that the filer of a document has a mere intent, hope or expectation that the media will republish it, or because the press does in fact report such a filing. Some affirmation by defendant other than the initial, absolutely privileged publication is required. Of course, another privilege may apply to subsequent dissemination of judicial or quasi-judicial determinations….

Elder, op. cit., págs. 2-87 – 2-91 (comillas y citas omitidas); Smolla, Law of Defamation, op. cit., sec. 8:17. Véase Cortés Portalatín v. Hau Colón, 103 D.P.R. 734, 739 (1975) (citando a Quiñones v. J.T. Silva Banking & Commercial Co., 16 D.P.R. 696 (1910)) ("Se pierde la inmunidad si… el actor le imparte publicidad excesiva al asunto; o si el actor se mueve por motivos impropios…. [Pero e]l hecho de que otras personas escuchen o lean incidentalmente una comunicación hecha de modo razonable no anula el privilegio…." (Citas internas omitidas)).

Resolvemos hoy que, aunque a una expresión se le haya extendido inmunidad por haberse ofrecido como parte de un procedimiento legal, ello no garantiza que la misma expresión sea privilegiada en subsiguientes publicaciones hechas fuera del foro que está atendiendo el asunto pendiente. Wagner v. Miskin, 660 N.W.2d 593 (N.D. 2003); World Wrestling Federation Intertainment v. Bozell, 142 F.Supp.2d 514, 534 (S.D.N.Y. 2001). Opinamos, además, que comunicaciones hechas a la prensa por un abogado, una parte, un testigo u otro participante en un proceso legal nunca forman parte de un procedimiento legal.

Conversaciones con la prensa no comprenden una publicación que se hace en un procedimiento legislativo, judicial u otro procedimiento cualquiera autorizado por la ley, tal como lo expresamente requerido por la Sección 4 de la Ley de Libelo y Calumnia. Por el contrario, son comentarios realizados en un espacio que abarca más allá de lo que rodea un procedimiento legal y que no merecen tratamiento preferente ante una acción de difamación.

Encontramos que esta delimitación no sólo concuerda con la interpretación literal de la Sección 4 de la Ley de Libelo y Calumnia, sino que también preserva los fines del privilegio sin ampliarlo a un extremo que facilita la perpetuación de declaraciones difamatorias. Específicamente, queremos evitar una situación como la que tenemos presente, donde una publicación falsa, pero privilegiada, hecha en el transcurso de un procedimiento legal sea repetida ilimitadamente, maculando el prestigio y reputación de una persona que se encuentra sin remedio para los daños sufridos.

Cabe señalar que nuestra determinación de ninguna manera restringe el derecho de libertad de palabra de cualquier abogado, parte o testigo cuando estén fuera del contexto de un procedimiento legal en curso. Éstos siguen poseyendo el derecho de expresarse como y a quien quieran. La regla que hoy adoptamos simplemente establece que si proceden a discutir el tema objeto del procedimiento legal a terceros que se encuentran fuera del mismo, no podrán

subsiguientemente invocar este privilegio en ese ámbito. Véase Smolla, Law of Defamation, op. cit., pág. 8-15.

Así pues, al comunicarse con un reportero de El Vocero, a diferencia de las cartas que envió al Secretario de Justicia, el licenciado Santiago Rivera no estaba preparando, desarrollando, ni avanzando los intereses de su clienta, la señora Marrero, dentro de los parámetros de un procedimiento legal. Por consiguiente, erró el Tribunal de Apelaciones al encontrar que las expresiones que el licenciado Santiago Rivera prestó al señor Purcell estaban protegidas bajo el privilegio de una comunicación hecha en un procedimiento autorizado en ley.

De igual manera, la señora Marrero tampoco está cobijada bajo este privilegio legal. Aun asumiendo, *arguendo*, que la señora Marrero se querelló verbalmente con el fiscal Goyco en su primera reunión con éste el 19 de junio de 1991, de su alegato y testimonio surge una larga lista de personas a quienes la señora Marrero les comentó su difícil relación con la licenciada Meléndez, con ejemplos específicos de cómo su jefa se dirigía hacia ella, *antes* de esa fecha. Esto es, *previo a* que se hubiese iniciado un procedimiento autorizado en ley. Por lo tanto, forzosa es la conclusión de que a esas expresiones difamatorias ciertamente no se les puede extender el privilegio legal.

Aun si designamos el 15 de octubre de 1991, fecha en que el fiscal Goyco recibió por primera vez una queja

escrita por la señora Marrero, como el inicio del procedimiento legal en torno a la investigación de hostigamiento sexual, ésta tampoco gozaría del privilegio. Poco después de cursar la carta, la señora Marrero consintió a una entrevista con el señor Purcell, quien le informó que interesaba reportar sobre el asunto en el periódico. En esa reunión, la señora Marrero le relató al periodista detalles de varios incidentes no incluidos en su carta al fiscal Goyco. Sus extensas y voluntarias comunicaciones con el señor Purcell sirvieron de fuente principal para la serie de artículos de El Vocero. No se hicieron como parte del procedimiento legal que apenas comenzaba. Por tanto, las expresiones de la señora Marrero tampoco encuentran inmunidad bajo el privilegio legal y están sujetas al escrutinio que conlleva una demanda por difamación.

## V

## FALTA DE REFERENCIA ESPECÍFICA A LA DEMANDANTE

Enfocándonos una vez más en las expresiones del licenciado Santiago Rivera dirigidas al Secretario de Justicia, que luego fueron publicadas por El Vocero, la próxima controversia plantea si éstas cumplieron con el requisito de referencia específica a la persona de la licenciada Meléndez. Como mencionáramos anteriormente, es un prerrequisito de dimensión constitucional y piedra angular de todo pleito de difamación que las manifestaciones alegadamente difamatorias identifiquen

específicamente al reclamante. Colón, Ramírez v. Televicentro de P.R., *supra*, págs. 720-721; Soc. de Ganaciales v. El Vocero de P.R., *supra*, pág. 128; New York Times Co. v. Sullivan, *supra*, pág. 288. "En el umbral de cada acción por difamación, la parte demandante tiene que demostrar que en algún sentido definitivo y directo es la persona contra quien la expresión difamatoria se dirige, esto es, tiene que probar que es quien sufre el daño a su reputación." Colón, Ramírez v. Televicentro de P.R., *supra*, pág. 722 n. 28 (citando Smolla, Law of Defamation, op. cit.). Este criterio limita el derecho a demandar a aquellos que realmente son objeto directo de críticas e impide reclamaciones por difamación vicaria. Soc. de Ganaciales v. El Vocero de P.R., *supra*, págs. 128-129.

Cabe señalar que este requisito no exige que el demandante sea mencionado por nombre y apellido, ni tampoco que cada lector reconozca que el demandante es el objeto de difamación. Colón, Ramírez v. Televicentro de P.R., *supra*, pág. 722 n. 28; Elder, op. cit., págs. 1-136. En su lugar, se mide el cumplimiento del elemento de identificación personal de acuerdo a lo que los receptores de la noticia razonablemente entendieron, irrespectivamente de si la asociación que la audiencia hace con el demandante fue intencional o no. Colón, Ramírez v. Televicentro de P.R., *supra*, pág. 722 n. 28 (citando Smolla, Law of Defamation, op. cit.).

A través de su carta fechada el 15 de noviembre de 1991 dirigida al Secretario de Justicia, el licenciado Santiago Rivera comunicó que su clienta había recibido información sobre la celebración de dos (2) reuniones distintas en las que estuvieron presentes varios fiscales, pero sin mencionar la participación de la licenciada Meléndez en ellas.[34] Indicó que el propósito de las mismas fue discutir los hechos concernientes a la querella de hostigamiento sexual sometida por la señora Marrero y las versiones que debían sostener al respecto. Sugirió que estas reuniones tenían "el propósito de encubrir, distorsionar, sugerir o acomodar testimonios que [iban] a ser eventualmente vertidos, bajo juramento," que presentaban una interferencia indebida con la investigación, y "que su propósito [era] evitar que aflore la verdad de lo ocurrido". También indicó que los fiscales Goyco, José Santiago Martínez (fiscal Santiago Martínez) y Emilio Duprey Tacaronte (fiscal Duprey), además de la Sra. Luz E. Machuca y otros funcionarios de la Fiscalía de San Juan, tenían "conocimiento directo de los hechos que motivan la investigación en proceso". Luego, en su carta de 16 de marzo de 1992, indicó que su clienta sentía que el Departamento de Justicia "se propone

---

[34]   Los participantes nombrados en la carta fueron la Sra. Luz E. Machuca (señora Machuca), el fiscal José A. Santiago Martínez (fiscal Santiago Martínez), el fiscal Paquito Rivera, y "otros fiscales".

encubrir y exonerar la actuación ilegal" del fiscal Goyco

y la licenciada Meléndez, entre otros.[35]

El Tribunal de Apelaciones concluyó que estas

declaraciones no sustentaban la responsabilidad civil del

licenciado Santiago Rivera. Explicó su razonamiento de la

siguiente manera:

> … Según lo ha sostenido la demandante desde los comienzos del pleito, la responsabilidad civil del letrado por los daños que sufrió la Lcda. Meléndez surge de las expresiones vertidas en varias cartas que éste remitió al Secretario de Justicia. En esas misivas, alegó que funcionarios de dicha agencia pretendían encubrir el hostigamiento sexual del que alegadamente fue víctima su cliente y procurar así que la Lcda. Meléndez saliera airosa de la investigación interna. Además, señaló que el proceso estaba viciado de tal manera que perjudicaba los intereses de su cliente.
>
> Pero aun si la información vertida en esas cartas fuera falsa y difamatoria, y el Lcdo. Santiago conociese de su falsedad, ello sería insuficiente en derecho para responsabilizarle por los daños sufridos por la apelada. Al referirse a las gestiones que alegadamente hicieron funcionarios del Departamento de Justicia para procurar que la Lcda. Meléndez fuera exonerada por la agencia, el Lcdo. Santiago le[s] imputó conducta ilícita a personas que no son parte en este pleito.
>
> … Conforme a la doctrina de referencia específica, aun si asumiéramos, *arguendo*, que las alegaciones del Lcdo. Santiago Rivera de que compañeros de la Lcda. Meléndez hicieron gestiones ilícitas para procurar que ésta saliera favorecida del proceso investigativo de la agencia fueron falsas, difamatorias, y hechas con malicia real, la apelada no tendría una causa de acción por dichas imputaciones. Toda vez que los funcionarios a los que se refieren las mismas no forman parte de este pleito, no procede compeler al Lcdo. Santiago a reparar daño alguno.

Sentencia del Tribunal de Apelaciones, págs. 52-53.

---

[35] No discutiremos el contenido de las otras tres (3) cartas intercambiadas, por éstas no incluir alegaciones referentes a la licenciada Meléndez ni al tema del supuesto "amapucho". En la segunda y tercera carta, ambas del 5 de diciembre de 1991, ni siquiera se encuentra el nombre de la licenciada Meléndez. El propósito del segundo mensaje era pedir que la Lcda. Zenaida Acosta fuera relevada de su función de investigar la querella porque representaba un conflicto de intereses, mientras que la tercera sólo pedía que se le proveyera a la señora Marrero una copia de su declaración jurada. La cuarta carta de 30 de diciembre de 1991 se refería al comportamiento de la fiscal Felícita Jomp Vázquez.

La licenciada Meléndez disputa esta determinación, razonando que "no es posible imputar un encubrimiento sin que exista referencia a los hechos y al sujeto protegido". Arguye que el licenciado Santiago Rivera sí se refería a ella directamente dado que "imputarle a una persona que otras personas se confabulan para 'amapuchar' [su investigación]… es idéntico a decir que la persona imputada cometió los hechos por los que se le investiga".

La licenciada Meléndez entiende, además, que su caso es análogo al de González Martínez v. López, 118 D.P.R. 190 (1987), donde el demandado declaró, entre otras cosas, que "[e]l señor Alcalde de Aguada [le] tendría que dar los planos de la casa de su mamá en la Calle San Narciso porque eso es obra de su gobierno". Íd. pág. 193. Confirmamos en ese caso que la madre del Alcalde de Aguada, la demandante, poseía capacidad jurídica para instar su acción contra el declarante, pues se le había imputado directa y falsamente que adquirió su casa con fondos públicos. Íd. pág. 197. Aunque la aparente intención de la recriminación fue hacerle daño al Alcalde de Aguada, también se perjudicó personal y específicamente la reputación, integridad y honradez de la madre de éste.

A pesar de sus intentos, la licenciada Meléndez no nos convence de que los hechos de su recurso son semejantes a los de González Martínez v. López, supra. En ese caso, el mensaje que claramente se transmite es que la señora González Martínez vive en una residencia construida

ilícitamente, la cual fue construida gracias a su hijo, el Alcalde de Aguada. Indudablemente, esa expresión se refería directamente a la persona de la demandante. En comparación, una lectura de la carta del licenciado Santiago Rivera desglosa los supuestos esfuerzos realizados por un grupo de funcionarios del Departamento de Justicia para intervenir en la investigación de la querella presentada por la señora Marrero. El enfoque de esa comunicación fue el hecho de que varios empleados estaban deliberadamente afectando la pureza de la investigación interna en curso. La licenciada Meléndez no fue incluida en la lista de nombres como partícipe en el esquema. Tampoco se hicieron aseveraciones afirmativas sobre la culpabilidad de ésta de haber hostigado a la señora Marrero. Por ende, ni la licenciada Meléndez, ni las imputaciones de la señora Marrero – que constituyen la médula de la presente Demanda – figuraron como objeto directo de las reclamaciones incluidas en las cartas del licenciado Santiago Rivera. El nombre de la licenciada Meléndez se mencionó por el solo hecho de que la comunicación era pertinente a la investigación que se cursaba sobre su alegado comportamiento hacia la señora Marrero. Únicamente una inferencia tenue e incierta llevaría a un lector a suponer que lo que el licenciado Santiago Rivera realmente estaba insinuando era que el hecho de que sus compañeros fiscales estuviesen

conspirando entre ellos significaba que la licenciada Meléndez ciertamente hostigó a su secretaria.

La presencia de un nombre en una expresión, sin más, no es suficiente para sustentar que la misma constituye una referencia a dicha persona que genere reparación de daño. Estas circunstancias no satisfacen adecuadamente la doctrina de referencia específica. No encontramos prudente flexibilizar este requisito de rango constitucional, el cual busca velar por que cada acción por difamación sea una realmente personal y no fundamentada en manifestaciones no específicas, que los reclamantes subjetivamente entienden que los perjudican. Colón, Ramírez v. Televicentro de P.R., *supra*, págs. 721-723.

Por lo tanto, encontramos que el Tribunal de Apelaciones llegó a la conclusión correcta en cuanto a la falta de responsabilidad del licenciado Santiago Rivera por sus comunicaciones a El Vocero, dado que las mismas no se referían específicamente a la licenciada Meléndez.[36]

---

[36] Ahora bien, no cabe duda de que en Puerto Rico la doctrina de "*of and concerning the plaintiff*" no impide el ejercicio de una causa de acción instada por terceros por los daños sufridos por éstos a causa de la difamación de otro, siempre que la publicación identifique personalmente a quien por cuya difamación éstos reclaman. Soc. de Gananciales v. El Vocero de P.R., 135 D.P.R. 122 (1994). Ésta es una causa de acción contingente a la causa de acción principal que tiene el difamado. Íd. pág. 135. Sin embargo, en el presente caso la licenciada Meléndez no planteó este fundamento alternativo, ni presentó prueba de daños sufridos a raíz de los comentarios que implicaban la alegada conducta ilícita de sus compañeros en el Departamento de Justicia. Por lo tanto, no nos ha colocado en una posición apropiada para aplicar la norma de Soc. de Gananciales v. El Vocero de P.R., *supra*, a este caso.

# VI

## MALICIA REAL

Atenderemos ahora las expresiones alegadamente difamatorias de la señora Marrero y de la prensa. Indudablemente, desde lo resuelto en New York Times Co. v. Sullivan, *supra*, se han fortalecido las garantías constitucionales de libertad de expresión y de prensa, ya que "no es difamatoria la publicación, en el ejercicio de dicha[s] libertad[es], de un informe falso o de comentarios injustificados concernientes a la conducta oficial de un funcionario público, a menos que la información fuere publicada a sabiendas de que era falsa o con grave menosprecio de si era falsa o no". García Cruz v. El Mundo, Inc., *supra*, pág. 178 (citando Torres Silva v. El Mundo, Inc., 106 D.P.R. 415 (1977)). Bajo ese marco legal, tenemos el deber de verificar si, de nuestro examen independiente del récord, surge evidencia clara y convincente de que la licenciada Meléndez probó la existencia de malicia real de parte de la señora Marrero y la prensa.

## A. LAS PUBLICACIONES DE LA SEÑORA MARRERO

### *VERSIÓN DE LOS HECHOS DE LA SEÑORA MARRERO*

La señora Marrero testificó que desde su primera visita al C.M.I.D., la licenciada Meléndez comenzó a hacerle observaciones que la hacían sentir incómoda, tales como lo lindo que tenía su pelo y los troncos de piernas

que tenía, que le gustaba verla maquillada y arreglada, y que no se debía poner su chaqueta porque se veía "chulísima" sin ella puesta. En una ocasión le preguntó qué hacía para enchular a los hombres. Expresó también que en varias ocasiones la licenciada Meléndez le tocaba el pelo y a veces le acariciaba el cuello. Testificó que este tipo de comportamiento duró desde septiembre de 1990 hasta después de abril de 1991.

Relató, además, que el 21 de diciembre de 1990, día de la fiesta de Navidad del Departamento de Justicia, ella y su compañera de trabajo, la Sra. Mayda Alicea (señora Alicea), le regalaron a su jefa un juego de ropa interior – un "set" de "panties y brasier" – y maquillaje. La señora Marrero testificó que la licenciada Meléndez les dijo que tendría que guardarlo para una ocasión especial, mirándola fijamente al decirlo. También alegó que ese mismo día, mientras sacaba fotocopias al mediodía, la licenciada Meléndez se le acercó por detrás y le agarró una nalga, comentando que estaba engordando.

Otro supuesto incidente ocurrió en abril de 1991, en la Semana de las Secretarias. Las señoras Marrero y Alicea salieron a almorzar con el fiscal Rafael A. Díaz Díaz (fiscal Díaz) y no regresaron a la oficina hasta tarde. La señora Marrero cuenta que la licenciada Meléndez las regañó por la tardanza, dando puños en el escritorio, e hizo comentarios aludiendo a que la demora

se debió a una relación íntima entre ellas y el fiscal Díaz.

Ante esta situación, la señora Marrero indicó que, para fines de mayo de 1991, le informó todo lo sucedido al Lcdo. Roberto Buono Grillasca (licenciado Buono) cuando éste le preguntó sobre su relación con la licenciada Meléndez. Éste corroboró que la señora Marrero le describió los comentarios de la licenciada Meléndez sobre lo lindo que tenía el pelo, lo guapa que era y que una vez le agarró la nalga. Fue el licenciado Buono quien le sugirió a la señora Marrero que lo que ella le relataba era hostigamiento sexual.

La señora Marrero también testificó que le expresó a los fiscales Santiago Martínez y Duprey, entre otros,[37] sobre la situación hostil que estaba pasando con la licenciada Meléndez y los actos de hostigamiento sexual.

## VERSIÓN DE LOS HECHOS DE LA LICENCIADA MELÉNDEZ Y OTROS

La licenciada Meléndez, por su parte, negó que hubiese tocado a la señora Marrero, y mucho menos de la forma en que ella lo describió. Testificó, además, que jamás se hubiera dirigido verbalmente a la señora Marrero de esa manera porque no es su estilo de ser ni hablar.

La licenciada Meléndez describió en su testimonio que la señora Marrero y su compañera de trabajo, la señora

---

[37] A la pregunta de con qué fiscal había hablado de su caso antes del 5 de noviembre de 1991, la señora Marrero contestó: el fiscal José Gilot Robledo, el fiscal Paquito Rivera, el fiscal Santiago Martínez, y el fiscal Goyco. También mencionó haber hablado con las señoras Machuca, Mayda Alicea (señora Alicea) y Elba Mejías Muñiz (señora Mejías).

Alicea, tenían una mala relación con el resto del personal de la oficina, al extremo de que el personal de Secretaría evitaba pasar frente el escritorio de la señora Marrero para de esa manera no tener ningún contacto con ella.

El Lcdo. Luis Rivera Martínez (licenciado Rivera Martínez), Subdirector del C.M.I.D., testificó que había conflictos y diferencias bastante marcadas entre las empleadas, y que "se maltrataban a veces hasta verbalmente".

La fiscal Lora también corroboró que el ambiente en el C.M.I.D. era hostil entre las taquígrafas y la señora Marrero.

Aunque varios de los anteriores directores del C.M.I.D. testificaron en cuanto al excelente trabajo de la señora Marrero,[38] la licenciada Meléndez sintió que ésta demostraba cierta resistencia hacia ella desde su llegada al C.M.I.D. porque representaba una figura de autoridad a la que tenía que responder. La licenciada Meléndez supuso que a la señora Marrero no le agradó que la hubiese despojado de varias responsabilidades administrativas que había adquirido bajo el director anterior que le daban "cierta autoridad sobre el resto de los empleados". Describió que la señora Marrero resentía que se le dieran instrucciones, contestándole "que no la ajorara", y que

---

[38]   Éstos incluyeron al fiscal Roberto González Rivera, el fiscal Osvaldo Rivera Maldonado, y el fiscal Santiago Martínez.  El Lcdo. Roberto Buono Grillasca (licenciado Buono) también declaró en cuanto a la excelente capacidad de la señora Marrero como secretaria.

también tenía que tolerar sus "actitudes arrogantes, llegadas tarde, palabras duras de parte de ella a veces hacia mí, a veces hacia otro personal".

Un ejemplo de la insubordinación que demostraba la señora Marrero ocurrió el mismo 21 de diciembre de 1990, fecha de la fiesta de Navidad del Departamento de Justicia. Ese día, las señoras Marrero y Alicea llegaron tarde al trabajo porque se habían ido a arreglar por la mañana. Después de llamarles la atención por la tardanza, al mediodía la licenciada Meléndez le pidió a la señora Marrero que terminara de preparar un memorando que estaba pendiente. La señora Marrero se molestó y le dijo que el memorando no tenía ninguna urgencia dado que ya habían cesado las funciones de la Oficina Central del Departamento de Justicia por las actividades de la fiesta navideña. Al comentarle de forma inmadura a la señora Alicea que ya no podría ir a la fiesta debido al trabajo asignado, la licenciada Meléndez le dijo que no se preocupara por lo pedido y que se fuera a la actividad.

En cuanto al regalo de Navidad de ropa interior que recibió de la señora Marrero, la licenciada Meléndez testificó que le sorprendió mucho porque en su opinión no era usual para una mujer hacer este tipo de regalo a otra mujer. Admitió que probablemente dijo algo sinónimo a lo expresado por la señora Marrero, de que lo guardaría para usarlo en una ocasión especial, pero sin el comentario adicional de "aunque tenga que esperar" como relató el

periódico y sin mirar a la señora Marrero de la manera que ésta lo describió.

También negó que agarrara el glúteo de la señora Marrero. En su lugar, la licenciada Meléndez recuerda que ese día le comentó a la señora Marrero que su falda estaba demasiada apretada e inapropiada para el trabajo.

El "incidente mayor" para la licenciada Meléndez sucedió la Semana de las Secretarias en abril de 1991, día en que las señoras Marrero y Alicea llegaron tarde de su almuerzo con el fiscal Díaz. La licenciada Meléndez testificó que la reacción de la señora Marrero al reprocharle por la tardanza en regresar a la oficina fue explosiva, y que fue ésta quien dio puños en el escritorio y se puso histérica. Declaró que ese suceso, además de otros incidentes y actitudes arrogantes por parte de la señora Marrero, le restaron su confianza en ella y la motivaron a empezar a indagar sobre la posibilidad de transferirla fuera del C.M.I.D.

La licenciada Meléndez indicó que le habló a su amigo, el licenciado Buono, sobre las dificultades que tenía con su secretaria y que éste ofreció conversar con la señora Marrero para solucionar el problema, lo cual hizo. El licenciado Buono testificó que nunca le informó a la licenciada Meléndez los detalles de lo que la señora Marrero le había relatado, los cuales le sorprendieron grandemente, y rehusó declarar en el juicio si le creyó a la señora Marrero o no.

Por otro lado, el fiscal Santiago Martínez negó que la señora Marrero le mencionara algo relacionado al alegado hostigamiento sexual, aunque sí recuerda que le había comentado que tenía problemas con su supervisora.

Otro hecho relevante es que antes de irse de vacaciones en mayo o junio de 1991,[39] la licenciada Meléndez le impartió instrucciones al Subdirector del C.M.I.D. para que no recomendara que la plaza de la señora Marrero fuera reclasificada a Secretaria Legal II porque no le parecía que ésta mereciera el ascenso. Por otro lado, durante el juicio también se leyó para el récord una sección de la deposición de la madre de la señora Alicea, donde ésta declaró que la señora Marrero le había dicho que no soportaba a la licenciada Meléndez y le declaró: "A nombre de Martha Marrero, la Fiscal no va a seguir siendo Fiscal y me la va a tener que pagar como Martha Marrero que me llamo".

### EL TRASLADO Y SECUELA

Del conjunto de testimonios presentados durante el juicio constan los siguientes eventos. El 7 de junio de 1991 la señora Marrero visitó la oficina del fiscal Goyco para solicitar un traslado, preferiblemente a la Fiscalía de San Juan, porque no se sentía a gusto trabajando con la licenciada Meléndez.

---

[39] Del testimonio de la licenciada Meléndez se desprende que ésta no recordaba la fecha exacta de cuándo se fue de vacaciones y aproximó que fue entre estos dos (2) meses.

La señora Marrero admitió que en esa ocasión no le mencionó que fuese víctima de hostigamiento sexual por su supervisora, sino que le indicó al fiscal Goyco que la licenciada Meléndez no le daba crédito por su trabajo y le hacía críticas injustas. Además, se quejó de que la fiscal no quería ayudarla con la reclasificación de su posición a Secretaria Legal II, la cual pagaba mejor.

Luego, el 19 de julio de 1991 la señora Marrero volvió a la oficina del fiscal Goyco y éste le notificó que la licenciada Meléndez estaba de acuerdo con el traslado dado los problemas de trabajo que tenían. De acuerdo al testimonio de la señora Marrero, fue entonces que le informó al fiscal Goyco del hostigamiento sexual. Alegó que el 2 de agosto de 1991 el fiscal Goyco le pidió que le entregara una solicitud de traslado por escrito, pero sin mencionar en este documento sus verdaderas razones para ello, es decir, el hostigamiento sexual.

El 5 de agosto de 1991, aunque fechada 2 de agosto, la señora Marrero le llevó al fiscal Goyco su solicitud por escrito, la cual no contenía referencia alguna a que la licenciada Meléndez la hostigaba sexualmente. Para el 12 de agosto de 1991 la señora Marrero comenzó a laborar en las oficinas de la Fiscalía de San Juan. Aunque tenía la expectativa de trabajar directamente para el fiscal Duprey, no había una plaza disponible en esa oficina, por lo que fue asignada a otra área de trabajo que no era de su agrado.

El próximo día, 13 de agosto de 1991, el programa de televisión "La Condesa del Bochinche" difundió que una secretaria del C.M.I.D. había sido trasladada a las oficinas de la fiscalía ubicada en el Centro Judicial de San Juan (Centro Judicial) tras ser víctima de hostigamiento sexual por parte de una fiscal de alta jerarquía. Al enterarse de lo propagado, la licenciada Meléndez se alarmó pensando que la noticia se refería a ella dado que no había otra mujer de alta jerarquía en el C.M.I.D., por lo que se comunicó con el fiscal Goyco. Sin embargo, éste le informó que la señora Marrero nunca le había hablado de hostigamiento sexual como razón para solicitar el traslado.

Al conocer lo anunciado por televisión y oír los rumores en los pasillos del Centro Judicial, el señor Purcell, periodista de El Vocero, llamó al fiscal Goyco para confirmar si era cierta la información difundida. El fiscal Goyco le explicó que sí había trasladado a una secretaria fuera del C.M.I.D., pero negó que fuera por razones relacionadas a hostigamiento sexual.

Posteriormente, el 19 de agosto de 1991 la señora Marrero le pidió al fiscal Goyco que la reinstalara en su puesto original en el C.M.I.D., lo cual le fue negado. Luego, la señora Marrero visitó la Unidad Anti-Discrimen del Departamento del Trabajo, pero no formalizó una querella oficial ante esa agencia.

El 15 de octubre de 1991 el fiscal Goyco recibió una carta de la señora Marrero, fechada el 1 de octubre de ese mismo año, en la cual manifestó que se había querellado con él en contra de la licenciada Meléndez por hostigamiento sexual en dos (2) ocasiones anteriores, y que nada se había hecho al respecto. También expresó que él le había pedido que solicitara el traslado de su lugar de trabajo sin aludir a sus razones verdaderas para ello, en el interés de evitar perjudicar a la licenciada Meléndez. En su carta, la señora Marrero no hizo referencia concreta alguna a un acto o evento de hostigamiento sexual en particular.

En su respuesta del 17 de octubre de 1991, el fiscal Goyco negó que la señora Marrero le hubiese comunicado verbalmente sus quejas de hostigamiento sexual y que él le pidiera que no las incluyera en su solicitud de traslado. También le informó a la señora Marrero que le solicitaría al Secretario de Justicia una investigación sobre las imputaciones de hostigamiento sexual hechas en contra de la licenciada Meléndez, además de una investigación separada relacionada a la conducta libelosa de la señora Marrero al hacer las recriminaciones difamatorias en contra de él.

El domingo 3 de noviembre de 1991 el señor Purcell entrevistó a la señora Marrero por varias horas en su hogar. Ésta le habló con mucha particularidad sobre todos los incidentes ocurridos entre ella y la licenciada

Meléndez, sin dejar fuera detalles gráficos del supuesto hostigamiento sexual.[40]  Esa amplia entrevista sirvió de fuente principal para la serie de artículos que comenzaron a publicarse en El Vocero a los dos (2) días.

El próximo día, 4 de noviembre, la señora Marrero se reportó al Fondo del Seguro del Estado por su condición emocional.  Testificó, sin embargo, que ya para entonces estuvo recibiendo tratamiento médico privado y tomando medicamentos para ayudar a controlar su estado emocional, el cual le impedía realizar sus labores.

En esa misma fecha, aunque recibida por la señora Marrero el 14 de noviembre del mismo año, la Unidad Anti-Discrimen del Departamento del Trabajo le envió a la señora Marrero una carta con instrucciones de cómo someterles una querella escrita, la cual casualmente no fue presentada por ésta sino hasta el 3 de enero de 1992.[41]

El Subsecretario de Justicia ordenó que se realizara una investigación interna de la querella para determinar si las alegaciones de hostigamiento sexual de la señora Marrero eran meritorias.  La señora Marrero ofreció una declaración jurada para dicha pesquisa, junto con la de otros veintiún (21) declarantes.  Sin embargo, la señora Marrero no compareció a la vista informal citada para que la licenciada Meléndez se enfrentara con la prueba, y se

---

[40]   El señor Purcell lo describió como una "kilométrica entrevista de cuatro o cinco horas".

[41]   Esta querella luego fue desistida voluntariamente por la señora Marrero, supuestamente para poder proseguir en el tribunal federal.

negó a firmar su propia declaración jurada aduciendo que no la firmaría sin que primero se le proveyera una copia. La investigación de la querella culminó el 4 de junio de 1992, con la determinación final de que las alegaciones de hostigamiento sexual de la señora Marrero eran falsas.[42]

En cuanto a la prueba pericial considerada en el juicio, la defensa de la señora Marrero presentó dos (2) peritos para probar la veracidad de lo alegado por su clienta. La siquiatra Dra. Cynthia Casanova Pelosi (doctora Casanova) concluyó que para la fecha de su examen, el 24 de marzo de 1992, la señora Marrero sufría de un trastorno post traumático y depresión mayor a consecuencia de ser hostigada sexualmente. Sin embargo, en su contrainterrogatorio admitió que no era usual que una víctima de hostigamiento sexual discutiera el asunto sufrido con un periodista y que para la misma época la señora Marrero podría haber estado afectada emocionalmente por otras circunstancias, incluyendo el hecho de que a su esposo se le estaba investigando criminalmente.

La señora Marrero también se sometió a una prueba de polígrafo el 27 de abril de 1996, dirigida por el poligrafista Dr. David Raskin (doctor Raskin). Las cuatro

---

[42]   A base de dicha determinación, la señora Marrero fue despedida de su puesto en el Departamento de Justicia. Sin embargo, después de presentar un recurso legal que se resolvió a su favor, ésta fue reinstalada en el año 1993 a su posición de Secretaria Legal I adscrita a la Secretaría Auxiliar de Asuntos Monopolísticos del Departamento de Justicia por el entonces Secretario de Justicia, Lcdo. Pedro Pierluisi.

De otra parte, en febrero de 1992, la señora Marrero instó un procedimiento judicial en el tribunal federal en contra del Departamento de Justicia, la licenciada Meléndez y el fiscal Goyco a causa del alegado hostigamiento sexual y supuesto encubrimiento de la querella por funcionarios de dicho departamento. Sin embargo, el caso inicialmente fue desestimado por el foro federal por razones procesales, mientras que el subsiguiente caso fue desistido voluntariamente por la señora Marrero en cuanto a la licenciada Meléndez.

(4) preguntas de la prueba, contestadas por la señora Marrero en la afirmativa, fueron las siguientes:

1) ¿Antes de julio de 1991, discutió usted con Santiago Martínez su inquietud de que Iris Meléndez podría haberla hostigado sexualmente?

2) ¿Le sugirió Santiago Martínez a usted que se comunicara con César Matos sobre su inquietud de que Meléndez la había hostigado sexualmente?

3) ¿Discutió usted con Goyco en julio y agosto de 1991 su solicitud de traslado debido a que Meléndez la había hostigado sexualmente?

4) ¿Le dijo Goyco a usted que no mencionara hostigamiento sexual en su solicitud por escrito para traslado?

El doctor Raskin interpretó los resultados como noventa por ciento (90%) indicativos de que la señora Marrero contestó verazmente.   Informe pericial doctor Raskin, Recurso - El Vocero, Ap. 1211-1213.

En vista de la prueba mayormente testimonial, el Tribunal de Primera Instancia tuvo que sopesar cuál versión de los hechos era más creíble.  A la luz de toda la evidencia – resumida por el Tribunal de Primera Instancia en más de sesenta y seis (66) páginas – el foro primario resolvió que la señora Marrero tenía "un plan concertado de hacer todo lo posible por mancillar y desacreditar la reputación de la [f]iscal Meléndez", y que sus imputaciones de hostigamiento sexual no tuvieron una base que las respaldara.   Sentencia del Tribunal de Primera Instancia, pág. 91.  Añadió que "las motivaciones alternas y el patrón de conducta desafiante y temerario por parte de la [señora] Marrero… no sólo le restan

credibilidad, sino que también nos permite ver la intención directa de difamar sin importar las consecuencias". Sentencia del Tribunal de Primera Instancia, pág. 92.

Por entender que los apelantes no mostraron prejuicio o parcialidad de parte del juzgador, el Tribunal de Apelaciones le otorgó deferencia al Tribunal de Primera Instancia en cuanto a su determinación, fundamentada a base de los testimonios recibidos, de que la señora Marrero mintió acerca de las imputaciones de hostigamiento sexual. En cuanto a la prueba pericial, conforme la regla general esbozada en López v. Dr. Cañizares, 163 D.P.R. 119, 135-136 (2004), el Tribunal de Apelaciones la evaluó por sí mismo y concluyó que "adolec[ía] de deficiencias que le resta[ban] peso en contraposición con el resto de la prueba del caso". Sentencia del Tribunal de Apelaciones, pág. 40. Por lo tanto, afirmó que la señora Marrero publicó sus imputaciones de hostigamiento sexual a sabiendas de su falsedad.

De nuestro análisis del expediente, concordamos con el resultado del Tribunal de Primera Instancia y el Tribunal de Apelaciones: la licenciada Meléndez probó clara y convincentemente que la señora Marrero tuvo conocimiento de la falsedad de sus imputaciones difamatorias y las publicó a sabiendas de dicha falsedad.

Si bien es cierto que el trasfondo procesal del juicio en el caso de autos es uno fuera de lo común, no

cabe duda que el Juez Roque Colón ciertamente pudo apreciar la credibilidad de los testigos que proveyeron sus extensos testimonios ante él. Tampoco hay reparo en cuanto al hecho de que la señora Marrero declaró ante el Juez Roque Colón durante dos (2) días. Igualmente, el fiscal Goyco y la fiscal Lora fueron llamados a testificar nuevamente durante la segunda fase del juicio. Como pronunciamos anteriormente, esto le dio la oportunidad al magistrado de aquilatar la credibilidad de estos testimonios. El Juez Roque Colón estuvo en una mejor posición para sopesar la prueba oral que un tribunal apelativo obrando con sólo una transcripción silenciosa. Estamos de acuerdo con la observación del Tribunal de Apelaciones de que "toda vez que la prueba de un caso debe evaluarse en conjunto, resulta evidente que un juez que, si bien no presidió el juicio durante los noventa y un (91) días que duró el mismo, sí recibió prueba durante treinta y siete (37) de éstos[,] está en mejor posición que este Tribunal para formular las correspondientes determinaciones de hechos". Sentencia del Tribunal de Apelaciones, págs. 32-33.

A la luz de nuestra discusión sobre el estándar de revisión apelativa adecuada en casos de difamación de una figura pública, aun desempeñando un examen independiente de la prueba, las determinaciones de credibilidad no se descartarán a menos que sean claramente erróneas. Harte-Hanks Communications v. Connaughton, *supra*, pág. 688.

Nada nos lleva a opinar que se cometió tal error en el juicio ante nuestra consideración. Por lo tanto, le brindamos deferencia a la determinación de instancia relativa a que la señora Marrero mintió al formular sus imputaciones de hostigamiento sexual en contra de la licenciada Meléndez.

Asimismo, la abrumadora cantidad de prueba oral desmintiendo a la señora Marrero y exponiendo su hostilidad hacia la licenciada Meléndez supera las contribuciones que la prueba pericial hace en favor de la señora Marrero. Es regla bien conocida en nuestra jurisdicción que la presencia de prueba pericial no obliga a éste o a cualquier tribunal a decidir un caso conforme lo sugerido por los peritos. Culebra Enterprises Corp. v. E.L.A., 143 D.P.R. 935, 952 (1997); Díaz García v. Aponte Aponte, 125 D.P.R. 1, 13 (1989).

Según nuestro parecer, el peso del informe pericial de la doctora Casanova fue mitigado dado que ésta llegó a su conclusión tomando como ciertas las alegaciones de la señora Marrero. Ello sin haber hablado con la licenciada Meléndez y sin haber revisado las transcripciones de las deposiciones de las otras partes, tal como había solicitado. En cambio, el juzgador de los hechos sí pudo formar su opinión relativa a la falta de credibilidad de la señora Marrero con información suplida por todas las partes y no sólo a base de un punto de vista parcial. La doctora Casanova tampoco descartó la posibilidad de que

los rasgos depresivos que le diagnosticó a la señora Marrero fueran causados por otros factores personales y no por los supuestos incidentes de hostigamiento que describió.

Por otro lado, las preguntas del doctor Raskin no inquirieron directamente sobre los alegados hechos de hostigamiento sexual. Más bien, las preguntas suministradas apuntaron hacia si la señora Marrero le *informó o no* al fiscal Santiago Martínez y/o al fiscal Goyco que se sentía hostigada sexualmente por su supervisora. Informe pericial doctor Raskin, Recurso - El Vocero, Ap. 1211 ("The purpose of the examination was to assess her credibility with regard to her allegations that she *reported* that she had been sexually harassed by her supervisor District Attorney IRIS D. MELÉNDEZ VEGA." (Énfasis nuestro)). Sin embargo, según notamos anteriormente, el enfoque del presente caso está centrado sobre si la licenciada Meléndez fue difamada al ser acusada de cometer actos de hostigamiento sexual dirigidos a su ex-secretaria; no los alegados actos de encubrimiento de la querella. Además, tal como estableció el Tribunal Supremo Federal en U.S. v. Scheffer, 523 U.S. 303, 309 (1998), nos consta que pruebas de esta índole, es decir, poligráficas, resultan ser poco confiables.

Resulta también curioso que la señora Marrero hubiese declarado en la investigación del Departamento de Justicia que más de treinta (30) personas tenían conocimiento

personal del hostigamiento, pero en el juicio instado en su contra no pudo presentar testigo alguno que corroborara el alegado comportamiento ilícito de la licenciada Meléndez. La única excepción fue la Sra. Elba Mejías Muñiz (señora Mejías), taquígrafa que trabajaba en el C.M.I.D. y amiga de la señora Marrero, quien testificó que una vez oyó cuando la licenciada Meléndez le dijo a la señora Marrero que no se debía poner su chaqueta porque se veía "sexy" sin ella. Sin embargo, los abogados de la licenciada Meléndez impugnaron a esta testigo exitosamente al confrontarla con las declaraciones que realizó en su deposición donde confesó que su conocimiento de los hechos era basado enteramente en lo que la señora Marrero le relataba.[43]

Tampoco podemos obviar la prueba presentada relativa a la animosidad que la señora Marrero albergaba en contra de la licenciada Meléndez.[44] Sin lugar a dudas, la señora Marrero fue excelente trabajadora bajo la dirección de los

---

[43] La señora Mejías también testificó que en una ocasión en febrero de 1991 la licenciada Meléndez le pidió que se quedara hasta tarde para terminar de transcribir unas declaraciones de testigos que se iban a juramentar el próximo día, y que mientras hacía el trabajo pedido, la fiscal se le presentó en la oficina vestida en ropa interior para decirle lo contenta que estaba con su trabajo. No obstante, sólo le informó de este incidente a su esposo, a la señora Marrero y a una tal Loyda. La licenciada Meléndez negó que esto ocurriera. Resulta curioso, sin embargo, que aunque la señora Marrero tuvo conocimiento de dicho incidente para febrero de 1991 – el cual es sumamente pertinente a sus propias alegaciones de hostigamiento sexual de parte de la licenciada Meléndez – el suceso no tuvo despliegue alguno en la serie del periódico objeto de esta causa de acción que abarcó desde noviembre de 1991 hasta septiembre de 1993. Lo imputado por la señora Mejías en contra de la licenciada Meléndez no se anunció sino hasta su deposición tres (3) años más tarde.

[44] Harte-Hanks Communications v. Connaughton, *supra*, pág. 668 ("Although courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence,… and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." (Citas internas omitidas)); Smolla, Smolla and Nimmer on Freedom of Speech, op. cit., pág. 23-21 ("While ill-will malice may not be equivalent to actual malice, it is nonetheless a factor that may be considered in determining whether actual malice exists.").

anteriores jefes del C.M.I.D., pero su disposición hacia la licenciada Meléndez resultó ser todo lo contrario. El hecho de que sus responsabilidades fueran disminuidas y que la fiscal no la recomendara para el ascenso de posición laboral evidencian un posible motivo para difamarla intencionalmente.

Por consiguiente, tomando en cuenta que el Tribunal de Primera Instancia no le dio credibilidad a la señora Marrero, pero sí a la licenciada Meléndez; la tensión que marcaba la relación profesional entre ellas, así como la de la señora Marrero con el resto del personal del C.M.I.D.; y en vista de todas las circunstancias que rodean las falsas expresiones en el caso de autos, confirmamos que se probó malicia real por parte de la señora Marrero de manera clara y convincente. Debido a que las alegaciones falsas se referían a la licenciada Meléndez de manera específica, ocasionándole daños a su reputación, según explicamos más adelante, resolvemos que la causa de acción por difamación en contra de ésta se concretó.

Cabe señalar también que, contrario a lo que alega la señora Marrero como planteamiento de error, no se le impuso responsabilidad por las publicaciones e información diseminada *por El Vocero*, de las cuales obviamente no tuvo control, participación o poder decisional. Más bien, la señora Marrero responde ante la licenciada Meléndez únicamente por lo que ella misma comunicó a las diferentes

personas con quien discutió los hechos falsos. No cabe duda de que, a base de la evidencia creíble en el récord, la señora Marrero difamó a la licenciada Meléndez.

## B. LAS PUBLICACIONES DE LA PRENSA

La prensa, por su parte, critica la poca profundidad en que se adentraron el Tribunal de Primera Instancia y el Tribunal de Apelaciones en los extensos hechos presentados durante el transcurso del largo juicio. Señala que esto denota la falta de prueba demostrativa de malicia real. También argumenta que ambos foros recurridos incumplieron con su deber revisor al analizar la serie de artículos de manera generalizada y englobada en lugar de aquilatar cada uno de los cuarenta y tres (43) artículos individualmente para determinar si cumplían con los elementos jurídicos necesarios para ser difamatorios. Además, reclama estar cobijada bajo el privilegio del informe justo y verdadero. Veamos.

Conforme indicamos anteriormente, en calidad de foro revisor nos toca realizar una evaluación independiente de la prueba presentada ante el Tribunal de Primera Instancia para determinar si el señor Purcell y El Vocero efectivamente obraron con malicia real en su vertiente de obrar con un grave menosprecio de si lo publicado era falso o no al diseminar las imputaciones de la señora Marrero de ser víctima de hostigamiento sexual por parte de la licenciada Meléndez.

En St. Amant v. Thompson, 390 U.S. 727 (1968), el Tribunal Supremo Federal estableció algunas guías amplias para determinar lo que constituye actuar con grave menosprecio, tal y como es requerido en el ámbito de la difamación:

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.  There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.  Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

Íd. pág. 731.   Véase Harte-Hanks Communications v. Connaughton, *supra*, págs. 666, 688; Rosenblatt v. Baer, *supra*, pág. 84.

Jurisprudencialmente incorporamos ese concepto a nuestro ordenamiento legal de la siguiente manera:

> No puede establecerse el grave menosprecio a que alude la norma, a menos que la prueba sostenga una determinación de que el demandado albergaba un alto grado de conciencia de la probable falsedad…. Es imprescindible que el demandado en efecto abrigue serias dudas sobre la certeza de la publicación…. Se ha resuelto que aun prueba de mala voluntad u odio no satisface de por sí el grado constitucionalmente requerido de la prueba de malicia…. Se ha resuelto también que el 'grave menosprecio' a que alude la norma no se mide por lo que un hombre razonablemente prudente hubiese publicado o hubiese investigado antes de la publicación.  Tiene que existir prueba suficiente que permita concluir que el demandado abrigaba serias dudas sobre la certeza de la información….

García Cruz v. El Mundo, Inc., *supra*, págs. 180-181 (citas, comillas y elipsis omitidas).  Véase Garib Bazain v. Clavell, *supra*, pág. 484.

Ahora bien, esto no significa que un demandado puede asegurarse un resultado favorable en un pleito de difamación con simplemente testificar que creyó en la veracidad y certeza de lo publicado. Es deber del juzgador de los hechos determinar la buena fe del demandado al momento de éste publicar. St. Amant v. Thompson, *supra*, pág. 732. Véase R.A. Smolla, Smolla and Nimmer on Freedom of Speech, Minnesota, West, 2011, Vol. 3, págs. 23-22 - 23-23 ("It is a fundamental axiom of defamation law that actual malice is often proven by circumstantial evidence and that mere protestations of good faith by a defendant do not preclude establishing actual malice through other inferential or circumstantial proof.").

En aras de asistir a los tribunales de instancia en el proceso de sopesar prueba relevante a la cuestión de grave menosprecio, el Tribunal Supremo de los Estados Unidos ha señalado varios ejemplos donde la evidencia circunstancial podría resultar suficientemente poderosa para refutar la alegada buena fe del declarante. Éstos son: cuando hay evidencia de que la información fue fabricada por la persona que lo publicó o se basó enteramente en una fuente anónima; cuando las alegaciones son tan inherentemente improbables que sólo una persona temeraria las pudo haber publicado; o cuando existen razones obvias para dudar de la veracidad del informante o

la precisión de la información suplida.[45]  St. Amant v. Thompson, *supra*, pág. 732.  Véase García Cruz v. El Mundo, Inc., *supra*, pág. 181 ("[L]a información puede ser tan inherentemente improbable que tan solo una persona temeraria pueda decidir difundirla.  Pueden existir también razones obvias para dudar de la veracidad de la fuente." (Citas internas omitidas)).  Véase, además, Krans Bell v. Santarrosa, 172 D.P.R. 731, 732-757 (2007) (Opinión disidente Juez Asociado señor Rivera Pérez).

Por otro lado, es regla bien establecida por el Tribunal Supremo Federal que la falta de investigación antes de publicar, sin más, no es suficiente para establecer malicia real, aunque una persona prudente lo hubiera hecho.  Harte-Hanks Communications v. Connaughton, *supra*, pág. 688; St. Amant v. Thompson, *supra*, pág. 733. Véase Elder, op. cit., pág. 7-141.

Sin embargo, prueba de que quien publicó la información evitó intencionalmente auscultar información de otras fuentes que contradicen la versión publicada, sí podría demostrar malicia real en algunas circunstancias.

---

[45]  St. Amant v. Thompson, 390 U.S. 727, 732 (1968) (nota al calce omitida):

The finder of fact must determine whether the publication was indeed made in good faith.  Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call.  Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation.  Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

Harte-Hanks Communications v. Connaughton, *supra*, pág. 692 (cita omitida). Véase Elder, op. cit., pág. 7-117 (A "publication may suffice to show knowing or reckless disregard of falsity where the nature of the known contradictory or refutatory evidence is such as to suggest that defendant's information was quite probably in error".). Véase, además, Cabrero v. Zayas, 167 D.P.R. 766, 777 (2006) (Sentencia) (Opinión de conformidad de la Juez Asociada señora Rodríguez Rodríguez).

En Harte-Hanks Communications v. Connaughton, *supra*, el Tribunal Supremo de los Estados Unidos ilustró cómo un conjunto de prueba circunstancial puede dar lugar a una inferencia de malicia real. En ese caso, el periódico demandado recibió información de una tal Alice Thompson quien alegaba que Daniel Connaughton, candidato para juez municipal, le había ofrecido recompensas a ella y a su hermana por cooperar en una investigación sobre la conducta ilícita de un empleado de su rival electoral. Después de recibir dicha información, los reporteros del periódico entrevistaron al señor Connaughton y todos los demás testigos de la conversación entre éste y la informante, excepto a la hermana de la señora Thompson. Todos rotundamente negaron lo imputado por la señora Thompson. No obstante, el rotativo decidió publicar lo alegado por ésta.

El Tribunal Supremo Federal resolvió que los siguientes factores, junto con la determinación unánime de credibilidad dada por el jurado a la versión de los hechos ofrecida por el señor Connaughton, eran indicativos de malicia real. Encontró sospechoso que se entrevistaran a todos los testigos del evento menos a la hermana de la señora Thompson, quien representaba la única persona sin interés en proteger la imagen del señor Connaughton y quien hubiera podido confirmar las imputaciones. Los seis (6) testigos, excluyendo la señora Thompson y su hermana, corroboraron la versión pautada por el señor Connaughton, negando que se ofrecieran recompensas de clase alguna. El periódico tampoco escuchó las grabaciones de la conversación entre la señora Thompson y el señor Connaughton para verificar si lo imputado era o no cierto. Por último, el Foro máximo dedujo que el editorial que se publicó el día antes de recibir las negaciones de lo relatado por la señora Thompson – el cual aludía a futuras noticias concernientes a la integridad de los candidatos – fue indicativo de la decisión inequívoca del demandado de publicar las imputaciones difamatorias, sin importar la falta de corroboración. Harte-Hanks Communications v. Connaughton, *supra*, págs. 681-685. El Tribunal Supremo determinó que, ante la totalidad de la prueba, se tomaron decisiones deliberadas para no adquirir conocimiento que llevara a confirmar la probable falsedad de lo informado. Íd. pág. 692.

Pasando al caso de autos, el Tribunal de Primera Instancia concluyó que la prensa no mostró un mínimo de interés en cotejar la veracidad de la información que publicó concerniente a la licenciada Meléndez, a la vez que encontró que la "confiabilidad de las fuentes principales, la [señora] Marrero y el [licenciado] Santiago Rivera, era sumamente cuestionable". Sentencia del Tribunal de Primera Instancia, pág. 88. En cuanto al señor Roca, el entonces Presidente de El Vocero, encontró que éste tuvo participación activa en las publicaciones y permitió que se publicaran las falsedades al no exigir corroboración. En apelación, el tribunal apelativo intermedio confirmó que la licenciada Meléndez probó "clara y convincentemente que el [señor] Purcell rehusó intencionalmente obtener información que contradecía las alegaciones de la [señora] Marrero". Sentencia del Tribunal de Apelaciones, pág. 52.

La prensa difiere de dichas determinaciones. Plantea que ambos tribunales obviaron cierta prueba indicativa de la veracidad de las alegaciones de la señora Marrero y que el señor Purcell no estaba obligado a entrevistar a la licenciada Meléndez o a dudar de las alegaciones aportadas por su informante, la propia víctima del hostigamiento sexual, frente a las negaciones de terceros sobre los supuestos actos impropios de la licenciada Meléndez.

Nuestro examen de la prueba presentada durante el largo juicio, la cual guarda semejanzas notables al cuadro fáctico de Harte-Hanks Communications v. Connaughton, *supra*, nos convence que las circunstancias atinentes a la decisión de la prensa de publicar los artículos difamatorios fue una revestida de malicia real. Veamos.

En su deposición, el señor Purcell indicó que la primera vez que supo del traslado de una secretaria del C.M.I.D., que luego se enteró era la señora Marrero, debido al supuesto hostigamiento sexual fue el 13 de agosto de 1991 vía conversaciones con diversos funcionarios en el Centro Judicial, quienes comentaban sobre lo anunciado ese día en "La Condesa del Bochinche". Dijo que varios fiscales,[46] alguaciles y secretarias le habían informado que la señora Marrero les indicó haberse quejado al fiscal Goyco por el hostigamiento sexual. No obstante, el señor Purcell tuvo que admitir que estos informantes nunca le confirmaron que la vieron acudir al fiscal Goyco. También testificó que desde que oyó los rumores por los pasillos del Centro Judicial implicando a la licenciada Meléndez con lo informado en el programa de televisión, lo dio por cierto.[47] Nos llama la atención que

---

[46]    Curiosamente, todos los fiscales que nombró como fuentes niegan haberle suplido información, incluyendo los fiscales Santiago Martínez y Paquito Rivera.

[47]    Dep. Purcell, 4 oct. 1995, pág. 138:

Pregunta:    Nunca se planteó que nada de eso fuese cierto?
Respuesta:    No, no, no, yo, yo tan pronto me entero de, de todo esto, estoy convencido de que esto era cierto y luego el tiempo me dio la razón,….

el señor Purcell llegó a esta conclusión operando puramente a base de rumores y sin haber hablado con la señora Marrero o la licenciada Meléndez.

Posteriormente, el señor Purcell llamó al fiscal Goyco para verificar si lo comentado era cierto. Este último negó que el traslado de la secretaria hubiese sido motivado por hostigamiento sexual. Sin embargo, el señor Purcell testificó que no le creía al fiscal Goyco dado el historial entre ellos y por toda la otra información que ya había recibido de terceros.

A mediados del mes de agosto de 1991, armado con esa pesquisa limitada, redactó y sometió a El Vocero un artículo exponiendo como ciertos los rumores de que la directora del C.M.I.D. había hostigado sexualmente a su secretaria. El señor Purcell testificó que en ese momento se sentía bastante seguro de que estaba publicando información veraz y nunca consideró la posibilidad de que la existencia de una querella fuese falsa.[48]

---

[48] Dep. Purcell, 4 oct. 1995, págs. 129-130:

Pregunta:   Contempló usted la posibilidad de que no hubiese una querella radicada?
Respuesta:  No, señora, no tengo por qué dudar si algunos fiscales y otra gente me dice que ya ella le ha dicho que ha estado en conversación con Goyco desde junio, no tengo por qué negarlo….

....

Respuesta:  Digo, por qué no creerlo, perdone.
Pregunta:   A ese momento el señor Goyco se lo ha negado y usted ha rechazado la negativa del señor Goyco por las razones que nos dio ahorita?
Respuesta:  Sí, señora. Eso es lo que hace que no se publique este primer artículo.

En ese mismo mes de agosto, el señor Purcell también tuvo una conversación con la fiscal Lora sobre el supuesto hostigamiento sexual.  Ella le indicó que no podía ser cierto que la licenciada Meléndez hubiese hostigado a su ex-secretaria y que él debía entrevistarla si interesaba conocer lo que realmente sucedió.  Sin embargo, el señor Purcell declinó la invitación de hablar con la licenciada Meléndez.[49]  La actitud del señor Purcell en ese momento y el hecho de que escribió un borrador sin corroboración sustantiva alguna del hostigamiento sexual demuestran que no estaba dispuesto a recibir información que lo llevara a cuestionar la veracidad de lo que hasta ese momento eran rumores.

Transcurridos varios días y al percatarse de que no se había publicado su borrador, el señor Purcell llamó a las oficinas de El Vocero para indagar al respecto. Testificó en su deposición que, siendo un periodista de una larga carrera, naturalmente quería que todo lo que él escribiera se publicara y entendía que el artículo estaba listo para imprimirse.  Eventualmente, el señor Roca le informó que el borrador se había referido a la División Legal porque se trataba de un asunto delicado.  Los

---

[49]    La fiscal Lora testificó que la conversación con el señor Purcell transcurrió de la siguiente manera:

> Yo le dije: "¿Pero tú hablaste eso con Iris o con Martha?" Me dijo que no, que él no sabía quién era Martha.  Entonces yo le dije quien era Martha….  Entonces le dije: "Pero habla con Iris."  Y me dice: "Yo no tengo nada que hablar con Iris sobre eso.  Yo sé que lo que me dijeron es cierto."  Yo dije: "Pero es que tú no puedes creer una cosa tan ilógica como esa.  Tú sabes muy bien que eso no puede ser."  Y me dijo: "No, eso es cierto". … [É]l dijo que a él le había parecido raro de primera intención.

Trans. 20 dic. 2000, pág. 348.

abogados del periódico le informaron al señor Purcell que no aprobaron la publicación del artículo dado que el fiscal Goyco negaba que hubiese una querella de hostigamiento sexual, pero le advirtieron, "si investigas y consigues corroboración, hablamos entonces". A base de ello, el señor Purcell se "dedi[có] de lleno, a partir de agosto, hasta noviembre" a conseguir la corroboración necesaria.

En el curso de su búsqueda, el señor Purcell volvió a entrevistar al fiscal Goyco el 17 de octubre de 1991, justo después de que éste recibió la carta de la señora Marrero donde ésta solicitó una investigación sobre la conducta impropia de la licenciada Meléndez. En esa reunión, el fiscal Goyco le mostró al señor Purcell la respuesta que le estaba cursando a la señora Marrero, donde negaba que tuviera conocimiento previo de las alegaciones en contra de la licenciada Meléndez.

Posteriormente, el 3 de noviembre de 1991 el señor Purcell finalmente logró entrevistar por varias horas a la señora Marrero. La encontró, en su opinión, coherente y creíble. A los dos (2) días, El Vocero publicó el primer artículo de la serie divulgando las alegaciones difamatorias de la señora Marrero en contra de su ex-supervisora.

Por otro lado, es curioso que el señor Roca, quien era el único supervisor del señor Purcell y quien decidía qué se publicaba en el periódico, nunca le pidió a éste

que le proveyese corroboración de lo alegado en sus escritos. Esto, cuando apenas cuatro (4) meses antes no permitió la publicación del primer borrador del señor Purcell porque su contenido era "delicado" por tratarse de hostigamiento sexual. Después de todo, como señaló el Sr. Cruz Roqué Vicens (señor Roqué), jefe de redacción de El Vocero, de ser falso lo difundido, dada la naturaleza de la noticia, le podía causar daños permanentes a la licenciada Meléndez. Sin embargo, del testimonio se desprende que la revisión editorial de lo redactado por el señor Purcell el día 4 de noviembre de 1991 se hizo ese mismo día y sin que mediara otro documento o prueba que no fuese dicho escrito.

De sus mínimos esfuerzos investigativos,[50] claramente surge que el señor Purcell sólo estaba interesado en corroborar lo que él ya daba por cierto. Es decir, que la señora Marrero se trasladó del C.M.I.D. por ser víctima de hostigamiento sexual de su supervisora, la licenciada Meléndez. Resulta curioso que casi inmediatamente después de hablar con la señora Marrero – a sólo dos (2) días – se publicó el primer artículo de lo que se convirtió en una larga serie. Aparentemente, la investigación del señor Purcell cesó del todo en cuanto habló con la alegada

---

[50] El señor Purcell resumió que para el artículo del 5 de noviembre de 1991, el primero de la serie, sólo había hablado con la señora Marrero, el fiscal Goyco, y el licenciado Buono, aunque este último negó haber hablado con él. No estimó necesario para su investigación periodística dedicarle tiempo para hablar con las demás personas mencionadas en su primer borrador.

víctima.[51]   Así pues, la prensa estaba satisfecha con publicar la versión de su fuente principal, la señora Marrero, y no encontró necesario cotejarla con otras fuentes que pudieran tener conocimiento directo de los eventos.   El único seguimiento que el señor Purcell hizo con respecto a la noticia consistió de sus conversaciones con el licenciado Santiago Rivera mientras se desarrollaba la investigación interna de la querella dentro del Departamento de Justicia y se iniciaba el pleito instado por la señora Marrero en el tribunal federal.[52]   Nos parece que la decisión de la prensa de publicar se hizo en ausencia de apreciación alguna de las circunstancias que rodeaban sus únicas fuentes.

El récord nos convence de que habían indicaciones suficientes para dudar de la veracidad de su informante principal.   Por ejemplo, la señora Marrero le aconsejó al señor Purcell que no debía molestarse en hablar con su compañera de trabajo, la señora Alicea, porque ésta

---

[51]   Dep. Purcell, 4 oct. 1995, págs. 117-118:

Pregunta:    Cuál, perdóneme, señor Purcell … cuál es el tiempo que se dedicó de lleno para investigar esto?

….

Respuesta:    Ah, sí, desde que el licenciado Marchand me notifica que no me puede autorizar la publicación, eso debe ser a mediados de agosto, 18, 19, 20, no puedo precisar, licenciada.

….

Hasta el 5 de novi' … bueno, no, yo escribo el 4 y se publica 5.

[52]   Véase lo indicado en las notas al calce número 41 y 42, *supra*.

negaría haber presenciado los actos de hostigamiento por miedo a represalias en su trabajo. La señora Alicea se llevaba bien con la señora Marrero y la pudo haber desmentido – lo cual eventualmente hizo – sin el pretexto de que quería favorecer a la licenciada Meléndez. Esta instrucción de la señora Marrero y la omisión de la prensa de hablar con la señora Alicea es conducta similar a la de la informante y el periódico en Harte-Hanks Communications v. Connaughton, *supra*, factor que causó incredulidad para el máximo Foro federal. Esto debió de haber levantado sospechas y llevar al señor Purcell a cotejar la veracidad y credibilidad de la información suplida por su informante antes de aceptar ciegamente su versión de los hechos. Sin embargo, en lugar de comparar notas con otras fuentes que pudieran haber clarificado lo que realmente provocó el traslado de la señora Marrero, inclusive entrevistar aquellas personas señaladas por la propia señora Marrero que alegadamente tenían conocimiento personal del hostigamiento sexual – tal como se hizo en Harte-Hanks Communications v. Connaughton, *supra* – el señor Purcell recopiló en sus reportajes todo lo informado por la señora Marrero y su representante legal, el licenciado Santiago Rivera.[53] Aunque éstos ciertamente tenían un interés

---

[53] Aunque los artículos de El Vocero incluyeron la negación del fiscal Goyco de que hubo hostigamiento sexual, este hecho no necesariamente atempera el cálculo de malicia real. Harte-Hanks Communications v. Connaughton, *supra*, págs. 680-681 (notando que el artículo difamatorio también incluía la negación del difamado y su versión contraria de los hechos).

personal en confirmar lo imputado, el señor Purcell rehusó considerar la posibilidad de que le estuviesen mintiendo.[54]

Otra indicación de la falta de credibilidad de la señora Marrero surge de las múltiples negaciones que recibió el señor Purcell antes de comenzar y durante la publicación de la serie.[55] Inicialmente, el fiscal Goyco y la fiscal Lora lo negaron. Luego, a raíz de la primera publicación de 5 de noviembre de 1991, muchas personas "desde los de mantenimiento hasta jueces del apelativo" le expresaron dudas sobre lo relatado. Inclusive, se organizó una conferencia de prensa en apoyo de la licenciada Meléndez el mismo 5 de noviembre de 1991, la cual el señor Purcell rápidamente abandonó cuando la señora Alicea le negó lo que la señora Marrero le había

---

[54]     En cuanto a la señora Alicea, el señor Purcell expresó lo siguiente:

Pregunta:     Se planteó usted la posibilidad, don José, de que fuese que lo iba a negar porque en efecto no había ocurrido?
Respuesta:    No, no, no me interesaba eso.

Dep. Purcell, 4 oct. 1995, pág. 192.

[55]    Véase Elder, op. cit., pág. 7-139 ("[A] reporter is not compelled to accept [a plaintiff's] denials as determinative or to accept them over apparently believable accusations…. However, such denials, although not decisive either way, are at least evidence to be considered on the issue of constitutional actual malice and may, together with other factors, be highly probative of actual malice." (comillas y notas al calce omitidas)). Véase, también, Smolla, Smolla and Nimmer on Freedom of Speech, op. cit., págs. 23-24:

A person who is the subject of a story being investigated will often strongly deny the defamatory charges…. Such a denial may or may not impact on the actual malice calculus, depending on the circumstances. If the denial is of a kind that would plausibly induce subjective doubt, then the denial may be a factor that can be used to construct a case for the existence of actual malice, *for once a publisher has reasons to doubt the accuracy of a story, the publisher must act reasonably to dispel those doubts prior to publishing….*

(Énfasis nuestro).

informado. A pesar de no haberle hecho caso a las negaciones y/o dudas antes de publicar el primer artículo, por lo menos lo debió de haber tomado en cuenta para los siguientes reportajes redactados. Sin embargo, el señor Purcell testificó que no le llamó la atención ni le dio importancia[56] y siguió publicando la serie de artículos.

Aparenta ser que el señor Purcell estaba dedicado a hacer lo necesario para que se publicara lo que relató en el borrador que escribió en agosto de 1991, incluyendo

---

[56] Dep. Purcell, 4 oct. 1995, pág. 79:

Pregunta:      Que si a usted le llamó la atención que todas estas personas desde mantenimiento hasta jueces del apelativo, le preguntaran que si esto, refiriéndose a los artículos que nos tienen aquí, era cierto?
Respuesta:     No me llamó la atención.  No.

Dep. Purcell, 4 oct. 1995, pág. 84:

Pregunta:      A usted no le preocupaba que si eran muchas las que estaban negando, eso para su función periodística era importante?
Respuesta:     No, señora.  Yo no ando recogiendo encuestas …

Dep. Purcell, 4 oct. 1995, págs. 85-87:

Pregunta:      Unjú.  Y lo que quiero tener claro, señor Purcell, es por qué usted entendía que los que les estaban diciendo que esto no era cierto, a esos usted no tenía que prestarle mucha atención?

                              ….

Respuesta:     Yo los escucho a todos por igual…
Pregunta:      Anjá.
Respuesta:     Escuchaba a los que me decían que dudaban de que doña Iris y también escuchaba a los otros.
Pregunta:      Unjú…?
Respuesta:     No usé sus opiniones para nada de mis artículos; entonces lo que hice fue atenderlos por cortesía porque no usé nada de sus revelaciones, de sus opiniones para mis artículos, eso está claro.
Pregunta:      Entonces, señor Purcell…
Respuesta:     Diga.
Pregunta:      La pregunta es si entiende usted que para su función periodística es importante prestarle atención a los que le están diciendo que es falsa la publicación?
Respuesta:     Je, je, nadie me ha dicho que era falsa, eso lo dice usted y aún asumiendo de que me dijeran, mira, José, yo creo que eso es falso…
Pregunta:      Unjú…
Respuesta:     …eso a mí no me interesaba, como no me interesaba los que me dijeran que sí que era lesbiana.

intencionalmente evitar toparse con información que lo llevaría a cuestionarse la veracidad de lo alegado. Véase Harte-Hanks Communications v. Connaughton, *supra*, pág. 684; Smolla, Smolla and Nimmer on Freedom of Speech, op. cit., págs. 23-25 ("[E]vidence of a preconceived story line may be probative of actual malice….").

Contrario a Harte-Hanks Communications v. Connaughton, *supra*, donde se confrontó a la persona objeto de las imputaciones falsas, en el caso de autos ni siquiera se le dio una oportunidad a la licenciada Meléndez de ofrecer su versión de los hechos a la prensa. Esto tiende a indicar que no sólo hubo una falta de investigación adecuada, sino que la prensa quería evitar enterarse de información que la pondría en una posición comprometedora.

Por todo lo anterior, concluimos que la licenciada Meléndez probó clara y convincentemente que la prensa actuó con un grave menosprecio de si la información publicada en cuanto a su persona era o no falsa. Ello no sólo en cuanto al primer artículo, sino a través del tiempo que se prolongó la serie aquí reclamada.

## VII

### ANÁLISIS DE LAS PUBLICACIONES

La prensa argumenta que los tribunales recurridos interpretaron nuestra directriz en Meléndez v. El Vocero

de Puerto Rico, 144 D.P.R. 389 (1997), erradamente y no revisaron cada artículo de la serie objeto del litigio individualmente. En esa ocasión, reconocimos que la demanda en controversia presentó una sola causa de acción por la *serie* de artículos difamatorios publicados por la prensa. Meléndez v. El Vocero de Puerto Rico, *supra*, págs. 392-393. Explicamos entonces que la licenciada Meléndez reclamó "por una única causa de acción, al pedir indemnización, no por los daños de cada publicación aisladamente, sino por los efectos acumulativos de todas las publicaciones tomadas en conjunto. Esta causa de acción es evidentemente diferente a la de reclamar daños por cada artículo publicado, en cuyo caso cada uno de ellos constituiría una causa de acción separada". Meléndez v. El Vocero de Puerto Rico, *supra*, pág. 397. Reconocimos, por lo tanto, que existen dos (2) alternativas para caracterizar la causa de acción. Se pueden reclamar daños por cada artículo publicado por separado, o se puede demandar a base del efecto global de una serie de artículos.

Irrespectivamente del tipo de reclamación, un demandante siempre vendrá obligado a probar en cada caso todos los requisitos correspondientes a la causa de acción por difamación. Es decir, tendrá que establecer que las expresiones objeto del pleito son falsas; se refieren

específicamente a su persona; se hicieron con malicia real, en el caso de figuras públicas, y le causaron daños.

Es importante destacar que la mera mención de la *existencia* de una querella por hostigamiento sexual en contra de la licenciada Meléndez no constituye difamación, como tampoco lo son publicaciones que sólo reportan sobre el estatus del trámite de la correspondiente investigación dentro del Departamento de Justicia. El hecho de que se haya presentado una querella en contra de la licenciada Meléndez; que la misma se haya investigado administrativamente; y que luego sirviera de base para varios pleitos en el foro federal y estatal resulta verdadero e irrefutable. Por lo tanto, si los reportajes se limitaran a proveer esa información, quedarían protegidos.

Sin embargo, en este caso nos enfrentamos a una serie de artículos difamatorios, que fueron publicados con grave menosprecio de si lo aseverado era verdadero o no y se referían específicamente a la licenciada Meléndez, causándole daños a su reputación. Véase St. Amant v. Thompson, *supra*; Harte-Hanks Communications v. Connaughton, *supra*. Veamos.

En la primera publicación de la serie de El Vocero, correspondiente al 5 de noviembre de 1991, el titular en la portada leía, en parte, "Hostigaba secretaria en la oficina". A continuación, el artículo presentó una larga

descripción de las acusaciones falsas y difamatorias de la señora Marrero en contra de la licenciada Meléndez.[57]

El próximo día, 6 de noviembre de 1991, el periódico aludió a "la terrible situación que [la señora Marrero] vivía por el hostigamiento sexual constante de parte de la fiscal Meléndez".

Seguidamente, el artículo publicado el 7 de noviembre de 1991 nuevamente recalcó algunos de "los serios

---

[57]  Citamos directamente a El Vocero:

....

Alega Mart[h]a que decidió acudir a Goyco para pedir el traslado debido a la tremenda presión que recibía de la fiscal Meléndez porque no cedía a sus acercamientos sexuales y las insinuaciones que la fiscal le hacía constantemente….

Aseguró Mart[h]a a EL VOCERO que sus angustias con la fiscal Meléndez comenzaron desde que la fiscal llegó al Centro de Denuncias en septiembre pasado. "La cogió conmigo desde el principio", dijo la atribulada mujer, madre de tres niños. Días después de asumir su puesto como directora, la fiscal Meléndez le dijo a Mart[h]a que le "encantaba su pelo, que era muy bonito para jugar con el" y de inmediato le metió la mano por debajo del cabello y le "acarició la nuca, apretándola y haciéndole cosquillas". Segundos más tarde volvió al ataque la fiscal Meléndez y le "sobó el cuello" a la vez que le expresó "tienes un pelo muy bello, precioso".

A partir de ese momento, Mart[h]a asegura que se percató de las intenciones de la fiscal, que no perdía tiempo en hostigarla y decirle lo bonita que era, las "troncos de piernas que se gasta" y la pregunta de todos los días, "¿Qué haces tú para que los machos se enchulen de ti?"

[E]l 21 de diciembre del 90 … a las 11:30 AM al momento de Mart[h]a estar sacando unas copias en la máquina que está en el pasillo frente a su oficina, la fiscal Meléndez se acercó y le "agarró la nalga derecha" y le comentó, "estás engordando, mama". Afirmó Mart[h]a que la fiscal Meléndez se pasaba todo el tiempo hablándole de la belleza de su cuerpo, de las combinaciones de ropas que hacía y le advertía constantemente que nunca se le presentara sin maquillarse porque, "a mi me gusta verte bien arreglada y pintada".

Otras de las muchas insinuaciones que la fiscal Meléndez le hizo a Mart[h]a fue cuando la secretaria le dio su regalo de Navidad, consistente en un juego de ropa íntima y que al agradecerle el obsequio, la fiscal dijo, "esto está muy lindo pero es para ponérmelo en una ocasión especial aunque tenga que esperar".

La gota que colmó la copa sucedió en marzo de este año en ocasión de estar Mart[h]a archivando en su oficina. Dijo que la fiscal Meléndez se acercó sigilosamente, se paró detrás de ella y después de quitarse los zapatos, y expandir las piernas hacia el lado, como es su costumbre, se llevó las manos a la cintura y le comentó, "que chula te ves en esa ropa, que buena estás". Mart[h]a dijo que se había quitado el "blazer" para estar más cómoda y se quedó con una blusa sin mangas, exponiendo los hombros. Dijo que cuando quiso ponerse el "blazer", la fiscal Meléndez le dijo, "no, no lo hagas que te ves bien sexy así"….

Recurso - licenciada Meléndez, *Apéndice* 86.

incidentes con la Fiscal, incluso las 'caricias al cabello, los sobos a la nuca y las flores que le echaba constantemente a las piernas y a su cuerpo'", además del "comentario que hizo la fiscal Meléndez sobre el regalo del juego de ropa íntima… que 'este regalo es para ponérmelo en una ocasión especial, aunque tenga que esperar'". Incluyó, también, el hecho de que la señora Alicea, supuesta testigo de varios de los incidentes de hostigamiento, negaba haber presenciado los alegados eventos "por estar atemorizada por la fiscal Meléndez, debido a que si dice la verdad sería objeto de represalias o despido".

La semana siguiente, el 13 de noviembre de 1991, El Vocero volvió a recoger todos los detalles del alegado hostigamiento antes publicados, añadiendo comentarios adicionales.[58] Luego, el artículo de 15 de noviembre de 1991 describió la supuesta reacción tempestuosa de la

---

[58]   El artículo, en su parte pertinente, expuso lo siguiente:

Pero Martha notaba el progreso de los acercamientos porque ya la Fiscal no sólo le decía cositas, sino que le pasaba las manos por los hombros, le cogía las manos ligeramente y le hablaba con voz suave y melosa….

Entiende Martha que la situación se convirtió en intolerable, al comenzar el mes de diciembre del '90…. Dijo la querellante que también fue criticada por Iris, que le censuró el uso de una pantalla que alegadamente no le pegaba con una hebilla de pelo que Martha llevaba recogiéndose el cabello.

Señaló la perjudicada que transcurrieron varios segundos antes de que la Fiscal le soltara la nalga, pero mientras le hizo la observación de la gordura, la Fiscal movió su mano varias veces, "como tanteando la masa que agarraba"….

Recurso - licenciada Meléndez, Ap. 94.

licenciada Meléndez cuando las señoras Marrero y Alicea regresaron tarde después de almorzar con el fiscal Díaz.[59]

Dentro del mismo mes, para el 27 de noviembre de 1991, El Vocero falsamente publicó, además, que la licenciada Meléndez "puso a disposición del [S]ecretario de Justicia, Lcdo. Jorge Pérez Díaz, su puesto de Fiscal Jefe del Centro, como resultado de la controversia existente con la radicación de una querella por hostigamiento sexual de parte de su ex secretaria Martha Marrero de Ramos", pero que la renuncia fue rechazada por el Secretario debido a consideraciones legales dado que la licenciada Meléndez estaba bajo investigación administrativa.

Pasados unos meses, el 11 de febrero de 1992 El Vocero diseminó que, según la señora Marrero, "la fiscal Meléndez Vega comenzó una campaña de comentarios negativos contra Martha, que hacían patente una supuesta intención de destruirla, por sus negativas ante los ilegales avances sexuales".

El reportaje de 25 de enero de 1993 incluyó alegaciones infundadas de la señora Marrero de que la Directora de la C.M.I.D. "ha[bía] seguido incurriendo en

---

[59]   El artículo, en su parte pertinente, dispuso:

Dijo Martha, que su jefa se puso histérica y como siempre hacía dio puños sobre su escritorio al tiempo que les insinuó que se habían ido para otro lugar en vez de almorzar.   Cuando Martha le salió al paso por las inferencias que hacía en su regaño, la Fiscal les dijo que ella conocía muy bien al [fiscal] Díaz y de que era capaz de llevarlas a algún lugar en la carretera de Caguas….

Recurso - licenciada Meléndez, *Apéndice* 96.

conducta similar, parecida o relacionada con diferentes personas, algunas de [é]stas supervisadas por la fiscal Meléndez y otras civiles que han generado querellas contra ella en el Departamento de Justicia".

Los artículos de la serie no sólo entraron en los detalles de lo que la señora Marrero sostuvo falsamente referente a los supuestos actos de hostigamiento sexual de la licenciada Meléndez, sino que intentaban reforzar las declaraciones de la secretaria a través de expresiones que: exaltaban lo detallada que había sido la declaración de la secretaria y el daño psicológico que había sufrido; desacreditaban a quienes desmentían la historia; manifestaban que estaban presionando a empleados del Departamento de Justicia para apoyar a la fiscal Meléndez; aseguraban que habían interferencias indebidas con la investigación administrativa, que todo estaba orquestado para encubrir el hostigamiento y que el resultado de la investigación era de esperarse porque siempre se favoreció a la fiscal Meléndez; indicaban que habían muchos testigos que hablarían sobre el hostigamiento y que quienes daban versiones diferentes a las de la señora Marrero lo hacían por temor a represalias; señalaban que a la secretaria se le hacía difícil conseguir abogado porque todos temían una venganza de parte del Departamento de Justicia por ir contra la fiscal Meléndez y que no le querían entregar documentos que necesitaba para presentar su caso; excusaban las desestimaciones de las demandas de la

secretaria contra la fiscal Meléndez; criticaban la forma en que la fiscal Meléndez se estaba relacionando con su personal luego de la querella; informaban que no era la primera vez que una empleada se querellaba contra ella; afirmaban que en el Departamento de Justicia estaban acosando a la secretaria y a su esposo, y expresaban que los fiscales estaban jugando con el proceso investigativo y las posibilidades de transigir los pleitos.

Dado el tipo de causa de acción de este caso, no se pueden atender los artículos de manera aislada. La serie de artículos relacionados con la querella por hostigamiento sexual debe verse como un conjunto. Asimismo, aunque no todos los artículos de la serie relatan los hechos de hostigamiento que se determinó que eran falsos, todos hacen referencia a la querella de hostigamiento sexual e incluyen el nombre completo, el puesto y en ocasiones la foto de la fiscal Meléndez. La mayoría de los artículos de la serie están identificados en el titular con frases como "caso hostigamiento contra la fiscal", "querella hostigamiento fiscal" y "fiscal acusada por hostigamiento sexual". Esa identificación refiere a las historias que describen el hostigamiento publicadas anteriormente por el periódico, las cuales nunca fueron desmentidas en el diario. Un lector común asocia las historias de seguimiento sobre el encubrimiento, las irregularidades en la investigación y las demandas con las primeras noticias sobre los avances

sexuales de la fiscal Meléndez contra su secretaria y sus abusos de poder. Como mencionamos anteriormente, el requisito de referencia específica se mide de acuerdo a lo que los receptores de la noticia razonablemente entendieron, irrespectivamente de si la asociación que la audiencia hace con el demandante fue intencional o no. Colón, Ramírez v. Televicentro de P.R., *supra*, pág. 722 n. 28.

Por otro lado, es menester considerar el rol del privilegio estatutario del informe justo y verdadero que protege a la prensa. Además de la inmunidad emergente de la Sección 4 de la Ley de Libelo y Calumnia atinente a comunicaciones hechas en un procedimiento legislativo, judicial u otro autorizado por la ley, según discutida anteriormente, el mismo cuerpo legal establece que "[n]o se presumirá que es maliciosa la publicación que se hace … [e]n un informe justo y verdadero de un procedimiento judicial, legislativo u oficial, u otro procedimiento cualquiera, o de algo dicho en el curso de dichos procedimientos". 32 L.P.R.A. sec. 3144 (2004).

A diferencia de la plena protección ofrecida a las expresiones hechas durante y como parte de un procedimiento legal, el privilegio condicional del reporte o informe justo y verdadero aplica a las recopilaciones de lo allí ocurrido que se hacen para el beneficio de la ciudadanía a través de los medios. Este privilegio se asienta en la idea de que el reportero actúa como

sustituto del público en la observación de un evento. Villanueva v. Hernández Class, *supra*, pág. 648; Caraballo v. P.R. Ilustrado, Inc., 70 D.P.R. 283, 288-289 (1949).

Del texto estatutario resaltan dos (2) requisitos necesarios para configurar el privilegio del informe justo y verdadero. Primero, el reporte tiene que ser justo en cuanto al objeto de información. Es decir, debe capturar lo acontecido tomando en consideración el probable efecto que su presentación tendrá en la mente de un lector y oyente promedio. Segundo, lo publicado tiene que ser cierto y reflejar, sustancialmente, lo verdaderamente expresado o acontecido en el procedimiento llevado a cabo. Villanueva v. Hernández Class, *supra*, págs. 647-648. Este privilegio abriga, inclusive, la difusión de una expresión falsa o difamatoria si ésta es relatada justa y verdaderamente. Íd. pág. 648.

Si bien es cierto que este privilegio ha sido reconocido como uno de los más importantes para la protección de la prensa contra ataques de libelo, Villanueva v. Hernández Class, *supra*, pág. 649, no es menos cierto su aplicabilidad restringida. Acevedo v. Western Digital Caribe, Inc., 140 D.P.R. 452, 462 (1996); Caraballo v. P.R. Ilustrado, Inc., *supra*, págs. 288, 290. Si se redacta un relato parcializado y subjetivo de lo acontecido, y se prueba que el demandado divulgó la información maliciosamente con ánimo prevenido, con el fin de causar daño, o conociendo la falsedad de la

información, el privilegio no entrará en juego.**60**
Villanueva v. Hernández Class, *supra*, págs. 648-649.
Véase Elder, op. cit., pág. 3-56; Smolla, Law of
Defamation, op. cit., secs. 8:61 – 8:65, 8:75.

Como la prensa actuó con malicia real al publicar
esta serie de noticias difamatorias, no cualifica para la
protección ofrecida bajo el privilegio de un informe justo
y verdadero.

Luego de una minuciosa lectura de la serie de
publicaciones en el caso de autos a la luz de las
consideraciones antes expuestas, encontramos que ésta es
difamatoria. La serie de artículos ciertamente le dio
extensa cobertura a la investigación de la licenciada
Meléndez por hostigamiento sexual y otros asuntos
tangenciales durante más de un (1) año. La fiscal
Meléndez presentó su Demanda por "*una sola causa de
acción*, por los daños causados por la *serie* de artículos".
Meléndez v. El Vocero de Puerto Rico, *supra*, págs. 392-393
(énfasis en el original). Las angustias mentales y los
daños a la reputación reclamados responden al resultado
que tuvo la diseminación continua y constante de
expresiones que aseveraban que el hostigamiento se llevó a
cabo y que esos hechos se estaban tratando de ignorar
mediante el encubrimiento y las estrategias legales. Por

---

**60** El peso de la prueba respecto al abuso de este privilegio recae sobre el demandante y deberá ser probado con evidencia independiente de la misma publicación. Cortés Portalatín v. Hau Colón, *supra*, pág. 740; Romany v. El Mundo, Inc., 89 D.P.R. 604, 616 (1963); Smolla, Law of Defamation, op. cit., págs. 8-52.

lo tanto, para determinar los daños causados por la difamación, debemos considerar el efecto acumulativo de todas las publicaciones vistas como un conjunto.

## VIII

## DAÑOS

Como próximo señalamiento de error, la señora Marrero y la prensa argumentan que los daños concedidos a la licenciada Meléndez no están sostenidos por la evidencia sometida en el juicio, toda vez que no se presentó prueba pericial de sus daños morales. Plantean, igualmente, que la valoración de los daños es exagerada, al punto de ser punitiva. Según detallamos a continuación, coincidimos que las sumas otorgadas por el Tribunal de Primera Instancia resultan ser excesivas, por lo que ameritan ser reducidas.

"[R]eiteradamente hemos establecido que los tribunales apelativos no deben intervenir con la estimación de los daños que realicen los tribunales de instancia *a menos que las cuantías concedidas sean ridículamente bajas o exageradamente altas…*". S.L.G. v. F.W. Woolworth & Co., 143 D.P.R. 76, 83 (1997) (énfasis nuestro y citas omitidas). Además, la norma le impone a la parte que solicita la modificación de los daños la obligación de "demostrar la existencia de las circunstancias que hacen meritorio que se modifiquen". Íd. (citas omitidas). Herrera, Rivera v. S.L.G. Ramírez-Vincéns, 179 D.P.R. 774 (2010); Sagardía de Jesús v. Hosp.

Aux. Mutuo, 177 D.P.R. 484, 509-510 (2009); Vázquez Figueroa v. E.L.A., 172 D.P.R. 150, 157-158 (2007) (no se puede "reducir la cuantía concedida a una cifra irrisoria que no guarda ninguna proporción con los daños sufridos"); S.L.G. Rodríguez v. Nationwide, 156 D.P.R. 614, 623, 630 (2002) ("el peticionario deberá demostrar pasión, prejuicio, error manifiesto o parcialidad por parte del foro recurrido al momento de hacer las [estimaciones de los daños]" (citas omitidas)); Nieves Cruz v. U.P.R., 151 D.P.R. 150, 170 (2000); Blás v. Hosp. Guadalupe, 146 D.P.R. 267, 339 (1998); Rodríguez Cancel v. A.E.E., 116 D.P.R. 443, 451-452 (1985).

Por otro lado, hemos reconocido que "[a]unque la valoración de los daños puede generar múltiples criterios, lo cierto es que la decisión debe descansar – dentro de lo posible – en el juicio del juzgador de instancia, quien tuvo la oportunidad de ver la prueba de cerca y de examinar la credibilidad de los testigos". Vázquez Figueroa v. E.L.A., *supra*, pág. 157.

Al impartir daños, un tribunal juzgador debe tener como su norte la siguiente cautela:

> Conceder cuantías insuficientes en concepto de daños tiene el efecto de aminorar la responsabilidad civil a la que debe estar sujeta el causante del daño, mientras que conceder daños exagerados conlleva un elemento punitivo, no reconocido por nuestro ordenamiento. Por lo tanto, al adjudicar la cuantía, el tribunal debe procurar alcanzar una razonable proporción entre el daño causado y la indemnización otorgada….

Rivera v. S.L.G. Díaz, 165 D.P.R. 408, 430 (2005) (cita omitida); S.L.G. Rodríguez v. Nationwide, *supra*, pág. 628.

Una manera de velar el que los daños atribuidos sean razonables es comparar con las sumas de reclamaciones previas donde concurren condiciones parecidas, siempre que las indemnizaciones sean ajustadas al valor presente. Rodríguez *et al.* v. Hospital *et al.*, 186 D.P.R. 889 (2012); Herrera, Rivera v. S.L.G. Ramírez-Vincéns, *supra*, págs. 785-786 (citando A.J. Amadeo Murga, El Valor de los Daños en la Responsabilidad Civil, San Juan, Ed. Esmaco, 1997, Tomo I).

> [S]i bien es cierto que no existen dos (2) casos exactamente iguales y que cada caso es distinguible según sus propias circunstancias, a los fines de determinar si la valorización de los daños en un caso específico es o no adecuada, ciertamente resulta de utilidad examinar las cuantías concedidas por este Tribunal en casos similares anteriores….

Herrera, Rivera v. S.L.G. Ramírez-Vincéns, *supra*, pág. 785 (corchetes y comillas omitidas) (citando S.L.G. v. F.W. Woolworth & Co., *supra*, págs. 81-82). Advertimos, no obstante, que luego de la valoración económica, venimos obligados a examinar las circunstancias particulares del litigio para asegurarnos de que se amerita la cuantía concedida. Véase Herrera, Rivera v. S.L.G. Ramírez-Vincéns, *supra*, pág. 786.

En casos de difamación, particularmente, una consideración que se tiene que tomar en cuenta al momento de imponer daños es asegurar que no se crea un efecto

disuasivo sobre la libertad de expresión, especialmente en cuanto a asuntos de interés público. Pérez v. El Vocero de P.R., *supra*, pág. 442.

En Colón, Ramírez v. Televicentro de P.R., *supra*, pág. 712, confirmamos la pauta esbozada en Soc. de Gananciales v. El Vocero de P.R., *supra*, págs. 127-128, a los efectos de que una acción de difamación al amparo del Artículo 1802 del Código Civil, *supra,* es más abarcadora que una acción bajo la Ley de Libelo y Calumnia. Ello, porque permite que la persona perjudicada, además de ser compensada por la lesión causada a su reputación y a sus relaciones en la comunidad, también sea resarcida por otros daños, tales como sus angustias mentales.

A pesar de que "la determinación o cuantificación de daños morales, tarea que ha sido descrita como uno de los desafíos más delicados que plantea hoy la tarea judicial, no debe descansar en datos materiales y prueba puramente objetiva…", el demandante sí "debe proveer evidencia que sustente que realmente quedó afectado en su salud, bienestar y felicidad…." Rivera v. S.L.G. Díaz, *supra*, págs. 431-432 (citas y comillas omitidas). Asimismo, hemos señalado que "[d]e ordinario, una reclamación en concepto de angustias mentales requiere la presentación de prueba pericial y documental, tanto para probar la validez de la reclamación como para que la parte adversa pueda defenderse adecuadamente". Berríos v. González, 151 D.P.R. 327, 345 (2000).

Precisa mencionar, también, que en Puerto Rico rige la regla de la publicación única, donde la extensión del agravio, así como la distribución y circulación del rotativo, son elementos valorativos del daño. Díaz Segarra v. El Vocero, 105 D.P.R. 850 (1977).

En el caso de autos, el Tribunal de Primera Instancia encontró que la licenciada Meléndez sufrió angustias mentales a consecuencia de las publicaciones de El Vocero, al igual que daños a su reputación personal. La fiscal testificó en el juicio que el 5 de noviembre de 1991 se iba a romper en pedazos de la agonía y que "no podía ni hablar, no podía levantar la voz porque [se] sentía… que [la] habían matado".[61] También describió lo difícil e incómodo que le resultó el tener que enfrentar y explicar la situación a su madre y a su hermano. A base de las publicaciones, su tío le pidió que no lo acompañara más a eventos sociales. Otro suceso que le causó gran angustia fue un día que llegó a su edificio de residencia y se encontró con un grupo de vecinos que se burlaban de ella. Asimismo, la licenciada Meléndez indicó que tenía dificultades para dormir, se sentía ansiosa y estaba obsesionada con leer todos los diarios por temor a encontrarse con otro artículo más. Sufrió de depresión al punto de contemplar quitarse la vida y tuvo que acudir a un sicólogo y a una siquiatra para ayuda profesional.

---

[61]    Trans. 21 marzo 2002, pág. 78.

El grave efecto que las publicaciones tuvieron sobre el estado emocional de la licenciada Meléndez y su forma de ser fue corroborado por el licenciado Rivera Martínez, quien la describió como deprimida, siempre encerrada en su oficina, poco comunicativa, y que compartía muy poco con las personas. Igualmente, la fiscal Lora testificó que durante ese periodo de tiempo la autoestima de la licenciada Meléndez estuvo muy baja, que ésta se encontraba avergonzada y tuvo que buscar ayuda profesional.

Según relató la licenciada Meléndez, como parte de sus labores entraba en contacto a menudo con personas que investigaba. En una ocasión, le preguntaron irrespetuosamente si era la misma persona acusada de hostigamiento sexual. Sentía temor de que los miembros del jurado de los casos criminales que trabajaba la reconocieran por las fotos publicadas en El Vocero y que eso influenciara en sus evaluaciones laborales. También estaba consciente de que la querella, al igual que los comentarios cuestionando su orientación sexual, eran temas de alto interés que se discutían por todo el Centro Judicial.

Para calcular los daños, el Tribunal de Primera Instancia usó como guía el promedio de daños concedidos en tres (3) casos anteriores cuyo elemento común era que se trataban de pleitos donde un miembro de la profesión legal

había sido difamado.[62] El valor actualizado de la cantidad promedio para diciembre de 2003 resultó ser ciento setenta y dos mil setenta y cinco dólares ($172,075.00).[63] Sin embargo, el tribunal de instancia encontró necesario aumentar esa cifra "considerablemente" en vista de las circunstancias particulares del caso de autos, tales como el número de publicaciones, la duración y el despliegue que se le dio a la serie de artículos en primera plana del periódico, y el efecto acumulativo que éstas tuvieron sobre la condición emocional de la licenciada Meléndez.

En vista de ello, el Tribunal de Primera Instancia hizo tres (3) valoraciones distintas en su adjudicación a favor de la licenciada Meléndez. El foro primario estimó los daños causados por la primera publicación de El Vocero en quinientos quince mil dólares ($515,000.00), mientras que los daños atribuibles al efecto cumulativo del resto de la serie se adjudicaron en un millón cincuenta mil dólares ($1,050,000.00). Concedió otros doscientos cincuenta mil dólares ($250,000.00) por daños a la reputación de la licenciada Meléndez, para un total de un millón ochocientos quince mil dólares ($1,815,000.00), además de intereses legales al cinco por ciento (5%) desde

---

[62] Éstos fueron <u>Benet v. Hernández</u>, 22 D.P.R. 494 (1915) (daños de dos mil dólares ($2,000.00) a un abogado); <u>Rivera v. Martínez</u>, 26 D.P.R. 760 (1918) (daños de tres mil dólares ($3,000.00) a un juez); <u>Franco v. Martínez</u>, 29 D.P.R. 237 (1921) (daños de cinco mil un dólares ($5,001.00) a un abogado-notario). Sentencia del Tribunal de Primera Instancia, págs. 96-98. Los tres (3) casos fueron resueltos antes de la doctrina de difamación establecida en <u>New York Times Co. v. Sullivan</u>, *supra.*

[63] El Tribunal de Primera Instancia basó este cálculo en la fórmula propuesta por A.J. Amadeo Murga en <u>El Valor de los Daños en la Responsabilidad Civil</u>, San Juan, Ed. Esmaco, 1997, Tomo I. Sentencia del Tribunal de Primera Instancia, págs. 95-96, 98 n. 144.

la fecha en que se presentó la Demanda hasta la fecha en que se dictó la Sentencia.

El Tribunal de Apelaciones confirmó los daños otorgados por el Tribunal de Primera Instancia en su totalidad por entender que la señora Marrero y la prensa no habían fundamentado adecuadamente que la indemnización asignada fuese arbitraria o excesivamente alta. Habiendo examinado rigurosamente la evidencia en autos, y a pesar de que reconocemos que una serie de publicaciones falsas tiene un impacto más devastador y perjudicial en la reputación de la persona objeto de la difamación que una noticia aislada, concluimos que la suma de los daños conferidos en el presente caso resulta demasiado alta.

En primer lugar, la concesión de más de quinientos mil dólares ($500,000.00) en daños por el primer artículo de la serie resulta improcedente porque la causa de acción presentada es por el efecto de la serie de artículos, no de cada artículo. En vista de que la Demanda no reclamaba daños por "cada publicación aisladamente, sino por los efectos acumulativos de todas las publicaciones tomadas en conjunto", en Meléndez v. El Vocero de Puerto Rico, *supra*, pág. 397, no encontramos razón por la cual fijar una compensación por separado para cada artículo difamatorio.

En segundo lugar, aunque el razonamiento del Tribunal de Primera Instancia de actualizar los daños concedidos en pleitos anteriores por difamación aparenta ser bueno en teoría, resultó ser impráctico e imposible en su

aplicación para este caso en particular. Los dictámenes sobre los cuales el tribunal sentenciador descansó no sirven de guía apta para ese fin. Además, nuestra jurisprudencia no apunta a un caso similar que se pudiera utilizar como punto de partida para estimar los daños adecuados cuando se difama un funcionario público, debido a que no hemos tenido la oportunidad desde lo resuelto en New York Times Co. v. Sullivan, *supra*, hasta hoy, para declarar meritoria una demanda por difamación presentada por una figura pública en contra de los medios.

También notamos que no existe evidencia en los autos de que las publicaciones de El Vocero afectaron el rango laboral de la licenciada Meléndez u ocasionaron disminución de su salario de forma alguna. De hecho, la licenciada Meléndez fue renominada y confirmada a su cargo de fiscal en el año 1991. Continuó manejando casos de alto interés público y gozando de su posición como Directora del C.M.I.D. hasta el año 1995, cuando se trasladó a la Fiscalía de Caguas. Luego, pasó a ser Directora de la División para Combatir el Crimen Organizado y, eventualmente, Fiscal Auxiliar II en la Fiscalía de Bayamón.

Por último, según consta en el récord, la licenciada Meléndez nunca presentó prueba pericial en cuanto a sus angustias mentales y el tiempo que duraron. Aunque ese tipo de evidencia no es un requisito indispensable, su ausencia dificulta precisar la magnitud del impacto

emocional que sostuvo, y alegadamente continúa sintiendo, debido a los eventos aquí involucrados.

En vista de todo lo anterior, resolvemos que, el Tribunal de Primera Instancia erró al calcular que el valor actualizado de los daños sufridos por la licenciada Meléndez asciende a un millón ochocientos quince mil dólares ($1,815,000.00).[64] Recalcamos que el criterio que debe guiar a un juez a la hora de fijar el resarcimiento debido es la razonabilidad. Sagardía de Jesús v. Hosp. Aux. Mutuo, *supra*, págs. 509-510. La aplicación de dicho criterio nos lleva a modificar el dictamen recurrido, a los efectos de reducir los daños adjudicados.

Hemos descartado por completo la suma concedida exclusivamente por la primera publicación de El Vocero de 5 de noviembre de 1991 puesto que, a base de lo antes explicado, resulta improcedente. Ahora bien, en cuanto al impacto negativo que la serie difamatoria tuvo sobre la reputación de la licenciada Meléndez, cabe notar que la integridad y honradez de la fiscal como mujer y como funcionario público, así como su orientación sexual, fueron altamente discutidos en la esfera pública durante los meses que El Vocero le dio extensa cobertura a las acusaciones infundadas de hostigamiento sexual de la señora Marrero. Considerando la totalidad de las

---

[64] En el caso de Krans Bell v. Santarrosa, *supra*, se le concedieron al demandante, una figura pública, daños ascendentes a ciento ochenta mil dólares ($180,000.00) cuando el programa de televisión SuperXclusivo anunció falsamente que "sostenía una relación extramarital con una mujer a quien le compró un apartamento, unas joyas y un vehículo de motor". Íd. pág. 734 (nota al calce omitida).

circunstancias presentes en este caso, estimamos que la suma de doscientos cincuenta mil dólares ($250,000.00) adjudicada por el foro de instancia por daños a la reputación de la licenciada Meléndez es adecuada.

Próximo, aun tomando en cuenta las consecuencias emocionales que alteraron la vida de la licenciada Meléndez como resultado de las publicaciones difamatorias en controversia, las cuales se encuentran ampliamente sostenidas por el testimonio en el récord, pesa en nuestro ánimo la falta de prueba pericial en cuanto al impacto prolongado alegado. Por lo tanto, disminuimos el valor de las angustias mentales sufridas por ella a cien mil dólares ($100,000.00).

A base de todo lo anterior, opinamos que la cantidad total de trescientos cincuenta mil dólares ($350,000.00) en el caso de autos representa una suma razonable.[65] Véase Vázquez Figueroa v. E.L.A., *supra*, pág. 158.

## IX

## TEMERIDAD Y HONORARIOS

Por último, tanto la señora Marrero como la prensa impugnan la determinación de temeridad e imposición de honorarios en su contra según consignado por el Tribunal de Primera Instancia.

---

[65] Cabe señalar que junto al pago de intereses post sentencia, habiéndose emitido dictamen el 15 de marzo de 2004, es decir, hace ya unos nueve (9) años atrás, el monto de la Sentencia a ser satisfecha aumentará aún más. Véase Regla 44.3(a) de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 44.3 (2001); C.O.P.R. v. S.P.U., 181 D.P.R. 299, 343, 349-350 (2011).

La Regla 44.1(d) de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 44.1(d) (2001) (Regla 44.1(d) de Procedimiento Civil),**66** establece que en la eventualidad de que una parte haya procedido con temeridad o frivolidad durante el trámite judicial, el tribunal sentenciador deberá imponerle el pago de una suma por concepto de honorarios de abogado que el juzgador entienda correspondan a tal conducta. Andamios de P.R. v. Newport Bonding, 179 D.P.R. 503, 519-520 (2010).

Por lo tanto, si en la discreción del tribunal de instancia se determina que hubo temeridad, a tenor con la Regla 44.1(d) de Procedimiento Civil es mandatorio imponer honorarios. P.R. Oil v. Dayco, 164 D.P.R. 486, 511 (2005); Blás v. Hosp. Guadalupe, *supra*, pág. 334 (citando Fernández v. San Juan Cement Co., Inc., 118 D.P.R. 713, 717-719 (1987)). Sólo se intervendrá con dicha determinación si media un claro abuso de esa discreción. Andamios de P.R. v. Newport Bonding, *supra*, pág. 520; S.L.G. Flores-Jiménez v. Colberg, 173 D.P.R. 843, 866 (2008); P.R. Oil v. Dayco, *supra*, pág. 511.

Para cuantificar los honorarios a ser impuestos conforme nuestro ordenamiento – a diferencia del método adoptado en el foro federal que equipara la cuantía de honorarios concedidos a los que efectivamente fueron

---

**66** Véase nota al calce número 1.

pagados por la parte victoriosa a su representante legal – nuestra Regla 44.1(d) de Procedimiento Civil exige que se "le imponga a [la] parte [temeraria], como sanción, una suma de dinero por concepto de honorarios que corresponda a esa conducta temeraria o frívola observada por ella; esto es, al grado, o intensidad, de tal conducta". Corpak, Art Printing v. Ramallo Brothers, 125 D.P.R. 724, 738 (1990) (énfasis suprimido).

Esta Curia ha expresado que el concepto de temeridad es amplio. Blás v. Hosp. Guadalupe, *supra*, pág. 334. La conducta temeraria se ha descrito como aquella que "prolonga innecesariamente o que obliga que la otra parte incurra en gestiones evitables…", Marrero Rosado v. Marrero Rosado, 178 D.P.R. 476, 504 (2010) (citando a Elba A.B.M. v. U.P.R., 125 D.P.R. 294, 329 (1990)), así como "una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia", P.R. Oil v. Dayco, *supra*, págs. 510-511 (nota al calce omitida). Véase, además, S.L.G. Flores-Jiménez v. Colberg, *supra*, pág. 866; Domínguez v. GA Life, 157 D.P.R. 690, 706 (2002); Blás v. Hosp. Guadalupe, *supra*, págs. 334-337.

En innumerables ocasiones hemos señalado, sin embargo, que "[l]a temeridad es improcedente en aquellos litigios que envuelven planteamientos complejos y novedosos aun no resueltos en nuestra jurisdicción…", así

como "cuando la parte concernida responde a lo que resulta ser una apreciación errónea del derecho…" o una "desavenencia honesta" en cuanto a la aplicación del derecho, especialmente cuando no existan precedentes vinculantes. *Maderas Tratadas v. Sun Alliance et al.*, 185 D.P.R. 880 (2012) (citando *Santiago v. Sup. Grande*, 166 D.P.R. 796, 821 (2006); *Oliveras, Inc. v. Universal Ins. Co.*, 141 D.P.R. 900, 936 (1996)). *Santos Bermúdez v. Texaco P. R., Inc.*, 123 D.P.R. 351 (1989). Así pues, en *C.O.P.R. v. S.P.U.*, 181 D.P.R. 299, 349 (2011), declinamos conferir los honorarios por temeridad solicitados toda vez que el litigante perdidoso estaba justificado en apelar ya que esbozó una controversia resuelta vía opinión por primera vez en ese caso.

En el caso de autos, el Tribunal de Primera Instancia encontró que la señora Marrero y la prensa fueron temerarias al prolongar innecesariamente los procedimientos del pleito, afectando de este modo el buen funcionamiento de la administración de la justicia. El juzgador concluyó que "los demandados incurrieron en conducta o actuación obstinada, contumaz, temeraria o frívola al radicar una serie de mociones y recursos cuya improcedencia era clara, cuyo propósito fue dilatar los procedimientos". Sentencia del Tribunal de Primera Instancia, pág. 102. En consecuencia, y en consideración de los factores establecidos en *Corpak, Art Printing v.*

Ramallo Brothers, *supra*, impuso el pago de cien mil dólares ($100,000.00) por concepto de honorarios de abogado, además de intereses legales al cinco por ciento (5%) desde la fecha de la presentación de la Demanda hasta la fecha en que se dictó la Sentencia. El foro apelativo intermedio confirmó dicha determinación, y resolvió que el Tribunal de Primera Instancia no abusó de su discreción ya que había base suficiente en el expediente para concluir que los apelantes habían sido temerarios durante el trámite de su caso.

Diferimos de la determinación de temeridad del tribunal primario y consideramos que el juez de instancia no ejerció su discreción debidamente. Si bien es cierto que los procedimientos del litigio se extendieron prolongadamente – no se puede negar este hecho dado que la Demanda se presentó en junio de 1992 y la Sentencia no se emitió hasta marzo de 2004, es decir, casi doce (12) años más tarde – no encontramos que la dilación fue provocada por los demandados intencional o estratégicamente. Por el contrario, varias de las interrupciones ocurridas a través del largo trayecto judicial fueron justificadas.

Previo a comenzar el juicio, surgieron un total de veintisiete (27) incidentes apelativos. Mediante estos recursos, iniciados tanto por la licenciada Meléndez como los demandados, se presentaron varias controversias novedosas, al punto que en dos (2) ocasiones estimamos necesario expresarnos en torno a ellas. Véase Meléndez v.

Caribbean Int'l. News, *supra*; Meléndez v. El Vocero de Puerto Rico, *supra*. Posteriormente, luego de transcurridos cincuenta y cuatro (54) días del juicio, se reasignó el caso al Juez Roque Colón quien, a su vez, necesitó tiempo adicional para familiarizarse adecuadamente con el récord y los testimonios vertidos durante el juicio. Este último imprevisto representó otra complicación sustancial, aunque inevitable, en el trayecto procesal del caso que retrasó su resolución por más de un año.

La demora ocasionada por estos eventos ciertamente no puede ser imputada a los demandados como fundamento de su alegada temeridad. Oliveras, Inc. v. Universal Ins. Co., *supra*, pág. 936. Es menester recordar que "no puede penalizarse a un litigante que utiliza las vías judiciales para vindicar un derecho por el simple hecho de no haber prevalecido en su acción". Santos Bermúdez v. Texaco P. R., Inc., *supra*, pág. 355. Abogar fielmente las defensas o teorías de ley que amparan un representado en un caso complejo, como lo es éste, no equivale a actuar de manera frívola o contumaz.

Concluimos, por lo tanto, que la conducta de la señora Marrero y de la prensa no cabe dentro del concepto de temeridad tal como éste ha sido desarrollado en nuestra jurisdicción. Por ende, los honorarios de abogado y el interés legal pre sentencia concedidos por el Tribunal de Primera Instancia son improcedentes.

**X**

Por las razones antes expuestas, reducimos el monto de los daños concedidos por angustias mentales y daños a la reputación de la licenciada Meléndez a trescientos cincuenta mil dólares ($350,000.00). De otra parte, eliminamos la concesión de honorarios de abogado, así como los intereses legales pre sentencia, toda vez que no se obró con temeridad. Así modificada, se confirma la Sentencia recurrida.

Se dictará Sentencia de conformidad.


ROBERTO FELIBERTI CINTRÓN
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| IRIS MELÉNDEZ VEGA<br><br>APELADA<br><br>v.<br><br>**EL VOCERO DE PUERTO RICO, INC.; CARIBE INTERNATIONAL NEWS CORP.; GASPAR ROCA; JOSÉ A. PURCELL Y OTROS**<br><br>APELANTES | Núm.: **AC-2007-0066**<br><br><br><br>Consolidado con | Apelación |
| IRIS MELÉNDEZ VEGA<br><br>APELADA<br><br>v.<br><br>EL VOCERO DE PUERTO RICO, INC. Y OTROS<br><br>**MARTHA MARRERO DE RAMOS**<br><br>APELANTE | Núm.: **AC-2007-0067**<br><br><br><br>Consolidado con | Apelación |
| IRIS MELÉNDEZ VEGA<br><br>PETICIONARIA<br><br>v.<br><br>EL VOCERO DE PUERTO RICO, INC. Y OTROS<br><br>RECURRIDOS | Núm.: **CC-2007-0827** | *Certiorari* |

**SENTENCIA**

En San Juan, Puerto Rico, a 3 de julio de 2013.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la

presente Sentencia, reducimos el monto de los daños concedidos por angustias mentales y daños a la reputación de la Lcda. Iris Meléndez Vega a trescientos cincuenta mil dólares ($350,000.00). De otra parte, eliminamos la concesión de honorarios de abogado, así como los intereses legales pre sentencia, toda vez que no se obró con temeridad. Así modificada, se confirma la Sentencia recurrida.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo, Interina. La Jueza Asociada señora Fiol Matta hace constar las siguientes expresiones:

Estoy conforme con la Opinión, excepto en cuanto a la cuantía por daños otorgada a la fiscal Iris Meléndez Vega y a la eliminación de los honorarios de abogado concedidos por temeridad. Entiendo que la Opinión elabora correcta y cabalmente los fundamentos para las determinaciones relacionadas con la sustitución del juez de primera instancia, con la deferencia que concedió el Tribunal de Apelaciones a las determinaciones de credibilidad del foro inferior, con la responsabilidad del licenciado Héctor Santiago Rivera, con el análisis de la serie de artículos como un conjunto y con la conclusión de que la parte demandante probó que la parte demandada actuó con malicia real al difamar a una figura pública. No obstante, no encuentro base para alterar la suma de $1,050,000.00 concedida por el Tribunal de Primera Instancia y confirmada por el Tribunal de Apelaciones para compensar las angustias mentales sufridas por la fiscal Meléndez Vega a causa de la publicación de la serie de noticias, ni para revocar la concesión de honorarios por temeridad.

La Juez Asociada señora Rodríguez Rodríguez concurre en parte y disiente en parte con opinión escrita. El Juez Presidente señor Hernández Denton y la Jueza Asociada señora Pabón Charneco no intervienen. El Juez Asociado señor Martínez Torres inhibido.

Camelia Montilla Alvarado
Secretaria del Tribunal Supremo, Interina

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Iris Meléndez Vega | |
| Apelada | |
| v. | AC-2007-0066 |
| El Vocero de Puerto Rico, Inc.; Caribe International News Corp.; Gaspar Roca; José A. Purcell y Otros | Consolidado con |
| Apelantes | |
| Iris Meléndez Vega | |
| Apelada | |
| v. | AC-2007-0067 |
| El Vocero de Puerto Rico, Inc. y Otros | |
| Martha Marrero de Ramos | Consolidado con |
| Apelante | |
| Iris Meléndez Vega | |
| Peticionaria | |
| v. | CC-2007-0827 |
| El Vocero de Puerto Rico, Inc. y otros | |
| Recurridos | |

Opinión concurrente y disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 3 de julio de 2013

Concurro con la Opinión que emite en el día de hoy este Tribunal por entender correcta la determinación con respecto a las controversias sobre la sustitución del juez de primera instancia, la responsabilidad del

licenciado Héctor Santiago Rivera y la conclusión de que en este caso se probó la difamación de la demandante con malicia real por parte de los demandados. No obstante, disiento de la reducción sustancial de la suma de daños concedidos a la Fiscal Meléndez y de la eliminación de los honorarios concedidos por temeridad bajo el pretexto de que la cuantía otorgada aumentará debido a los intereses postsentencia.

A continuación repasamos el derecho aplicable y los criterios que consideramos deben tomarse en cuenta al analizar una causa de acción por los daños acumulativos de la publicación de una serie de artículos difamatorios y la valorización de estos daños.

## I

Los hechos que generaron la controversia ante nosotros están adecuadamente resumidos en la Opinión del Tribunal, por lo tanto sólo resaltaré aquellos detalles que justifican que la cuantía de daños no sea disminuida arbitrariamente.

La licenciada Iris Meléndez Vega (fiscal Meléndez) fue designada Directora del Centro Metropolitano de Investigaciones y Denuncias (C.M.I.D) del Departamento de Justicia el 3 de septiembre de 1990. En el puesto de Secretaria Legal I del Director o Directora del C.M.I.D. se desempeñaba la demandada, señora Martha Marrero Rivera. La fiscal Meléndez decidió retener a la señora Marrero como secretaria para no crear ningún tipo de

ansiedad entre los empleados por hacer cambios de personal, descartando la idea de reclutar a alguien de confianza para el puesto de secretaria.

Con el pasar del tiempo, según las determinaciones de hechos del Tribunal de Primera Instancia, la relación laboral entre la fiscal Meléndez y la señora Marrero comenzó a generar fricciones por varios incidentes de insubordinación protagonizados por la secretaria. En junio de 1991, la señora Marrero fue trasladada, primero destacada en la oficina central del Departamento de Justicia y luego en la Fiscalía de San Juan. Como detalla la Opinión del Tribunal, los motivos del traslado contrastan entre sí: según la Fiscal Meléndez, el traslado ocurrió debido a desavenencias en la relación laboral; mientras que la señora Marrero afirma que solicitó el traslado del C.M.I.D. por ser víctima de hostigamiento sexual por parte de la Fiscal.

Posterior al traslado, la señora Marrero presentó una querella contra la Fiscal Meléndez por alegado hostigamiento sexual que fue desestimada. Al mismo tiempo, la señora Marrero sostuvo una entrevista con el señor José A. Purcell (señor Purcell), donde le ofreció su versión de los hechos que alegadamente culminaron en su traslado. A partir de esta entrevista, la señora Marrero, el señor Purcell, El Vocero de Puerto Rico, Inc. (El Vocero) y el licenciado Héctor Santiago Rivera (licenciado Santiago Rivera), llevaron a cabo continuas

acciones difamatorias que consistieron en una serie de artículos publicados en el periódico El Vocero durante veintitrés (23) meses y cinco (5) cartas dirigidas al Secretario de Justicia, pero divulgadas a la prensa.

Comenzando el 5 de noviembre de 1991, el periódico El Vocero inició una serie de publicaciones relacionadas a la Fiscal Meléndez y a la falsa imputación de hostigamiento sexual por su secretaria en el C.M.I.D., la señora Marrero. La mayoría de estas publicaciones fueron redactadas por el señor Purcell, empleado de El Vocero que entrevistó y fundamentó sus publicaciones en la versión de los hechos de la señora Marrero.

Culminado el proceso administrativo de la investigación sobre la querella presentada por la señora Marrero en el Departamento de Justicia y varios procedimientos judiciales instados por ésta, el 19 de junio de 1992 la Fiscal Meléndez presentó la demanda de difamación que hoy resolvemos contra El Vocero de Puerto Rico Inc., Caribbean International News Corp., Gaspar Roca, José A. Purcell, Martha Marrero de Ramos y la sociedad integrada por ésta y su esposo. Poco después, enmendó su demanda para incluir al licenciado Héctor Santiago Rivera, representante legal de la señora Marrero.

Luego de un lento, dilatado y accidentado proceso ante dos jueces en el Tribunal de Primera Instancia, cuyo detalle se encuentra resumido por la Opinión del

Tribunal, casi 12 años después de presentada la demanda, el foro de instancia ordenó a todos los codemandados a compensar a la Fiscal Meléndez por los daños ocasionados al difundir falsas alegaciones de hostigamiento sexual mediando malicia real. A la vez, estimó los daños en un millón ochocientos quince mil dólares ($1,815,000.00) en angustias mentales y daños a su reputación. Además, impuso cien mil dólares ($100,000.00) a la parte demandada en honorarios de abogado por haber litigado con temeridad, e intereses legales sobre ambas cuantías al cinco por ciento (5%), desde la fecha de la presentación de la demanda hasta que se dictó Sentencia.

En desacuerdo con el dictamen, los demandados recurrieron al Tribunal de Apelaciones. En una Sentencia emitida el 28 de febrero de 2007, el foro apelativo intermedio confirmó la Sentencia del Tribunal de Primera Instancia con respecto a la responsabilidad de la señora Marrero y la prensa,[67] pero revocó la responsabilidad del licenciado Santiago Rivera.

Inconformes, todas las partes excepto el licenciado Santiago Rivera, recurren ante nosotros.

## II

### A

Continuamente se ha reconocido que a partir de 1952 "[l]a fuente principal de la protección contra injurias

---

[67] Al igual que la Opinión del Tribunal, nos referimos al señor Purcell, Caribbean International News Corp., El Vocero y el señor Roca conjuntamente como "la prensa".

es... la Constitución". *Cortés Portalatín v. Hau Colón*, 103 D.P.R. 734, 738 (1975); *véase Colón Pérez v. Televicentro*, 175 D.P.R. 690, 704-705 (2009); *Ojeda v. El Vocero*, 137 D.P.R. 315, 327 (1994); *Clavell v. El Vocero de P.R.*, 115 D.P.R. 685, 690 (1984). Esta protección surge de la Sección 8 de la Carta de Derechos, que reconoce a toda persona la "protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar". Const. P.R., Art. II, Sec. 8.[68] Sin embargo, al existir un interés social y constitucional de protección a la libertad de prensa con el fin de "promover la discusión franca y vigorosa de los asuntos públicos", *Torres Silva v. El Mundo, Inc.*, 106 D.P.R. 415, 420 (1977), la protección del ciudadano contra la publicación difamatoria genera un conflicto entre dos valores fundamentales que requiere de un análisis cauteloso. *Giménez Álvarez v. Silén Maldonado*, 131 D.P.R. 91 (1992).

En esencia el análisis va a depender de si el demandante es funcionario o figura pública, con un grado de exigencias constitucionales más fuertes, o si el

---

[68] Por otro lado, también se ha reconocido que la acción por difamación o libelo en nuestra jurisdicción tiene tres (3) fuentes: la propia Sección 8 del Art. II; la Ley de Libelo y Calumnia, Ley de 19 de febrero de 1902, 32 L.P.R.A. sec. 3141 *et seq.* y el Art. 1802 de nuestro Código Civil. Sin embargo, la Ley de Libelo y Calumnia sólo aplica "en cuanto es compatible con la Constitución". *Cortés Portalatín*, 103 D.P.R. en la pág. 738.

demandante es considerado una persona privada, en cuyo caso se aplicaría un criterio más laxo. En *Torres Silva v. El Mundo, Inc.*, 106 D.P.R. 415 (1977), incorporamos en nuestro ordenamiento el análisis constitucional establecido por el Tribunal Supremo de los Estados Unidos en *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), con respecto al funcionario público o figura pública. *Véase Colón Pérez*, 175 D.P.R. en la pág. 706.

En este caso no existe controversia entre las partes de clasificar a la Fiscal Meléndez como funcionaria pública,[69] clasificación que opinamos correcta. Sin embargo, la Opinión del Tribunal carece de una discusión sobre el concepto de funcionario público el cual acarrea una menor protección del individuo frente a publicaciones difamatorias a los ciudadanos. Es apropiado en este caso discutir el alcance del término funcionario público, cuyos límites se "rige[n] por consideraciones de índole constitucional" y que el "hecho de ser 'funcionario' o 'empleado' para otros propósitos jurídicos no es pertinente". *Soc. de Gananciales v. López*, 116 D.P.R. 112, 114-115 (1985). Por lo tanto, antes de discutir el criterio necesario para reconocer la causa de acción por

---

[69] En el Informe de Conferencia con Antelación al Juicio, la Fiscal Meléndez expone como parte de su teoría del caso que: "Por ser funcionaria pública, para prevalecer en este caso la aquí demandante tiene que probar, con prueba clara y convincente, que las publicaciones se hicieron con 'malicia real', esto es, con conocimiento de su falsedad, o con grave menosprecio respecto a si eran falsas o no". Apéndice del recurso CC-2007-827 en la pág. 843.

difamación según *New York Times v. Sullivan*, es necesario establecer los límites de la clasificación de funcionario público.

En *Soc. de Gananciales v. López*, 116 D.P.R. 112 (1985), adoptamos la dirección propuesta por el Tribunal Supremo federal en *Rosenblatt v. Baer*, 383 U.S. 75 (1966). En este caso, luego de reconocer que en *New York Times v. Sullivan* se había pospuesto esa discusión para otra ocasión,[70] se discutieron los dos principios que motivaron la creación de la clasificación. En primer lugar, se reconoció que existe: "a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide open", y que por tanto ese debate podría incluir ataques poco placenteros a funcionarios públicos. *Id.* en la pág. 85. En este sentido, se reconoce que existe tanto un fuerte interés en el debate de asuntos públicos como en debatir sobre aquellas personas que se encuentran en una posición suficientemente importante para influenciar los asuntos públicos. *Id.* Por lo tanto, concluye que la clasificación de funcionario público aplica "at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs". *Id.*

---

[70] Véase *Rosenblatt*, 383 U.S. en la pág. 85; *Sullivan*, 376 U.S. en la pág. 727 n.23.

Sin embargo esto sólo presenta un criterio para la aplicación de la clasificación como funcionario público. En *Rosenblatt* se provee un segundo factor que limita el alcance de la clasificación, descrito de la siguiente forma: "[w]here a position in government has such apparent importance that the public has an **independent** interest in the qualifications and performance of the person who holds it, **beyond the general public interest** in the qualifications and performance of all government employees". *Id.* en la pág. 86 (énfasis nuestro). Con respecto a estos empleados públicos, se exige el cumplimiento de los dos elementos que motivaron *New York Times v. Sullivan* y por tanto el estándar para reconocer la causa de acción por difamación requiere malicia real. Este segundo criterio permite hacer un balance adecuado entre la protección a la libertad de prensa y el interés que posee la sociedad en proteger la reputación de un individuo.

Por otro lado, es necesario resaltar, como lo hizo el Tribunal Supremo federal, que el requisito de malicia real no debe aplicar simplemente porque la publicación difamatoria sobre un empleado de gobierno haya atraído el interés público. *Id.* en la pág. 86 n.13. "La posición del empleado debe ser tal que invite el escrutinio público y la discusión de la persona que la ocupe". *Soc. de Gananciales*, 116 D.P.R. en la pág. 116.

Según el profesor David A. Elder, el análisis establecido en *Rosenblatt* ha sido "grossly interpreted, flagrantly misaplied or blatantly ignored" tanto por las cortes federales como estatales. David A. Elder, *Defamation: A Lawyer's Guide* Sec. 5:1, 5-12 (1993). A fin de aplicar de forma adecuada este criterio, este caso nos permite delimitar la aplicabilidad del requisito de malicia real, al menos respecto a los abogados que laboran para el Estado Libre Asociado de Puerto Rico. Resalta el profesor Elder que no debe haber duda de que abogados de tanto el gobierno federal como estatal que poseen poder decisional o de creación de política pública y un control sustancial sobre aspectos importantes del sistema judicial deben ser clasificados como funcionarios públicos. David A. Elder, *Defamation*, *Public Officialdom and the Rosenblatt v. Baer Criteria – A Proposal for Revivification: Two Decades After New York Times Co. v. Sullivan*, 33 Buff. L. Rev. 579, 673 (1984)("Clearly, federal or state legal counsel with substantial control over important aspects of the judicial system and significant decision-making or policy-making imput...are fairly deemed 'public officials'").

En Puerto Rico esto incluye necesariamente al Secretario de Justicia, al Fiscal General, al Procurador General y a los Fiscales de Distrito. Sin embargo, es necesario analizar la Ley Orgánica del Departamento de Justicia para determinar si la Fiscal Meléndez, como

Directora del C.M.D.I. ocupa una posición que "invite el escrutinio público y la discusión de la persona que lo ocupe". *Soc. de Gananciales*, 116 D.P.R. en la pág. 116. Mientras, cualquier otro abogado que es simplemente compensado con fondos gubernamentales no debe considerarse funcionario público para efectos de requerir malicia real. A menos de que la parte demandada pueda demostrar que "particular functions and responsibilities of such an attorney qualify him as a 'public official' through a fact-intensive delineation of his authority." Elder, *supra,* pág. 675.

**B**

En *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) se estableció el análisis aplicable a la causa de acción de libelo. El Tribunal Supremo federal determinó que "la publicación de un informe falso o comentarios injustificados relacionados a la conducta oficial de un funcionario público están inmunes de reclamaciones de libelo y gozan de un privilegio restringido". *Torres Silva*, 106 D.P.R. en la pág. 421. Ese privilegio se pierde cuando la información divulgada haya sido falsa y su publicación se haya hecho con conocimiento de que era falsa o con un grave menosprecio de su falsedad. *Id.* Este requisito es el que *New York Times v. Sullivan* definió como 'malicia real'.

Por lo tanto, en casos que impliquen a un funcionario público, los elementos de la causa de acción de difamación consisten en probar mediante prueba directa o circunstancial que: (a) la información difamatoria es falsa, (b) que se publicó a sabiendas de que era falsa o con grave menosprecio de si era falsa o no; y (c) que se causaron daños reales. *Garib Bazain v. Clavell*, 135 D.P.R. 475, 482 (1994); *Villanueva v. Hernández Class*, 128 D.P.R. 618, 642-643 (1991); *Torres Silva*, 106 D.P.R. en la pág. 427. Además, según resuelto por *New York Times v. Sullivan*, y adoptado por este Tribunal anteriormente, es requisito constitucional la existencia de identificación específica, *Colón Pérez*, 175 D.P.R. en la pág. 722, conocido en el derecho norteamericano como el requisito de "*of and concerning the plaintiff*." *New York Times v. Sullivan*, 376 U.S. en las págs. 290-292. Este requisito "consiste en que para que se resuelva a su favor una demanda por difamación, la parte demandante debe probar que las manifestaciones alegadamente libelosas o calumniosas se refería específicamente a su persona". *Colón Perez*, 175 D.P.R. en la pág. 720.

Con respecto a la malicia real, ésta requiere de prueba clara, robusta y convincente. *Id.* en la pág. 725; *Clavell v. El Vocero*, 115 D.P.R. en la pág. 696; *New York Times v. Sullivan*, 376 U.S. en las págs. 285-286. Esto quiere decir que "la parte reclamante deb[e] señalar hechos que, de ser creídos, demuestr[an] que la persona

demandada abrigaba serias dudas sobre la certeza de la publicación". *Colón Pérez*, 175 D.P.R. en la pág. 708. En otras palabras, no se trata de evaluar si una persona razonablemente prudente hubiera publicado o investigado un poco más antes de publicar la información falsa, sino que "[t]iene que existir 'prueba suficiente que permita concluir que el demandado abrigaba serias dudas sobre la certeza de la información'". *García Cruz v. El Mundo, Inc.*, 108 D.P.R. 174, 181 (1978). [71] Finalmente, la suficiencia de la prueba presentada para sustentar la malicia real es una cuestión estrictamente de derecho debido al interés protegido por el requisito de malicia real. *Colón Pérez*, 175 D.P.R. en la pág. 725; *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989).

## C

En el caso ante nosotros ya habíamos reconocido que la demandante había decidido "demandar por una única

---

[71] Es importante resaltar que el concepto de *malicia real* no tiene que ver con la intención del demandante en publicar información difamatoria, sino con el conocimiento que tuvo en el momento de la publicación. Según hemos expresado anteriormente: "Quien se expresa con malicia real lo hace a sabiendas de que los hechos imputados son falsos o con grave menosprecio a la verdad, incurriendo en el susodicho menosprecio quien se expresa albergando serias dudas con respecto a la veracidad de los hechos imputados". *Cabrero v. Zayas*, 167 D.P.R. 766, 779 (2006) (Sentencia)(Rodríguez Rodríguez, J., Op. Conformidad). El concepto de *malicia real* "es una figura subjetiva", donde se debe probar, no que el demandado debió actuar como una persona normal hubiera actuado, sino que actuó con conocimiento de la ausencia de la verdad en su publicación. *Id.*

causa de acción, al pedir indemnización, **no por los daños de cada publicación aisladamente, sino por los efectos acumulativos de todas las publicaciones en conjunto**". *Meléndez v. El Vocero de Puerto Rico*, 144 D.P.R. 389, 397 (1997) (énfasis nuestro). Esta causa de acción, concluimos en aquella ocasión, "es evidentemente diferente a la de reclamar daños por cada artículo publicado, en cuyo caso cada uno de ellos constituiría una causa de acción separada". *Id.* Por ende, esta causa de acción requiere de un análisis distinto a la causa de acción por cada publicación, pero deberá contener criterios similares de suerte que se garantice un adecuado balance entre el derecho a la intimidad de la demandante y el derecho a la libertad de expresión del demandado. No podemos atender la controversia ante nosotros mediante un análisis individual de cada artículo, ya que "[l]a acción ante nos es por los daños causados por **el efecto acumulativo** de la *serie* de artículos". *Id.* en la pág. 398 (énfasis nuestro). Ésta requiere de un análisis global de la serie de artículos publicados junto a un análisis según los criterios de una publicación difamatoria.

En nuestro dictamen anterior no discutimos si esta causa de acción requería un análisis distinto a aquellas en que se reclama por cada publicación como causas de acción independientes, pues este asunto no estuvo ante nuestra consideración, y lo cierto es que no nos hemos

expresado sobre cómo se debe probar esta causa de acción. Debido a la clara diferencia entre reclamar por los daños de una publicación y reclamar por el efecto acumulativo de una serie de artículos, ciertamente el análisis no puede ser el mismo. Pasemos entonces a considerar cuáles deben ser estos requisitos.

Para definir lo que constituye **una serie de artículos**—y determinar si constituyen una publicación difamatoria debemos comenzar con lo obvio, qué significa "una serie". La Real Academia Española define el vocablo serie como un "[c]onjunto de cosas que se suceden unas a otras y que están relacionadas entre sí". Real Académica Española, *Diccionario de la lengua española* 2053, T. II (22da ed. 2001). Por lo tanto, una serie de artículos consiste de un conjunto de publicaciones sucesivas relacionadas al mismo tema. En el caso de alegarse que los artículos son difamatorios, la serie debe referirse a la misma persona. En este sentido, para efectos de la causa de acción por difamación, definiremos serie de artículos difamatorios como un conjunto de publicaciones que consiste de tres o más artículos,[72] publicados en fechas distintas, relacionadas al mismo tema y persona, dentro de un periodo de tiempo determinado que refleje un

---

[72] Nos parece razonable definir serie como tres (3) artículos o más, ya que la publicación de una cantidad menor de artículos no presenta un interés de continuidad sobre el tema o la persona sobre quien se publica la información. En estos casos sólo estaría disponible una causa de acción por cada publicación difamatoria.

patrón o consistencia y que en conjunto publican una información falsa, hacen una referencia específica a la parte demandante, son publicados con malicia real y generaron daños.

Ahora bien, esto no quiere decir que cada uno de los artículos tiene que ser difamatorio por sí solo. Por ser la causa de acción dirigida al efecto acumulativo de todos los artículos en conjunto, al evaluar la prueba presentada se debe considerar el efecto que tiene la insistente publicación de información falsa, con grave menosprecio de si era falsa o no. En este sentido, es irrelevante determinar el número de artículos difamatorios, si en efecto todos los artículos publicados vinculan a la demandante continuamente con aquellos artículos que, analizados de forma independiente, son difamatorios. Al ser una causa de acción distinta, los tribunales vienen obligados a evaluar todos los requisitos antes mencionados, pero tomando la serie como un conjunto. De lo contrario, no existiría diferencia alguna entre presentar una reclamación por cada uno de los artículos y presentar la causa de acción reconocida por este Tribunal en etapas anteriores de este caso. *Véase Meléndez v. El Vocero*, 144 D.P.R. 389 (1997).[73] Es

---

[73] En aquella ocasión claramente distinguimos la causa de acción separada por cada artículo publicado de la causa de acción por el efecto acumulativo de una serie de artículos. Con respecto a la figura de prescripción expresamos que: "No puede haber, pues 'prescripción' de alguno de esos artículos porque lo que puede prescribir

evidente que reclamar los daños por los efectos acumulativos de una serie de artículos difiere de reclamar por los daños generados por cada uno de ellos. *Id.* en la pág. 397.

Es necesario aclarar que el efecto de este análisis propuesto no sanciona expresiones protegidas bajo nuestra Constitución o la de Estados Unidos, ya que, probada la malicia real de las publicaciones, el derecho a la libertad expresión no permite la continuidad de la publicación de información falsa. Aquellos artículos que contengan expresiones protegidas no se tomarán en cuenta para el efecto acumulativo, a menos que contengan una referencia específica de continuidad a los artículos difamatorios. De esta forma se salvaguarda el derecho a la libertad de expresión y se limita cualquier efecto de autocensura. *Colón Pérez*, 175 D.P R. en la pág. 703; *Pérez v. El Vocero*, 149 D.P.R. 427, 442 (1999). Por lo tanto, el análisis del efecto acumulativo de una serie de artículos es *sui generis* y consiste en evaluar la serie de artículos publicados en fechas distintas, que se refieren a un mismo tema y persona, en conjunto a los requisitos jurisprudenciales de una publicación difamatoria, excluyendo sólo los artículos que contengan

---

es la causa de acción, **no un elemento de ésta**". *Meléndez v. El Vocero de Puerto Rico*, 144 D.P.R. en la pág. 398 (énfasis nuestro). No podemos evaluar de manera independiente cada uno de los artículos, cuando anteriormente reconocimos que sólo constituyen un elemento de la causa de acción por el efecto acumulativo de una serie.

expresiones protegidas sin la intención de proveerle continuidad a anteriores publicaciones difamatorias.

### III

### A

Apliquemos el marco jurídico expuesto a la controversia ante nosotros. Del expediente del caso se desprende que por veintitrés (23) meses El Vocero publicó, de manera consistente y habitual, cuarenta y tres (43) artículos cuyo tema constante fue la Fiscal Meléndez y las falsas imputaciones de hostigamiento sexual por parte de la señora Marrero. Según se definió anteriormente, nos encontramos ante una serie de artículos difamatorios.

La Fiscal Meléndez trabajó como abogada en el Departamento de Justicia desde que fue admitida a la profesión. Su primer nombramiento como Fiscal Auxiliar ocurrió en 1979, ascendiendo por los distintos niveles jerárquicos del ministerio público hasta recibir en 1991 la designación de Fiscal Especial General.[74] Es este nombramiento que debemos analizar para determinar si es acertado o no denominar a la Fiscal Meléndez como funcionaria pública y aplicar los requisitos de *New York Times v. Sullivan*.

La Ley Orgánica del Departamento de Justicia, Ley Núm. 205 de 9 de agosto de 2004, 3 L.P.R.A. secs. 291-

---

[74] La Fiscal Meléndez fue designada por el entonces gobernador Rafael Hernández Colón.

296f (Ley Núm. 205), establece las funciones y deberes del Secretario de Justicia, de los otros funcionarios y empleados del Departamento y, además, provee la organización interna necesaria para que el Secretario pueda cumplir con sus funciones constitucionales indispensables. Asimismo, la Ley Núm. 205 crea los cargos particulares de Fiscal General de Puerto Rico y Procurador General, con sus respectivos deberes y funciones. 3 L.P.R.A. secs. 293v; 294k. Finalmente, establece las distintas categorías de fiscales y procuradores que componen la mayoría de los empleados del Departamento. Estos últimos, según la Ley Núm. 205, estaban subcategorizados en: Fiscales Especiales Generales, Fiscales de Distrito, Fiscales Auxiliares III, Fiscales Auxiliares II, Fiscales Auxiliares I, Procuradores de Asuntos de Familia y Procuradores de Asuntos de Menores.[75] Todas estas posiciones requieren del nombramiento por el Gobernador o Gobernadora de Puerto Rico con el consejo y consentimiento del Senado. 3 L.P.R.A. sec. 294q. Ciertamente, todos deben ser abogados admitidos a la profesión por el Tribunal Supremo de Puerto Rico y gozar de "buena reputación moral, intelectual y profesional". 3 L.P.R.A. sec. 294s. Sin

---

[75] El Plan de Reorganización Núm. 5 de 2011 sustituyó "Fiscales Especiales Generales" con "Fiscales Auxiliares IV", "Fiscales de Distrito" con "Fiscales Auxiliares" y "Fiscal General" con "Jefe de Fiscales".

embargo, existe diferencia entre los años de experiencia profesional requerida para sus nombramientos.

En el caso de los Fiscales Especiales Generales, Fiscales de Distrito y Fiscales Auxiliares III, se requería por lo menos seis (6) años de experiencia profesional. Los Fiscales Auxiliares III, Procuradores de Asuntos de Menores y de Familia requerían cuatro (4) años de experiencia profesional y los Fiscales Auxiliares I sólo requerían de un (1) año de experiencia.[76] Esta diferencia se sustenta esencialmente en las funciones y deberes particulares reconocidos a los Fiscales Especiales Generales y a los Fiscales de Distrito.

Según la Ley Núm. 205, los Fiscales Especiales Generales tenían:

> [A]demás de los deberes, poderes, obligaciones y autoridad que la ley confiere a los Fiscales de Distrito...los siguientes [deberes y funciones]:
> (a) Supervisar y dirigir las divisiones y unidades especializadas en el área criminal o en cualquier área del Departamento que el Secretario determine.
> (b) Investigar los asuntos penales, civiles y administrativos que el Secretario o el Fiscal General le encomiende y representar a estos funcionarios ante las agencias gubernamentales en la vista de cualquier causa.

---

[76] Con las enmiendas del Plan de Reorganización Núm. 5 de 2011 los años de experiencia profesional requeridos son los siguientes: Fiscal de Distrito: Diez (10) años de experiencia profesional; Fiscal Auxiliar IV: Ocho (8) años de experiencia profesional; Fiscal Auxiliar III: Seis (6) años de experiencia profesional; Fiscal Auxiliar II: cuatro (4) años de experiencia profesional; Fiscal Auxiliar I: Dos (2) años de experiencia profesional; Procuradores de Asuntos de Menores y Procuradores de Asuntos de Familia: Cuatro (4) años de experiencia profesional. 3 L.P.R.A. sec. 2942s.

(c) Actuar como representante del Pueblo de Puerto Rico, en cualquier caso penal o civil en el Tribunal de Primera Instancia.

3 L.P.R.A. sec. 294z.[77]

Como puede apreciarse, al redactar la Ley Núm. 205 el legislador estableció una diferenciación marcada entre los requisitos, deberes y funciones del Secretario o la Secretaria de Justicia, el Procurador o la Procuradora General, el o la Fiscal General, los o las Fiscales de Distrito y los y las Fiscales Especiales Generales y los demás fiscales.[78] En particular, se le encomendó a los Fiscales Especiales Generales "supervisar y dirigir" divisiones y unidades especializadas del Departamento de Justicia. Evidentemente, estos deberes adicionales al

---

[77] El artículo 75 de la Ley establece que las funciones y deberes de Fiscal de Distrito son las siguientes:

(a) Supervisar el personal adscrito a la fiscalía.

(b) Asignar los casos e investigaciones correspondientes entre los fiscales bajo su supervisión.

(c) Velar porque los asuntos propios de la fiscalía se conduzca de manera eficiente y expedita.

(d) Recomendar al Fiscal General y al Secretario cualquier movimiento del personal adscrito que se estime propio hacer, así como solicitar recursos adicionales que se entiendan necesarios para el mejor funcionamiento de la fiscalía.

(e) Realizar las funciones y deberes ordinarios de fiscal y cualquier otra tarea o encomienda que tenga a bien asignarle el Fiscal General o el Secretario.

3 L.P.R.A. 295

[78] Fiscales Auxiliares III, II y I; Procurador de Menores y Procurador de Familia.

cargo de Fiscal Especial General incentivan a un "escrutinio público y la discusión de la persona que lo ocupe". *Soc. de Gananciales*, 116 D.P.R. en la pág. 116. Por lo tanto, la clasificación de funcionario público, en el caso del Departamento de Justicia incluye a los siguientes funcionarios: Secretario o Secretaria de Justicia, Procurador o Procuradora General, Fiscal General, Fiscales de Distrito y Fiscales Especiales Generales. En el caso ante nosotros, al momento de los hechos la Fiscal Meléndez poseía un nombramiento de Fiscal Especial General, encargada de dirigir el C.M.I.D., con la consecuencia de ser clasificada como funcionaria pública y, por lo tanto con una protección limitada frente a publicaciones difamatorias.[79]

**B**

Determinada su clasificación como funcionaria pública, procede analizar si la información difamatoria es falsa, si se publicó con malicia real y si le causó daños reales a la demandante.

En este aspecto concurro con el análisis de la Opinión del Tribunal. Del examen independiente del expediente en el caso ante nosotros surge la falsedad de

---

[79] Esta clasificación la reconocemos y "*la hacemos con pleno conocimiento de sus consecuencias*". Según reconocimos en *Cabrero v. Zayas*, "*la discusión en los medios de nuestro país, no menos que en sus cafetines, hogares y foros afines, puede ser cruel en demasía. Tal es el precio de la igualdad y la libertad política, valores que subyacen la normativa constitucional en materia de difamación*". *Cabrero v. Zayas*, 167 D.P.R. en la pág. 788

la información publicada y contiene evidencia clara y convincente de la existencia de malicia real por parte de la señora Marrero y El Vocero. No es necesario repetir la prueba testimonial y la serie de contradicciones que llevaron al Tribunal de Primera Instancia a determinar que "la señora Marrero tenía 'un plan concertado de hacer todo lo posible por mancillar y desacreditar la reputación de la [f]iscal Meléndez'". Opinión del Tribunal, en la pág. 63. Esta determinación fue confirmada por el Tribunal de Apelaciones que resaltó que la señora Marrero "publicó sus imputaciones de hostigamiento sexual a sabiendas de su falsedad". *Id.* en la pág. 64. De la misma manera, concurro con la exposición y determinación de la Opinión del Tribunal con respecto a las publicaciones de la prensa. El expediente de este caso muestra que "había[] indicaciones suficientes para dudar de la veracidad de [la] informante principal" de la prensa. *Id.* en la pág. 82. Además, como se resalta la Opinión del Tribunal:

> [E]n el caso de autos ni siquiera se le dio la oportunidad a la licenciada Meléndez de ofrecer su versión de los hechos a la prensa. Esto tiende a indicar que no sólo hubo una falta de investigación adecuada, sino que la prensa quería evitar enterarse de información que la pondría en una posición comprometedora.

*Id.* en la pág. 86.

Cabe resaltar, que la Fiscal Meléndez probó la existencia de malicia real por parte de la prensa, "no sólo en cuanto al primer artículo, **sino a través del**

**tiempo que se prolongó la serie aquí reclamada**". *Id.* (énfasis nuestro).

## C

Con respecto al requisito constitucional de referencia específica, un análisis integral de los cuarenta y tres (43) artículos publicados por El Vocero nos lleva a concluir que la serie de artículos publicados se refieren constantemente a la demandante. El elemento constante de la serie de artículos publicados es la controversia generada alrededor de unas imputaciones falsas de hostigamiento sexual. En vista de que la causa de acción presentada por la Fiscal Meléndez está dirigida a los daños generados por el efecto acumulativo de la serie de artículos, el requisito de referencia específica debe satisfacerse con los artículos analizados en conjunto.

Evaluados los artículos contenidos en el expediente, encontramos que en todos y cada uno de los artículos que componen la serie de publicaciones del periódico El Vocero se hace referencia específica al nombre de la Fiscal Meléndez.[80] Por otro lado, una mayoría de las

---

[80] Según hemos reconocido anteriormente, el requisito de referencia específica no exige que la publicación difamatoria haga mención directa al nombre de la persona que presenta su causa de acción. Más bien, existe referencia específica cuando una publicación difamatoria "identifica específicamente al sujeto demandante cuando la audiencia o los receptores, correcta o erróneamente, pero

publicaciones contiene como parte de su titular, y resaltadas en letras engrandecidas, las palabras: acoso sexual, hostigamiento o caso hostigamiento, aun cuando su contenido se refería a aspectos procesales de la investigación o procedimientos judiciales.  La única intención que se puede inferir del uso continuo de estas palabras en los artículos que hacen referencia a la Fiscal Meléndez era mantener vivo el vínculo entre ésta y las falsas acusaciones de hostigamiento.  Finalmente, en el periodo de veintitrés (23) meses en que se publicó la serie de artículos, El Vocero incluyo la fotografía de la Fiscal Meléndez en ocho (8) ocasiones, con clara intención de mantener relacionada a la demandante con los hechos e imputaciones de hostigamiento publicados en la serie de artículos.

Por lo tanto, existe una clara referencia específica a la demandante durante todo el periodo de publicación de la serie de artículos en controversia.

## IV

### A

Nos resta analizar los daños concedidos a la Fiscal Meléndez, reducidos por la Opinión del Tribunal. Reiteradamente hemos expresado que "los foros apelativos no debe[mos] intervenir con la apreciación de la prueba y la determinación de daños que realice un tribunal de instancia, salvo que ésta sea exageradamente alta o razonablemente, así lo comprenden". *Colón Pérez v. Televicentro de P.R.*, 175 D.P.R. 690, 722 n.28.

ridículamente baja". *Rodríguez Ramos v. Hospital Dr. Susoni Inc.*, 2012 T.S.P.R. 150, en la pág. 23, 186 D.P.R. ___ (2012) (Rodríguez Rodríguez, J., Op. Concurrente y Disidente). Sin embargo, hoy una mayoría de este Tribunal ignora las determinaciones del tribunal de instancia, y sin ofrecer mayor explicación en cuanto a su metodología, reduce sustancialmente los daños concedidos.

El juez de instancia fundamentó su determinación de los daños otorgados basándose en la práctica doctrinal de "utilizar como guía o punto de partida las sumas concedidas... en casos similares". Sentencia del Tribunal de Primera Instancia, en la pág. 95 (citando a *Vázquez v. Woolworth & Co.*, 143 D.P.R. 76 (1997). Esta práctica ha sido reiterada en innumerables ocasiones, incluso tan reciente como el pasado mes de octubre en *Rodríguez v. Hospital Dr. Susoni Inc.*, 2012 T.S.P.R. 150 en la pág. 11. (Opinión del Tribunal). Sin embargo, para una mayoría de este Tribunal hoy esta práctica parece insuficiente.

El juez sentenciador utilizó como guía tres casos similares para comenzar su análisis al valorizar los daños ocasionados a la Fiscal Meléndez. La similitud de los casos presentados con el caso ante nosotros consiste en que éstos fueron procedimientos en los que se les concedió indemnización a miembros de la profesión legal una vez probada la causa de acción por libelo. Ciertamente, este Tribunal nunca había resuelto una

controversia donde se satisficieran todos los requisitos de una causa de acción de libelo bajo los criterios de *New York Times v. Sullivan*, por lo tanto no existe un precedente puntual con respecto a la valorización de daños. Pero esto no quiere decir que debemos ignorar indemnizaciones avaladas por este Tribunal en controversias que tengan características similares. El examinar cuantías concedidas en casos anteriores, "[a]demás de constituir un punto de partida...reduce el margen de arbitrariedad implícito en la valorización de un daño no pecuniario". *Id.* en la pág. 23 (Rodríguez Rodríguez, J., Op. Concurrente y Disidente).

Según resolvimos en *Herrera, Rivera v. S.L.G Ramírez-Vicéns*, 179 D.P.R. 774 (2009), una vez se identifican casos anteriores similares y las cuantías concedidas, lo que procede es ajustarlas a su valor presente. *Rodríguez v. Hospital Dr. Susoni Inc.*, 2012 T.S.P.R. 150, en la pág. 23, 186 D.P.R. ___ (2012) (Rodríguez Rodríguez, J., Op. Concurrente y Disidente). En *Rodríguez v. Hospital Dr. Susoni Inc.* una mayoría de este Tribunal decidió alterar el análisis originalmente adoptado por esta Curia en *Herrera, Rivera* y formular uno distinto. A pesar de disentir por el cambio de metodología adoptado,[81] procede que analicemos los hechos en este caso conforme a lo que la mayoría dictaminó en

---

[81] Véase *Rodríguez v. Hospital Dr. Susoni Inc.*, 2012 T.S.P.R. 150, 186 D.P.R. ___ (2012) (Rodríguez Rodríguez, J., Op. Concurrente y Disidente).

*Rodríguez v. Hospital Dr. Susoni Inc.* Así, una vez se realizan los "cálculos, la cuantía resultante debe ser analizada a la luz de las circunstancias particulares del caso considerado ante el Tribunal". *Herrera,* Rivera, 179 D.P.R. en la pág. 786. Sólo se debe intervenir "con la indemnización concedida...cuando, tomando en cuenta las concesiones por daños en casos similares anteriores actualizadas al momento de la sentencia, y a la luz de las circunstancias particulares del caso ante la consideración del Tribunal, la cuantía concedida se desvía manifiestamente de lo que sería una indemnización razonable por ser 'ridículamente baja o exageradamente alta'". *Id.* en las págs. 786-787.

Veamos el análisis del tribunal primario. El juez de instancia identificó tres casos donde se concedía cierta indemnización en casos de libelo a miembros de la profesión legal. Los casos son: *Benet v. Hernández*, 22 D.P.R. 494 (1915); *Rivera v. Martínez*, 26 D.P.R. 760 (1918) y *Franco v. Martínez*, 29 D.P.R. 237 (1921). En promedio, la compensación otorgada en los casos fue de $3,333.00. Utilizando la fórmula propuesta por el tratadista Amadeo Murga en su obra *El Valor de los Daños en la Responsabilidad Civil*, esta compensación tendría un valor, a diciembre de 2003, de $172,075.00.[82]

---

[82] El cómputo llevado a cabo por el juez de instancia fue el siguiente:

Una vez actualizada la compensación de casos similares, el juez de instancia procedió a resaltar características del caso ante su consideración, según la evidencia presentada, que justifican aumentar considerablemente la compensación. Expuso el juez que "[e]n el caso de autos debemos considerar las circunstancias particulares tales como, el número de publicaciones realizadas por el periódico (43), **el efecto cumulativo** que éstas tuvieron en la mente y la conciencia de la víctima (efecto sicológico), la duración o tiempo de las publicaciones," entre otros factores. Sentencia del Tribunal de Primera Instancia, en la pág. 99 (énfasis nuestro). Además, reconoció que se tienen que "valorar separadamente los daños a la reputación del daño por

---

Fórmula:  $3,333 x 7.40 = $24,664.00

$24,664 ÷ .43 = $57,358.00

$57,358 x 300 = $172,075.00

Donde: $3,333.00 = al promedio de las compensaciones otorgadas en casos similares durante los años 1915, 1918 y 1921.

7.40 = al promedio del valor adquisitivo del dólar durante los años 1915, 1918 y 1921.

.43 = al poder adquisitivo del dólar a diciembre del año 2003.

300 = al % de aumento del nivel de vida en el año base 1940.

Sentencia del Tribunal de Primera Instancia, en la pág. 98 n. 144.

angustias mentales lo que implica una mayor compensación de daños en general".[83] *Id.*

Con esto en mente, el juez valoró los daños causados por la primera publicación en $515,000.00. Con respecto al efecto acumulativo de las otras cuarenta y dos (42) publicaciones, concedió $1,050,000.00 y finalmente valoró los daños causados a la reputación de la Fiscal Meléndez en $250,000.00, para una totalidad de daños de $1,815,000.00. *Id.*

Esta valorización de los daños fue confirmada por el Tribunal de Apelaciones luego de estudiar la evidencia presentada durante el juicio por la Fiscal Meléndez. Luego de destacar ciertas partes del testimonio, el tribunal concluyó que "los apelantes no han traído a la atención de este Tribunal **circunstancia alguna** que evidencie que el foro apelado fue arbitrario y trasgredió los límites de su función de estimar el valor de la compensación a la que vienen obligados los apelantes".[84]

---

[83] Nos dice el tratadista Amadeo-Murga que:

> Los daños a la reputación son una partida de daño moral separada de los de las angustias mentales en los casos en que esta pérdida tiene lugar y hay prueba de la misma. Se compensa la pérdida de la estimación por parte de otros lo que es distinto y separado de nuestra propia reacción y sufrimiento ante la difamación o el libelo y aun ante la pérdida de la estimación por parte de otros.

Antonio J. Amadeo-Murga, *El valor de los daños en la responsabilidad* civil 181 (2da ed. 2012).

[84] El panel de Tribunal de Apelaciones estuvo integrado por: la Jueza Rodríguez Oronoz, como Jueza Ponente; la

Sentencia del Tribunal de Apelaciones, en la pág. 59. (énfasis nuestro).

Tomando en consideración que la demandante en este caso presentó su causa de acción dirigida a pedir indemnización por los efectos acumulativos de todas las publicaciones en conjunto, no se debe otorgar la partida de daños concedida por la primera publicación. Por otro lado, considerando que el juez de instancia siguió la práctica doctrinaria para valorar los daños ocasionados a la Fiscal Meléndez, ciertamente una tarea "difícil y angustiosa, debido a que no existe un sistema de computación que permita llegar a un resultado exacto", *Rodríguez v. Hospital Dr. Susoni Inc.*, 2012 T.S.P.R. 150, en la pág. 23 (Rodríguez Rodríguez, J., Op. Concurrente y Disidente), no debemos intervenir con la discreción, razonabilidad y apreciación de la prueba de quien tiene "un vínculo más cercano con la prueba testifical del caso y todos los componentes que lo rodean". *Id.* Por lo tanto, eliminaría la compensación concedida por los daños de la primera publicación y sólo ajustaría la compensación por el efecto acumulativo de la serie de publicaciones para que considere la primera publicación dentro de la misma.

Ahora bien, han transcurrido nueve (9) años desde que el Tribunal de Primera Instancia emitió la sentencia en la que declaró con lugar la causa de acción de la

Jueza Bajandas Vélez y la actual Jueza Asociada del Tribunal Supremo señora Pabón Charneco.

demandante. Ante la arbitraria reducción de la valorización de los daños por parte de una mayoría de este Tribunal, es necesario hacer un análisis de actualización en la valorización de los daños al año corriente para mostrar la categórica subvaloración de los daños sufridos por la funcionaria pública.

Utilizando los tres casos similares señalados por el Tribunal de Primera Instancia, los valores actualizados[85] de cada uno, según la fórmula establecida por una mayoría de este Tribunal en *Rodríguez v. Hospital*, son: $22,758.62,[86] $22,862.06,[87] y $32,592.72[88] respectivamente. En promedio se otorgó $26,071.33 en daños por un sólo

---

[85] Debido a la falta de estadísticas sobre Puerto Rico para los años anteriores al 1941, hemos decidido utilizar el valor del poder adquisitivo del dólar del consumidor en Estados Unidos para calcular la actualización. Reconocemos que el valor del poder adquisitivo del dólar del consumidor en Puerto Rico para los mismos años podría variar. Sin embargo ante la falta de una fuente confiable de estadística para esos años, preferimos utilizar un dato comparable. Por otro lado, decidimos utilizar el valor del poder adquisitivo del dólar para el año 2012 en el ajuste por inflación por ser el último año natural del que se posee estadística revisada.

[86] *Benet v. Hernández*, 22 D.P.R. 494 (1915). El valor adquisitivo del dólar para el 1915 es $9.90, que se multiplican por los $2,000.00 que se otorgaron como compensación para luego dividirlo entre $0.87. Este ajuste por inflación representa la cifra de $22,758.62.

[87] *Rivera v. Martínez*, 26 D.P.R. 760 (1918). El valor adquisitivo del dólar para el 1918 es $6.63, que se multiplican por los $3,000.00 que se otorgaron como compensación para luego dividirlo entre $0.87. Este ajuste por inflación representa la cifra de $22,862.06.

[88] *Franco v. Martínez*, 29 D.P.R. 237 (1921). El valor adquisitivo del dólar para el 1921 es $5.67, que se multiplican por los $5,001.00 que se otorgaron como compensación para luego dividirlo entre $0.87. Este ajuste por inflación representa la cifra de $32,592.72.

acto de difamación, y en sólo uno de los casos por una publicación en un periódico. Por lo tanto, el efecto negativo en la conciencia de la víctima y su reputación ciertamente eran menores a los acaecidos en el caso ante nosotros.

Vista la marcada diferencia con respecto al número de publicaciones, el tiempo de duración de la actuación difamatoria y el hecho de que en este caso hubo más de una actuación difamatoria, la cantidad anterior debe ser aumentada considerablemente. La prueba presentada y creída tanto por el Tribunal de Primera Instancia como por el Tribunal de Apelaciones demuestra los daños que le causaron las publicaciones a la Fiscal Meléndez tanto en su vida personal y familiar, como profesional. Según concluye el Tribunal de Apelaciones, "el foro sentenciador tuvo ante sí la prueba testimonial necesaria sobre el efecto traumático que causó en la Lcda. Meléndez toda esa experiencia". Sentencia del Tribunal de Apelaciones, en la pág. 57.

Tomando en cuenta las indemnizaciones actualizadas en casos similares y la causa de acción presentada por la Fiscal Meléndez, procede otorgar una cantidad que refleje el valor de los daños por el efecto acumulativo de la publicación de cuarenta y tres (43) artículos de periódico, algunos con retrato de la demandante, otros en portada y todos con referencia constante a las falsas acusaciones por hostigamiento sexual. Vista la cantidad

otorgada por el Tribunal de Primera Instancia y reconociendo que tal foro se encuentra en una mejor posición para aquilatar el testimonio presentado, considero que al eliminar la cantidad otorgada por sólo el primer artículo difamatorio e integrarlo al análisis del efecto acumulativo de la serie, se deben valorizar los daños en no menos de $1,100,000.00.

En el pasado, vimos que se ha otorgado en promedio $26,071.33 por un acto difamatorio probado ante un Tribunal. En este caso hubo constantes actuaciones difamatorias, incluyendo cuarenta y tres (43) publicaciones en un periodo de veintitrés (23) meses en un periódico de circulación general en Puerto Rico. Sin llevar a cabo un análisis individual de cada una de las publicaciones, podríamos equiparar cada publicación a una actuación difamatoria por mantener la continuidad de la publicación de información falsa. Si dividimos la cantidad de $1,100,000.00 entre esas cuarenta y tres (43) publicaciones, en promedio cada publicación, generó un daño de $25,581.40. Por lo tanto, en comparación con la valorización de los daños otorgados en el pasado por este Tribunal una vez probada una actuación difamatoria, vemos que el valor del daño por efecto acumulativo que proponemos otorgar es jurídicamente y metodológicamente razonable. Aplicando este análisis, reducimos los márgenes de arbitrariedad que genera la reducción sin discusión de la Opinión del Tribunal.

**B**

Por otro lado, una mayoría del Tribunal decide dejar sin efecto la decisión del Tribunal de Primera Instancia de conceder honorarios de abogados luego de determinar que la parte demandada actuó con temeridad en la litigación del caso. Como resalta la Opinión del Tribunal, la Regla 44.1(d) de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 44.1(d) (2001), dispone para la otorgación de estos honorarios en aquel procedimiento donde "una parte haya procedido con temeridad o frivolidad durante el trámite judicial". Opinión del Tribunal, en la pág. 114. Por otro lado, "hemos indicado que un litigante actúa con temeridad cuando con 'terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconvenientes de un pleito'". *Flores Berger v. Colberg y otros*, 173 D.P.R. 843, 866 (2008). Igualmente, "la determinación de temeridad es de **índole discrecional**, por lo que sólo debemos intervenir con ella cuando nos enfrentemos a un caso de abuso de discreción". *Id. Colón Santos v. Coop. Seg. Mult. P.R.*, 173 D.P.R. 170 (2008); *P.R. Oil v. Dayco*, 164 D.P.R. 486 (2005).

Incluso, este Tribunal reconoció en *Blas v. Hospital Guadalupe*, varias de las situaciones en las que existe temeridad, a saber:

(1) contestar una demanda y negar responsabilidad total, aunque se acepte posteriormente; (2) defenderse injustificadamente de la acción; (3) creer que la cantidad reclamada es exagerada y que sea esa la única razón que se tiene para oponerse a las peticiones del demandante sin admitir francamente su responsabilidad, pudiendo limitar la controversia a la fijación de la cuantía a ser concedida; (4) arriesgarse a litigar un caso del que se desprendía prima facie su responsabilidad, y (5) negar un hecho que le conste es cierto a quien hace la alegación.

*Blas v. Hospital Guadalupe*, 146 D.P.R. 267, 335-336 (1998).

Discutido el derecho, considero inapropiada la intervención de este Tribunal con la discreción del foro de instancia. El Tribunal de Primera Instancia, al determinar que hubo actuación temeraria por la parte demandante, justificó su conclusión en que "los demandados incurrieron en conducta o actuación obstinada, contumaz, temeraria o frívola **al radicar una serie de mociones y recursos cuya improcedencia era clara, [y] cuyo propósito fue dilatar los procedimientos**". Sentencia del Tribunal de Primera Instancia, en la pág. 102. (énfasis nuestro). Ciertamente este Tribunal ha reconocido que no procede la determinación de temeridad "cuando lo que se plantea ante el tribunal de instancia son planteamientos complejos y novedosos que no han sido resueltos en nuestra jurisdicción". *Santiago v. Sup. Grande*, 166 D.P.R. 796, 821 (2006). Pero esa no es la situación en este caso. La doctrina y el requisito de malicia real establecida en *New York Times v. Sullivan*

fue adoptada por este Tribunal desde *Torres Silva*, 106 D.P.R. 415 (1977), por lo tanto no nos encontramos ante una controversia novedosa no resuelta.

Reconociendo la discreción del Tribunal de Primera Instancia y ante falta de prueba sobre abuso de discreción por ese foro, no procede la eliminación de honorarios de abogado impuestos por temeridad.

**C**

Finalmente, el procedimiento legal que genera la Opinión que hoy emite este Tribunal comenzó hace más de veinte años. A todas luces, refleja una contravención al principio inmerso en nuestras Reglas de Procedimiento Civil de garantizar "una solución justa, **rápida y económica** en todo procedimiento". Regla 1 de las de Procedimiento Civil, 32 L.P.R.A. Ap. V, R.1 (énfasis nuestro). Como si la ardua, extensa y tortuosa litigación junto a los años de espera por un resultado favorable fuera poco, hoy una mayoría de este Tribunal, aunque resuelve que tanto la señora Martha Marrero de Ramos y la prensa difamaron la buena reputación de la fiscal Iris Meléndez Vega con imputaciones falsas de alegados hechos de hostigamiento sexual, reduce los daños concedidos sin mucha explicación y descartando el análisis llevado a cabo por el Tribunal de Primera Instancia. Anticipando el cuestionamiento de la reducción, nos alerta que no debemos preocuparnos ya que "el monto de la Sentencia a ser satisfecha aumentará aún

más"[89] por los intereses postsentencia. Regla 44.3(a) de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 44.3. Esto, sin embargo, no justifica la reducción de los daños sufridos en este caso.

La imposición de intereses a partir del dictamen de una sentencia que ordene el pago de dinero es parte de la política pública establecida por nuestro ordenamiento jurídico desde principios de siglo. Más aún, este Tribunal constantemente ha dicho "que estos intereses forman parte integrante de la sentencia dictada y que pueden ser recobrados aun cuando no se mencionen en la misma". *Municipio de Mayagüez v. Rivera*, 113 D.P.R. 467, 469 (1982). Aún más reciente, interpretando la Regla 44.3, expresamos que es "mandatorio que un tribunal, al dictar sentencia en la que ordena la entrega de dinero, imponga el pago de interés al tipo legal sobre la cuantía de la sentencia, sin excepción de clase alguna". *Vélez Cortés v. Baxter* 179 D.P.R. 455, 480 (Rodríguez Rodríguez, J., Op. Conformidad). Por tanto, es irrelevante para la valorización de los daños ocasionados a la demandante si la cuantía que en su día pueda recobrar aumenta o no por los intereses postsentencia.

## V

En fin, concurro con la determinación de la Opinión del Tribunal con respecto a las controversias sobre la sustitución del juez de primera instancia, la

---

[89] Opinión del Tribunal, en la pág. 114 n. 66.

responsabilidad del licenciado Héctor Santiago Rivera y la conclusión de que en este caso se probó la difamación de la Fiscal Meléndez por parte de los demandados con malicia real. Además, concurro con la determinación de que el análisis que se tiene que llevar a cabo cuando se presente una causa de acción por el efecto acumulativo de una serie de publicaciones difamatorias, las publicaciones tienen que estudiarse en conjunto y no de manera individualizada.

Ahora bien, disiento de la disminución arbitraria en más de cinco veces la cuantía otorgada por el Tribunal de Primera Instancia sin mayor discusión y la eliminación de los honorarios de abogado por temeridad. Como se puede apreciar de los cómputos presentados anteriormente, al actualizar las indemnizaciones otorgadas en los casos similares resaltados al valor del dólar para el año 2012, la cantidad a otorgarse aún sería inferior a la otorgada por el Tribunal de Primera Instancia en el 2004. La reducción de los daños a la suma de $350,000.00[90] que confiere una mayoría de este Tribunal no es más que un vilipendio a los daños sufridos por la demandante por las actuaciones mal intencionadas, poco profesionales e

---

[90] Si valoramos que los daños otorgados por la mayoría son los que debieron otorgarse al emitirse la sentencia del Tribunal de Primera Instancia en el 2004, entonces, al menos, debería actualizarse al valor del dólar al día de hoy. El valor adquisitivo del dólar para el 2004 es $1.13, que se multiplican por los $350,000.00 otorgados por la mayoría de este Tribunal como compensación para luego dividirlo entre $0.87. Este ajuste por inflación representa la cifra de $454,597.70.

insolentes de los demandados en este caso. Por lo tanto, lo que procede es tomar en consideración los precedentes de indemnizaciones por difamación a miembros de la profesión legal, atemperarlos por inflación y evaluar el efecto acumulativo del daño generado a la demandante. Por consiguiente, eliminaría los daños otorgados por el foro de instancia por la primera publicación y lo integraría al análisis del efecto de la serie, otorgando una suma total de $1,100,000.00 con respecto al efecto acumulativo de las publicaciones. Igualmente, confirmaría la cuantía de $250,000.00 otorgada por los daños causados a la reputación de la demandante. Finalmente, procede confirmar al Tribunal de Apelaciones en su determinación de que no se probó abuso de discreción por parte del foro primario al momento de conceder los honorarios por temeridad y conceder los intereses postsentencia desde la presentación de la demanda.


                                        Anabelle Rodríguez Rodríguez
                                                Juez Asociada